1   Michael L. Rodenbaugh (SBN 179059)
    RODENBAUGH LAW
2   548 Market Street, Box 55819
    San Francisco, CA 94104
3   Phone: (415) 738-8087
    Email:  mike@rodenbaugh.com
4   docket@rodenbaugh.com

5   David E. Weslow (admitted *pro hac vice*)
    Adrienne J. Kosak (admitted *pro hac vice*)
6   WILEY REIN LLP
    2050 M Street NW
7   Washington, DC 20036
    Telephone: (202) 719-7000
8   Facsimile: (202) 719-7049
    dweslow@wiley.law
9   akosak@wiley.law

10  Attorneys for Defendant IMPOSSIBLE LLC and
    JOEL RUNYON
11

12

13                  UNITED STATES DISTRICT COURT

14          FOR THE NORTHERN DISTRICT OF CALIFORNIA

15                       SAN JOSE DIVISION

16  IMPOSSIBLE FOODS INC.,          )   Case No. 5:21-cv-02419-BLF
                                    )   (SVK)
        Plaintiff,                  )
17                                  )   Judge: Hon. Beth Labson Freeman
        v.                          )
18                                  )   **DEFENDANT IMPOSSIBLE
    IMPOSSIBLE LLC,                 )   LLC'S ANSWER AND
19                                  )   COUNTERCLAIMS TO
        Defendant.                  )   SECOND AMENDED
20                                  )   COMPLAINT**
                                    )
21                                  )   **DEMAND FOR JURY TRIAL**
                                    )
22  ─────────────────────────────

23      Defendants Impossible LLC and Joel Runyon, by and through their undersigned counsel,

24  hereby answers the Second Amended Complaint filed in this action by Plaintiff Impossible

25  Foods, Inc, alleges affirmative defenses, and states counterclaims as follows.

26                       **THE PARTIES**

27      1.      Plaintiff Impossible Foods is a Delaware corporation with its principal place of

28  business at 400 Saginaw Drive, Redwood City, California. Impossible Foods develops and

distributes plant-based substitutes for meat products.

**ANSWER:** Defendants are without information sufficient to confirm or deny this allegation, and therefore this paragraph is denied.

2.      Impossible LLC ("ILLC") is a Texas limited liability company with a principal place of business at 402 West Johanna St., Austin, Texas 78704. On January 1, 2021, ILLC merged with Impossible X LLC, an Illinois limited liability company with its principal place of business at 1231 Champion Forest Court, Wheaton, Illinois 60187 ("XLLC"). As a consequence of that merger, ILLC acquired, among other things, any trademark rights owned by XLLC, as well as any liabilities. ILLC, and its predecessors in interest, including XLLC, are collectively referred to as "Company Defendant."

**ANSWER:** Defendants admit that Impossible LLC is a Texas limited liability company with a former principal place of business at 402 West Johanna St., Austin, Texas 78704, that Impossible LLC previously merged with Impossible X LLC, and that it is the owner of all trademark rights and associated goodwill previously owned by Impossible X LLC. To the extent not expressly admitted, the allegations in this paragraph are denied.

3.      On information and belief, ILLC is solely owned and operated by XLLC founder Joel Runyon, and has no other members, employees, or outside investors, and no manufacturing or production facilities. On information and belief, Mr. Runyon resides in Austin, Texas and maintains an address at 402 West Johanna St., Austin, Texas 78704. Joel Runyon and Company Defendant are collectively referred to as "Defendants."

**ANSWER:** Defendants admit that Joel Runyon is the sole member of Impossible LLC, that there are no employees or outside investors, and that Mr. Runyon resides at 402 West Johanna St., Austin, Texas 78704. To the extent not expressly admitted, the allegations in this paragraph are denied.

4.      ILLC states that its mission is to help consumers "push their limits and do something impossible." ILLC offers motivational blog and video content and information relating to exercise and fitness through its multiple websites, in addition to a small offering of apparel. ILLC also claims to offer search engine optimization ("SEO") services and marketing

consulting in the field of social media. Impossible Foods recently learned that ILLC also offers sleep and energy powders and that, upon information and belief, ILLC will offer for sale additional edible products bearing IMPOSSIBLE branding.

**ANSWER:** Defendants admit that Impossible LLC offers, among many fitness- and health-related goods and services, fitness blogging and video content; information relating to exercise, fitness, and nutrition; apparel; nutritional supplement products; and SEO and marketing services. To the extent not expressly admitted, the allegations in this paragraph are denied.

5.    Impossible Foods brings this action to protect its valuable and well-known IMPOSSIBLE marks against threats and overt opposition by Defendants. Impossible Foods currently owns federally-registered trademark rights in numerous IMPOSSIBLE-formative marks, including:

| MARK | REG. NO. | DATE OF FIRST USE | FILING DATE/ REG. DATE | GOODS AND SERVICES |
|---|---|---|---|---|
| IMPOSSIBLE | 5459255 | Oct 29, 2015 | Oct 25, 2013 / May 1, 2018 | Substitutes for foods made from animals or animal products, namely, vegetable-based burger patties; meat substitutes |
| IMPOSSIBLE | 7179385 | Oct 29, 2015 | Apr 19, 2022 / Oct 3, 2023 | Meat substitutes; plant-based meat substitutes; plant-based meat patties; vegan and vegetarian meat substitutes; plant-based chicken substitutes; poultry substitutes; plant-based poultry substitutes |
| IMPOSSIBLE | 98042164 | Oct 29, 2015 | Jun 14, 2023 / May 28, 2024 | Meat substitutes; plant-based meat substitutes; vegan and vegetarian meat substitutes; plant-based meat patties; plant-based ground meat; chicken substitutes; poultry substitutes; pork substitutes; plant-based meatballs; plant-based sausage; prepared meals consisting primarily of plant- |

| | | | | based meat; frozen meals consisting primarily of plant-based meat |
|---|---|---|---|---|
| IMPOSSIBLE BURGER | 6211591 | Jul 2016 | May 16, 2018 / Dec 1, 2020 | Substitutes for food, namely, plant-based meat substitutes |
| IMPOSSIBLE | 7249916 | Oct 12, 2016 | May 13, 2021 / Dec. 19, 2023 | Restaurant services; café services, cafeterias, snack bar services, and the provision of food in restaurants and cafes; catering services for meals |
| IMPOSSIBLE | 5370337 | Nov 3, 2016 | My 20, 2014 / Jan 2, 2018 | Providing food and drink via mobile truck |

True and correct copies of Impossible Foods's Certificates of Registration for its IMPOSSIBLE-formative marks are attached collectively as Exhibit A. The registrations in the foregoing table are collectively referred to as "Plaintiff's Registrations," and the marks underlying those registrations are collectively referred to as "Plaintiff's Marks."

**ANSWER:** The articulation of Plaintiff's trademark registrations in this paragraph does not match with the public records of the U.S. Patent and Trademark Office, and this paragraph is denied.

6.     Over almost a decade, Impossible Foods has invested millions of dollars in building and promoting its IMPOSSIBLE trademarks. Impossible Foods's IMPOSSIBLE-branded products are widely available at restaurants and grocery retailers across the United States.

1      **ANSWER:** Defendants are without information sufficient to confirm or deny this

2    allegation, and therefore this paragraph is denied.

3      7.    Company Defendant nonetheless has (1) asserted that it has superior rights based

4    on its purported use of an IMPOSSIBLE mark for, inter alia, search engine optimization and

5    clothing; (2) accused Impossible Foods of trademark infringement; and (3) initiated a proceeding

6    at the United States Patent and Trademark Office ("USPTO") opposing Impossible Foods's

7    federal trademark application for the mark IMPOSSIBLE for: "Providing information about

8    recipes, ingredients and cooking information; providing an online computer database to

9    consumers featuring information about recipes, ingredients and cooking information."

10     **ANSWER:** Defendants admit that Impossible LLC's predecessor-in-interest to its

11    trademark rights initiated a trademark opposition proceeding relating to Plaintiff's intent-to-use

12    trademark application for IMPOSSIBLE directed to "Providing information about recipes,

13    ingredients and cooking information; providing an online computer database to consumers

14    featuring information about recipes, ingredients and cooking information," and that it send a

15    letter to counsel for Plaintiff in November 2020 seeking an amicable resolution to Plaintiff's

16    expanding use of its mark that encroached upon Impossible LLC's longstanding trademark

17    rights. To the extent not expressly admitted, the remaining allegations of this paragraph are

18    denied.

19     8.    Accordingly, Impossible Foods seeks a declaration that its use and registration of

20    the trademark IMPOSSIBLE in connection with recipes, food ingredients, and cooking

21    information do not, and will not, infringe upon, or otherwise violate any of Company

22    Defendant's valid trademark rights.

23     **ANSWER:** Defendants admit that this action was initially brought under the Declaratory

24    Judgment Act, regarding the likelihood of confusion between the parties' respective marks.

25    Except as expressly admitted, the allegations in this paragraph are denied.

26     9.    Impossible Foods also asserts claims for trademark infringement and unfair

27    competition under federal and state law against Defendants in connection with Defendants' use

28    of the IMPOSSIBLE mark in connection with sleep and energy powders and other edible

1  products—goods over which Impossible Foods enjoys priority in the mark IMPOSSIBLE.

2  **ANSWER:** Defendants admit that Plaintiff asserts claims for trademark infringement and

3  unfair competition in its Second Amended Complaint. Except as expressly admitted, the

4  allegations in this paragraph are denied.

5  **JURISDICTION AND VENUE**

6  10.   This court has subject matter jurisdiction over the claim for declaratory relief

7  under 28 U.S.C. §§ 2201 and 2202 (the Declaratory Judgment Act) and 15 U.S.C. § 1051 et seq.,

8  as well as under 28 U.S.C. §§ 1331 and 1338, because Impossible Foods brings the action to

9  determine a question of actual controversy between the parties arising under the trademark laws

10  of the United States. This court also has subject matter jurisdiction over Impossible Foods's

11  trademark infringement and unfair competition claims pursuant to 28 U.S.C. §§ 1338 and 1367.

12  **ANSWER:** Paragraph 10 does not state a factual allegation to which a response is

13  required. To the extent it is interpreted as including a factual allegation requiring a response,

14  Defendants respond that they do not intend to contest subject matter jurisdiction in this action.

15  11.   Impossible Foods's claims for relief arise directly from Defendants' contacts with

16  California, including its demands and threats made to Impossible Foods in California. (*See*

17  *Impossible Inc. v. Impossible X LLC*, 80 F.4th 1079, 1087 (9th Cir. 2023).) Further, Company

18  Defendant has challenged the right of Impossible Foods, a California-based company, to provide

19  services under its IMPOSSIBLE trademark to California consumers and nationally.

20  **ANSWER:** Inasmuch as the Ninth Circuit has opined on this issue, Defendants do not

21  intend to contest personal jurisdiction in this matter. Except as expressly admitted, the allegations

22  in this paragraph are denied.

23  12.   This court also has personal jurisdiction over Defendants because, upon

24  information and belief, Defendants have knowingly and purposefully marketed, distributed,

25  offered for sale, and sold the Accused Products to persons within the State of California;

26  Defendants regularly transact and conduct business within the State of California; and

27  Defendants have otherwise made or established contacts within the State of California sufficient

28  to permit the exercise of personal jurisdiction.

**ANSWER:** Defendants do not intend to contest personal jurisdiction in this matter. Except as expressly admitted, the allegations in this paragraph are denied.

13.     This court also has personal jurisdiction over Joel Runyon because Mr. Runyon: (a) is the sole member and sole employee of ILLC; (b) personally participated, authorized, and directed ILLC to market, distribute, offer for sale, and sell goods that infringe Impossible Foods's trademarks in connection with the Accused Products within the State of California; (c) regularly transacts and conducts business within the State of California; (d) purposefully availed himself of the laws of the State of California by personally participating, authorizing, and directing ILLC to market, distribute, offer for sale, and sell goods that infringe Impossible Foods's trademarks in connection with the Accused Products within the State of California; and (e) has otherwise made or established contacts with the State of California sufficient to permit the exercise of personal jurisdiction. At all relevant times, Mr. Runyon personally was aware of, directed, and participated in the unlawful conduct of Company Defendant alleged in this pleading.

**ANSWER:** Defendants do not intend to contest personal jurisdiction in this matter. Except as expressly admitted, the allegations in this paragraph are denied.

14.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this complaint occurred in this judicial district.

**ANSWER:** Defendants do not intend to contest venue in this matter. Except as expressly admitted, the allegations in this paragraph are denied.

## INTRA-DISTRICT ASSIGNMENT

15.     This is an Intellectual Property Action and thus may be assigned to a division of the Court on a district-wide basis.

**ANSWER:** Paragraph 15 does not state a factual allegation to which a response is required. To the extent it is interpreted as including a factual allegation requiring a response, the paragraph is admitted.

## BACKGROUND

### The IMPOSSIBLE Brand

16.     Impossible Foods is a pioneer in the field of plant-based substitutes for meat products. The company's aim is to give people the taste and nutritional benefits of meat without the negative health and environmental impacts associated with products from livestock.

**ANSWER:** Defendants are without information sufficient to confirm or deny this allegation, and therefore this paragraph is denied.

17.     Impossible Foods has enjoyed extraordinary commercial success in the United States. The company's signature products—the IMPOSSIBLE BURGER and other plant-based IMPOSSIBLE meat substitutes—are widely available in grocery stores across the United States, including Albertsons, Kroger, Safeway, Walmart, Target, Wegmans, Costco, and Trader Joe's. IMPOSSIBLE-branded products are sold at thousands of restaurants, including Burger King (Impossible Whopper), White Castle, Red Robin, Starbucks, Hard Rock Café, Cheesecake Factory, and Applebee's. Impossible Foods's products are also available at numerous independent, high-end restaurants.

**ANSWER:** Defendants are without information sufficient to confirm or deny this allegation, and therefore this paragraph is denied.

18.     Since its inception, Impossible Foods's IMPOSSIBLE mark has received considerable publicity. The mark has been featured in prominent national news coverage, including in The New York Times, The Los Angeles Times, The Wall Street Journal, the Chicago Tribune, San Jose Mercury News, San Francisco Chronicle, Bloomberg, Reuters, FORTUNE, Forbes, Time, and USA Today, as well as on CNN, MSNBC, NPR, Fox Business, and other cable networks.

**ANSWER:** Defendants are without information sufficient to confirm or deny this allegation, and therefore this paragraph is denied.

19.     Since at least as early as 2015, Impossible Foods has continuously used the mark IMPOSSIBLE in connection with edible products.

**ANSWER:** Defendants are without information sufficient to confirm or deny this allegation, and therefore this paragraph is denied.

20.     Impossible Foods began using the IMPOSSIBLE mark with edible products prior

to any trademark use by ILLC and XLLC for edible products.

**ANSWER:** Defendants are without information sufficient to confirm or deny this allegation, and therefore this paragraph is denied.

21.    Impossible Foods's IMPOSSIBLE marks are arbitrary and enjoy a high degree of commercial strength because Impossible Foods has used the marks regularly and continuously since October of 2015 for plant-based substitutes for meat products, restaurant services, recipes, ingredients, and cooking information, and other related goods and services.

**ANSWER:** Denied.

22.    As a result of the commercial success of Impossible Foods' products, the IMPOSSIBLE mark has become well-known, including in California—especially in connection with meat substitutes.

**ANSWER:** Defendants are without information sufficient to confirm or deny this allegation, and therefore this paragraph is denied.

23.    Impossible Foods intends to continue using its IMPOSSIBLE marks in connection with its goods and services, including those related to recipes, food ingredients, and cooking information.

**ANSWER:** Defendants are without information sufficient to confirm or deny this allegation, and therefore this paragraph is denied.

**Company Defendant's Assertion of Purported Trademark Rights and an Infringement Claim Relating to Recipes, Food Ingredients, and Cooking Information**

24.    More than five years after Impossible Foods commenced use of its IMPOSSIBLE marks, XLLC sent a demand letter to Impossible Foods. XLLC's letter accused Impossible Foods of "encroachment into spaces either occupied by or closely related to goods and services offered by [XLLC]," which it said "greatly increases the likelihood of confusion." XLLC also referenced, without providing details, "several apparent instances of actual confusion."

**ANSWER:** Defendants admit that Impossible LLC's predecessor-in-interest to its trademark rights sent a demand letter to Plaintiff's Washington-based counsel regarding Plaintiff's expanding use of the IMPOSSIBLE trademark. Defendants further admit that the

1    quoted out-of-context language is contained in that letter. Except as expressly admitted, the

2    allegations in this paragraph are denied.

3        25.    XLLC's letter demanded that Impossible Foods "cease all use of its confusingly

4    similar IMPOSSIBLE designs (that is, uses without 'FOODS' in stylizations that mimic

5    [XLLC's] marks) and limit the use of its IMPOSSIBLE mark to only use in association with

6    plant-based food substitutes."

7        **ANSWER:** Denied. The demand letter, which Plaintiff chose not to include as an exhibit

8    to its Amended Complaint despite the letter forming at least part of the basis for this declaratory

9    judgment action, sought amicable resolution but warned that "***in the absence of a mutual***

10   ***agreement,*** Impossible X must demand that your client cease all use of its confusingly similar

11   IMPOSSIBLE designs (i.e., uses without 'FOODS' in stylizations that mimic Impossible X's

12   marks) and limit the use of its IMPOSSIBLE mark to only use in association with plant-based

13   food substitutes" (emphasis added).

14       26.    On November 25, 2020, XLLC filed a Notice of Opposition with the Trademark

15   Trial and Appeal Board opposing Impossible Foods's trademark application for the mark

16   IMPOSSIBLE (Serial No. 88/855875), which covers: "Providing information about recipes,

17   ingredients and cooking information; providing an online computer database to consumers

18   featuring information about recipes, ingredients and cooking information." A true and correct

19   copy of the disputed trademark application is attached as Exhibit B, and a true and correct copy

20   of the Notice of Opposition filed by Impossible X is attached as Exhibit C.

21       **ANSWER:** Admitted that Impossible LLC's predecessor-in-interest filed a Notice of

22   Opposition against U.S. Trademark Appl Ser. No. 88855875. The content of Exhibits B and C

23   speak for themselves.

24       27.    In its Notice of Opposition, XLLC alleges without citing to any evidence that it

25   "has used its IMPOSSIBLE Marks in association with nutrition, food, and cooking resources

26   since 2010 including publication of guides to different foods, ingredients, diets, and recipes." *See*

27   Exhibit C.

28       **ANSWER:** Admitted that the quoted language is contained in the Notice of Opposition.

To the extent not expressly admitted, the allegations in this paragraph are denied.

28.    In its Notice of Opposition, XLLC alleges ownership of 10 trademark registrations and 1 pending application. None of the USPTO filings submitted in connection with those marks shows use in connection with food or cooking. *See* Exhibit C.

**ANSWER:** Admitted that the Notice of Opposition cites ownership of ten of Impossible LLC's longstanding IMPOSSIBLE trademark registrations, as well as one application that has since matured into a registration. To the extent not expressly admitted, the allegations in this paragraph are denied.

29.    In its Notice of Opposition, XLLC also alleges:

- That Impossible Foods lacks "any constructive or actual right" in the IMPOSSIBLE trademark;
- That "[t]here is no issue of priority."; and
- That registration of Impossible Foods' IMPOSSIBLE trademark in connection with the applied-for services "would result in irreparable damage to Impossible X as consumers would be likely to consider the services offered under the registered mark as emanating from Impossible X, and purchase such services, resulting in a loss to Impossible X."

*See* Exhibit C.

**ANSWER:** Admitted that the quoted language is contained in its Notice of Opposition. Denied that the Notice of Opposition stated that "Impossible Foods lacks 'any constructive or actual right' in the IMPOSSIBLE trademark;" the relevant allegation in the Notice of Opposition states that Plaintiff lacks "any constructive or actual right in the Applicant's Mark ***prior to the filing date of the application opposed herein***" (emphasis added).

30.    To the extent Company Defendant used an IMPOSSIBLE mark in connection with recipes, food ingredients, or cooking information prior to 2016, that use was sporadic and de minimis, at best, and not the required bona fide use in commerce, and not trademark use. Notably, the three websites that appear to be the core of Company Defendant's web presence, <impossiblex.com>, <impossiblehq.com>, and <impossible.co>, did not offer any products or

1    services related to recipes, food or cooking until 2017 at the earliest. Company Defendant

2    therefore does not own protectable trademark rights in any IMPOSSIBLE-formative mark for

3    recipes, food ingredients, or cooking information, and any use post-dates Impossible Foods's

4    trademark rights.

5        **ANSWER:** Denied.

6        31.    The goods and services that Impossible Foods has continuously provided under its

7    IMPOSSIBLE marks since 2015 or earlier are not similar to any goods and services Company

8    Defendant actually offered under its marks prior to 2016 and are not likely to create confusion

9    among consumers.

10       **ANSWER:** Denied.

11       32.    The consuming public does not associate Company Defendant's IMPOSSIBLE-

12   formative marks with recipes, food ingredients, or cooking information because Company

13   Defendant has no history of providing such goods and services under IMPOSSIBLE-formative

14   marks.

15       **ANSWER:** Denied.

16       33.    Because of the goods and services on which Company Defendant allegedly has

17   made use, and the ways in which it allegedly has (and has not) made use, Company Defendant's

18   IMPOSSIBLE-formative marks are conceptually and commercially weak.

19       **ANSWER:** Denied.

20   **Defendants Are Infringing and Unfairly Competing With Impossible Foods's**

21   **IMPOSSIBLE Marks**

22       34.    Impossible Foods has been using its IMPOSSIBLE marks in connection with

23   edible products since at least 2015 and has owned strong common law trademark rights in those

24   marks since at least 2015. Impossible Foods also owns federal trademark registrations for its

25   IMPOSSIBLE marks in connection with edible products and related goods and services.

26       **ANSWER:** Defendants are without information sufficient to confirm or deny this

27   allegation, and therefore this paragraph is denied.

28       35.    Notwithstanding Impossible Foods's prior use and superior rights in the

IMPOSSIBLE marks in connection with edible products, Defendants are using, at the direction of Mr. Runyon, IMPOSSIBLE-formative marks in connection with edible products such as sleep and energy powders, as shown below, and upon information and belief, intends to offer for sale additional edible products soon (the "Accused Products").

 

 





1   **ANSWER**: Defendants admit that Impossible LLC is currently selling sleep and energy

2   supplements. Except as expressly admitted herein, the allegations of this paragraph are denied.

3   36.    Defendants' use of IMPOSSIBLE-formative marks in connection with the

4   Accused Products are similar to, and compete with, the edible products offered and sold by

5   Impossible Foods.

6   **ANSWER:** Defendants are without information sufficient to confirm or deny this

7   allegation, and therefore this paragraph is denied.

8   37.    On information and belief, Defendants knowingly, willfully, and intentionally

9   adopted and used IMPOSSIBLE-formative marks in connection with the Accused Products, at

10  the direction of Mr. Runyon, likely causing consumer confusion with Impossible Foods.

11  **ANSWER**: Denied.

12  38.    On information and belief, the Accused Products are marketed through

13  overlapping channels, including social media, and offered through overlapping channels of trade,

14  including online.

15  **ANSWER:** Defendants are without information sufficient to confirm or deny this

16  allegation, and therefore this paragraph is denied.

17  39.    Defendants' use of IMPOSSIBLE-formative marks in connection with the

18  Accused Products is not authorized by Impossible Foods and, on information and belief, is likely

19  to cause consumers to mistakenly associate Defendants and the Accused Products with

20  Impossible Foods.

21  **ANSWER:** Defendants are without information sufficient to confirm or deny this

22  allegation, and therefore this paragraph is denied.

23  40.    On information and belief, Defendants' use of IMPOSSIBLE-formative marks in

24  connection with the Accused Products is likely to cause consumers to believe, mistakenly, that

25  Impossible Foods offered, authorized, or approved the Accused Products.

26  **ANSWER:** Defendants are without information sufficient to confirm or deny this

27  allegation, and therefore this paragraph is denied.

28  **<u>FIRST CLAIM FOR RELIEF</u>**

**(Declaratory Relief)**

41.     Impossible Foods realleges and incorporates by reference the allegations of the preceding paragraphs.

**ANSWER:** Paragraph 41 does not state a factual allegation to which a response is required. To the extent it is interpreted as including a factual allegation requiring a response, the paragraph is denied.

42.     As a result of the actions and statements of ILLC, which include allegations of trademark infringement and challenges to Impossible Foods's commercial use and registration of its IMPOSSIBLE marks in connection with recipes, food ingredients, and cooking information, there is an actual controversy between Impossible Foods and ILLC as to the parties' rights and as to the legal relations associated with each party's use of IMPOSSIBLE-formative marks. An immediate, real, and substantial controversy exists between the parties, who have adverse legal interests.

**ANSWER:** Paragraph 42 does not state a factual allegation to which a response is required. To the extent it is interpreted as including a factual allegation requiring a response, Defendants respond that they do not intend to contest subject matter jurisdiction over this declaratory judgment action.

43.     Impossible Foods has used and intends to continue to use its IMPOSSIBLE marks in interstate commerce.

**ANSWER:** Defendants are without information sufficient to confirm or deny this allegation, and therefore this paragraph is denied.

44.     Company Defendant's position is that Impossible Foods has made use of IMPOSSIBLE-formative marks in a manner justifying ILLC and its predecessors to sue Impossible Foods immediately for trademark infringement and other legal violations.

**ANSWER:** Admitted that certain of Plaintiff's trademark uses of the IMPOSSIBLE formative have encroached upon Impossible LLC's exclusive trademark rights. To the extent not expressly admitted, the allegations in this paragraph are denied.

45.     Impossible Foods's use of its IMPOSSIBLE-formative marks in connection with

recipes, food ingredients, and cooking information, does not infringe or dilute any of ILLC's valid trademark rights and does not violate any federal or state trademark, trade name, or related law.

**ANSWER:** Denied.

46.    A judicial determination is necessary and appropriate at this time to resolve the foregoing issues, and for the parties to ascertain their respective rights and obligations as to the IMPOSSIBLE-formative marks at issue.

**ANSWER:** Paragraph 46 does not state a factual allegation to which a response is required. To the extent it is interpreted as including a factual allegation requiring a response, Defendants respond that they does not intend to contest subject matter jurisdiction over this declaratory judgment action.

47.    Impossible Foods does not engage in any activities that harm or threaten any lawful rights of ILLC and is entitled to a declaration to that effect in this action.

**ANSWER:** Denied.

<u>**SECOND CLAIM FOR RELIEF**</u>

**(Federal Trademark Infringement)**

48.    Impossible Foods realleges and incorporates by reference the allegations of the preceding paragraphs.

**ANSWER**: Paragraph 48 does not state a factual allegation to which a response is required. To the extent it is interpreted as including a factual allegation requiring a response, the paragraph is denied.

49.    Impossible Foods is the record owner of Plaintiff's Registrations and has exclusive registered and common-law rights in Plaintiff's Marks.

**ANSWER**: Defendants are without information sufficient to confirm or deny this allegation, and therefore this paragraph is denied.

50.    Defendants' unauthorized use, at the direction of Mr. Runyon, of imitations of Plaintiff's Marks in connection with edible products such as sleep and energy powders is likely to cause confusion, deception, and mistake by creating the false and misleading impression that

1   Defendants' goods and services are offered by Impossible Foods, or are associated or connected

2   with Impossible Foods, or have the sponsorship, endorsement, or approval of Impossible Foods.

3         **ANSWER**: Denied.

4         51.    Defendants' conduct, at the direction of Mr. Runyon, has caused—and unless

5   enjoined by the Court, will continue to cause—a likelihood of confusion and deception among

6   members of the trade and public, and injury to Impossible Foods's goodwill and reputation as

7   symbolized by Plaintiff's Marks, for which Impossible Foods has no adequate remedy at law.

8         **ANSWER**: Denied.

9         52.    Defendants' conduct, at the direction of Mr. Runyon, demonstrates a willful intent

10  to trade on the goodwill associated with Plaintiff's Marks to Impossible Foods's great and

11  irreparable harm.

12        **ANSWER**: Denied.

13        53.    Impossible Foods is thus entitled to permanent injunctive relief and to recover

14  Defendants' profits, actual damages, enhanced profits and damages, costs, and reasonable

15  attorneys' fees under 15 U.S.C. §§ 1114, 1116, and 1117.

16        **ANSWER**: Denied.

17        **THIRD CLAIM FOR RELIEF**

18        **(Federal Unfair Competition)**

19        54.    Impossible Foods realleges and incorporates by reference the allegations of the

20  preceding paragraphs.

21        **ANSWER:** Paragraph 54 does not state a factual allegation to which a response is

22  required. To the extent it is interpreted as including a factual allegation requiring a response, the

23  paragraph is denied.

24        55.    Impossible Foods owns extensive and exclusive common-law rights in Plaintiff's

25  Marks.

26        **ANSWER**: Defendants are without information sufficient to confirm or deny this

27  allegation, and therefore this paragraph is denied.

28        56.    Defendants' unauthorized use, at the direction of Mr. Runyon, of imitations of

Plaintiff's Marks in connection with edible products such as energy and sleep powders is likely to cause confusion, deception, and mistake by creating the false and misleading impression that Defendants' goods and services are offered by Impossible Foods, or are associated or connected with Impossible Foods, or have the sponsorship, endorsement, or approval of Impossible Foods.

**ANSWER**: Denied.

57.     Defendants' conduct, at the direction of Mr. Runyon, has caused—and unless enjoined by the Court, will continue to cause—a likelihood of confusion and deception among members of the trade and public, and injury to Impossible Foods's goodwill and reputation as symbolized by Plaintiff's Marks, for which Impossible Foods has no adequate remedy at law.

**ANSWER**: Denied.

58.     Defendants' conduct, at the direction of Mr. Runyon, demonstrates a willful intent to trade on the goodwill associated with Plaintiff's Marks to Impossible Foods's great and irreparable harm.

**ANSWER**: Denied.

59.     Impossible Foods is thus entitled to permanent injunctive relief and to recover Defendants' profits, actual damages, enhanced profits and damages, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1125(a), 1116, and 1117.

**ANSWER**: Denied.

## **FOURTH CLAIM FOR RELIEF**

### **(California Common Law Unfair Competition)**

60.     Impossible Foods realleges and incorporates by reference the allegations of the preceding paragraphs.

**ANSWER**: Paragraph 60 does not state a factual allegation to which a response is required. To the extent it is interpreted as including a factual allegation requiring a response, the paragraph is denied

61.     Impossible Foods owns extensive and exclusive common-law rights in Plaintiff's Marks.

**ANSWER**: Defendants are without information sufficient to confirm or deny this

allegation, and therefore this paragraph is denied.

62.     Defendants' unauthorized use, at the direction of Mr. Runyon, of imitations of Plaintiff's Marks in connection with edible products such as energy and sleep powders is likely to cause confusion, deception, and mistake by creating the false and misleading impression that Defendants' goods and services are offered by Impossible Foods, or are associated or connected with Impossible Foods, or have the sponsorship, endorsement, or approval of Impossible Foods.

**ANSWER**: Denied.

63.     Defendants' conduct, at the direction of Mr. Runyon, has caused—and unless enjoined by the Court, will continue to cause—a likelihood of confusion and deception among members of the trade and public, and injury to Impossible Foods's goodwill and reputation as symbolized by Plaintiff's Marks, for which Impossible Foods has no adequate remedy at law.

**ANSWER**: Denied.

64.     Defendants' conduct, at the direction of Mr. Runyon, demonstrates a willful intent to trade on the goodwill associated with Plaintiff's Marks to Impossible Foods's great and irreparable harm.

**ANSWER**: Denied.

65.     Impossible Foods is therefore entitled to injunctive relief and to recover actual damages, attorneys' fees, and punitive damages to the full extent provided for by the common law of the State of California.

**ANSWER**: Denied.

## RESPONSE TO PRAYER FOR RELIEF

Denied that Plaintiff is entitled to any of the requested relief in the Second Amended Complaint.

Except as expressly admitted herein, all allegations lodged in the Second Amended Complaint are denied.

## AFFIRMATIVE DEFENSES

1.     Plaintiff's Second, Third, and Fourth Claims for Relief are barred by the doctrine of laches, based on its longstanding actual and/or constructive knowledge of Impossible LLC's

use of IMPOSSIBLE with edible products, and Plaintiff's delay in bringing its claims that caused prejudice to Defendants.

2.     Defendants reserve all rights to assert further affirmative defenses as the case progresses.

## COUNTERCLAIMS AGAINST IMPOSSIBLE FOODS, INC.

Defendant and Counterclaim Plaintiff Impossible LLC ("Impossible") alleges the following against Plaintiff and Counterclaim Defendant Impossible Foods, Inc. ("Impossible Foods").[1]

## NATURE OF THE SUIT

1.     Impossible hereby counterclaims for trademark infringement, unfair competition, false association, and counterfeiting under the Lanham Act, denial of trademark registration, and trademark infringement and unfair competition under California and common law.

2.     Impossible may be a small business relative to its adversary in this action, but it is a business with great ambition that has operated commercially long prior to the existence of Impossible Foods. Since 2010, Impossible and its predecessors-in-interest have used IMPOSSIBLE and other marks incorporating the term IMPOSSIBLE to offer a wide variety of products and services in the fields of fitness, health, athletics, marketing, and philanthropy.

3.     Impossible's products and services include informational websites on exercise, nutrition and food, and personal motivation; retail of nutritional supplements, books, and apparel; and providing marketing consultation and assistance to other start-up companies. Impossible has long recognized the value in establishing a unique brand, and took great pains to differentiate itself through the establishment of a strong portfolio of trademarks. Impossible and

---

[1] Impossible lodges these counterclaims in response to Impossible Foods' Second Amended Complaint, as permitted by the Federal Rules of Civil Procedure. *See, e.g.*, *Bryant v. Mattel, Inc.*, No. CV049049DOCRNBX, 2010 WL 11463865, at *5 (C.D. Cal. Oct. 5, 2010) (holding that an amended complaint "supersede[s its] predecessor(s)," and entitles a defendant to plead affirmative defenses and counterclaims anew); *cf. Joseph Bancroft & Sons Co. v. M. Lowenstein & Sons, Inc.*, 50 F.R.D. 415, 419 (D. Del. 1970) ("Since the amending pleader chooses to redo his original work, and receives the benefit of this *nunc pro tunc* treatment, he can hardly be heard to complain that claims filed against him are improper because they should have been asserted in response to his original pleading.").

its predecessors-in-interest own long-standing common law and statutory trademark rights in the IMPOSSIBLE mark in association with the aforementioned goods and services, and Impossible obtained its first U.S. trademark registration incorporating the term IMPOSSIBLE (of eleven total registrations, to date) in March of 2012.

4.      Impossible Foods came to its use of the IMPOSSIBLE mark much later than Impossible. In 2016, the company Maraxi, Inc. chose to rebrand and adopt the moniker Impossible Foods, as well as IMPOSSIBLE as a standalone mark. While Impossible Foods' uses of the mark were for years limited to artificial meat products, little by little, Impossible Foods has sought to expand into more nutrition-focused areas, including through marketing geared toward health and fitness.

5.      It is that insidious expansion by Impossible Foods that brings this action before the Court. Until 2020, Impossible was unaware of facts that would cause it to believe a trademark conflict existed between the parties. But then, Impossible Foods filed an intent-to-use trademark application for recipe services, despite the fact that Impossible had longstanding trademark rights in related products and services. Upon learning of this trademark application, Impossible conducted further investigation, and found that Impossible Foods was also expanding into books and apparel. Perhaps most troubling, Impossible Foods had adopted a stylization of the IMPOSSIBLE mark *nearly identical* to that which Impossible had used—and registered—for many years:



(left, Impossible's mark reflected in U.S. Reg. Nos. 4260617 and 5376208; right, image taken Impossible Foods' website at impossiblefoods.com). And Impossible Foods was applying that nearly identical trademark to products nearly identical to those that Impossible had been offering for many years and which were covered by Impossible' s U.S. federal trademark registrations:

 

(left, image from Impossible's specimen of use of the mark reflected in Reg. No. 4260617 for apparel goods, dated March 23, 2012; right, apparel product available through Impossible Foods);



(left, a book published by Impossible's principal in 2012; right, a book published by Impossible Foods in 2020).

6.    Impossible has tried to seek amicable resolution of this dispute, but instead of engaging in business discussions to avoid and prevent consumer confusion, Impossible Foods has leveraged its vast resources to first ignore and then bulldoze over Impossible's senior trademark rights.

7.    Impossible Foods never even responded to the November 2020 letter that forms the basis of Impossible Foods' declaratory judgment claim above, in which Impossible sought to negotiate boundaries to protect consumers and its senior trademark rights. When Impossible

brought a limited opposition against the single intent-to-use recipe application, Impossible Foods waited until the eve of its discovery response deadline, and then filed a broad declaratory judgment action in its own home forum, with a simultaneous request to stay the opposition. When Impossible pointed out that it was a Texas company with no significant ties to California, rather than simply refile in an appropriate venue, Impossible Foods fought to stay in its home forum—even after losing the initial motion to dismiss and then receiving a deeply divided decision from the Ninth Circuit.

8.      Now, Impossible has no choice but to counterclaim for violation of its trademark rights. Impossible Foods has forced Impossible's hand—either engage in costly litigation in Impossible Foods' forum of choice, or forfeit Impossible's inarguably senior trademark rights. Impossible therefore brings these counterclaims for infringement, unfair competition, false association, and counterfeiting against Impossible Foods' use of the IMPOSSIBLE mark as applied to goods and services that overlap with Impossible's offerings, or any other use of the IMPOSSIBLE formative as applied to nutrition and recipe information (including books and online information, but excluding mere listing of nutrition *facts* on Impossible Foods' products as may be required by law), as well as apparel products.

## PARTIES

9.      Impossible is a Texas limited liability company with a principal place of business at 1401 Lavaca St # 40065, Austin TX 78701.

10.      Impossible Foods is a Delaware corporation with its principal place of business at 400 Saginaw Drive, Redwood City, California.

## JURISDICTION AND VENUE

11.      This Court has original jurisdiction under 15 U.S.C. § 1121(a) and 28 U.S.C. §§ 1331 and 1338(a).

12.      This Court has personal jurisdiction over Impossible Foods by virtue of its incorporation and headquarters in the State of California.

13.      Venue as to this Counterclaim is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1), as Impossible Foods is a resident of the State of California.

# BACKGROUND
## Impossible's Trademark Rights

14.   Impossible is a business that helps others push their mental and physical limits. It is a fitness and lifestyle brand, offering informational blogging and podcasts, as well as clothing and nutritional supplement sales. Impossible also offers search-engine optimization and marketing services to start-up companies, and has undertaken significant philanthropic initiatives including the 777 Project, through which Impossible funded the building of seven schools with its non-profit partner Pencils of Promise.

15.   Impossible owns all right, title, and interest in the IMPOSSIBLE trademarks asserted herein, via assignment from related parties. The trademarks were first used and established by Impossible's principal Joel Runyon, beginning in 2010.

16.   In 2012, Mr. Runyon established a limited liability company under the name Impossible Ventures LLC, to which all rights, title, and interest in the trademarks were assigned. In 2016, that entity was renamed Impossible X LLC. In 2020, Impossible X LLC merged into the current Defendant/Counterclaim Plaintiff Impossible LLC, and the trademark rights were assigned thereto.

17.   Impossible began as a personal project of its sole member, athlete and entrepreneur Joel Runyon. In 2010, Mr. Runyon established a blog encouraging its readers to push themselves to their limits, and "do something impossible." Mr. Runyon posted his first blog entry on April 3, 2010, about training for endurance athletics. The blog at the time was entitled "Blog of Impossible Things."

18.   On April 23, 2010, Mr. Runyon officially launched the blog on his personal and professional website. The "Blog of Impossible Things" began receiving significant notice as early as May 2010, when Mr. Runyon had the opportunity to guest post and cross-promote on the blog of the well-known blogger J.D. Roth.

19.   The blog quickly and consistently grew, expanding beyond Mr. Runyon's personal fitness exploits, into a guide on all things fitness and health. By June 2010, Mr. Runyon began providing fitness product reviews as part of his blog.

20.     By September 2010, the IMPOSSIBLE blog included food information including posts reviewing diet and recipe resources. By September 2011, the blog provided explicit guidance on "eating well," and blog posts repeatedly linked to a diet guide offered by an affiliated company at ultimatepaleoguide.com.

21.     The IMPOSSIBLE brand also swiftly grew beyond just a blog. In September 2011, Mr. Runyon began producing and selling activewear, including t-shirts, under the marks IMPOSSIBLE and DO SOMETHING IMPOSSIBLE.

22.     Around the same time of launching its apparel line, Mr. Runyon adopted a particular stylization of the IMPOSSIBLE mark:

**IMPOSSIBLE**

This stylization was applied to the website, blog, and merchandise.

23.     In October 2011, Mr. Runyon launched IMPOSSIBLE HQ, a "new hub for everything impossible online," at the domain impossiblehq.com. The IMPOSSIBLE HQ launch also publicized the sales of the IMPOSSIBLE shirt.

24.     Beginning in February 2012, Mr. Runyon introduced numerous fitness programs under the IMPOSSIBLE mark, which included specific sections and guidance on diet. For example, Mr. Runyon launched the IMPOSSIBLE TRI triathlon program, and as part of the program, Mr. Runyon worked with the organization No Meat Athlete to put together a diet guide for training. Another example is the IMPOSSIBLE ABS product, launched in August 2012, which contained a cookbook, and updates later that same year added meat-free options for vegan and vegetarian lifestyles.

25.     On March 13, 2012, Mr. Runyon shifted the rapidly growing IMPOSSIBLE business to a formal business entity—at the time, the Illinois limited liability company Impossible Ventures LLC (as the various Impossible entities have continuously operated the business and held the trademark rights from this point on, the current Defendant/Counterclaimant and its predecessors-in-interest will be referred to collectively as "Impossible" from here on).

26.     Having established a strong presence for its IMPOSSIBLE formative marks in the fields of health and fitness, Impossible continued expanding. In addition to its offerings at the domain impossiblehq.com, Impossible established websites at impossible.co for its retail offerings, impossiblefitness.com for its fitness resources, and impossible.org for its philanthropic initiatives. Impossible also established a storefront at Amazon.com that it uses extensively for its product sales.

27.     At least as early as 2012, Impossible adopted another IMPOSSIBLE formative mark, IMPOSSIBLE FITNESS, to offer fitness information, and used the mark to offer apparel products at least as early as 2014. These products are offered both on Impossible's own e-commerce site and on Amazon.

28.     At least as early as 2016, Impossible developed and launched two software applications directly related to food and nutrition: Paleo(io), promoted as "the best paleo food list in the world," and Paleo Recipe Pro, promoted as "the best paleo recipe app on the iTunes store." Both applications have been updated several times, and remain active and available for purchase on mainstream app stores today. Within the app stores, the applications are clearly listed as products of Impossible.

29.     At least as early as 2017, Impossible introduced nutritional supplements to its product line. The products offered have varied over the years, and have included energy drinks, sleep supplements, and Omega 3 supplements.

30.     Impossible's blog has consistently offered nutrition information and recipes, and allowed consumers to search for such by including a "Nutrition" tag and subpage on its website at impossiblehq.com.

31.     Impossible has consistently promoted its products and services, including through its websites, social media, podcasts, merchandising, and sponsorships of athletes and athletic events, e.g.:



32.     Impossible regularly uses the IMPOSSIBLE marks to promote its products and services in conjunction with running and ultra-endurance events such as the Antarctica Ice Marathon:



33.     Impossible and its products and services have received significant coverage in mainstream media, including coverage from Vice.com, Runner's World, Competitor.com, GQ, Oprah.com, The Huffington Post, Discover Magazine, Fox News, GQ, TIME, Inc, 99u, Fast Company, The Guardian, ProBlogger, LifeHack.org, Dumb Little Man, Michael Hyatt, Lifehacker, CNBC, Daily Mail, and others.

34.     The IMPOSSIBLE marks are not descriptive of any of the products and services offered thereunder. The marks are inherently distinctive, and serve as strong source indicators for Impossible's offerings.

35.     Though Impossible Foods' complaint attempts to dismiss Impossible's use of the IMPOSSIBLE marks—and specifically the marks as related to nutrition and food—as *de minimis*, Impossible has in fact been using the IMPOSSIBLE formative for many years to market products and services with specific focus on food and nutrition (as just a few examples, its blog, its athletic programs with specific diet and nutrition components, its nutrition supplements, its diet and recipe software applications). Impossible's continuous and longstanding use of the IMPOSSIBLE marks in commerce entitles it to strong common law trademark rights in numerous fields including fitness, health, athletics, and philanthropy; and goods and services including informational services for fitness, nutrition, and recipes; apparel; and supplement products.

36.     In addition to its common law trademark rights, Impossible owns significant statutory trademark rights by virtue of its ownership of numerous trademark registrations, including the following:

- Reg. No. 4260617, IMPOSSIBLE (stylized), for "Clothing, namely, shirts, t-shirts, tank tops" and "Providing a website featuring information in the field of personal fitness, endurance athletics, story telling, and adventure activities, namely, bungee jumping, skydiving, trekking, mountaineering, surfing, and kite surfing," filed with the U.S. Patent and Trademark Office ("USPTO") on March 23, 2012, and registered on the Principal Register on December 28, 2012;

- Reg. No. 4624158, IMPOSSIBLE FITNESS, for "Website featuring information relating to exercise and fitness," filed with the USPTO on March 3, 2014, and registered on the Principal Register on October 21, 2014;

- Reg. No. 5155646, IMPOSSIBLE X, for "search engine optimization and marketing

services; marketing consulting in the field of social media," filed with the USPTO on July 26, 2016, and registered on the Principal Register on March 7, 2017;

- Reg. No. 5179974, IMPOSSIBLE HQ, for "providing a website featuring information relating to exercise and fitness," filed with the USPTO on July 26, 2016, and registered on the Principal Register on April 11, 2017;

- Reg. No. 5376208, IMPOSSIBLE (stylized), for "nutritional supplements" and "search engine optimization and marketing services; marketing consulting in the field of social media," filed with the USPTO on July 16, 2016, and registered on the Principal Register on January 9, 2018;

- Reg. No. 5387588, IMPOSSIBLE NUTRITION (stylized), for "nutritional supplements" and "providing a website featuring information relating to exercise and fitness," filed with the USPTO on July 26, 2016, and registered on the Principal Register on January 23, 2018;

- Reg. No. 5576376, DO SOMETHING IMPOSSIBLE, for "nutritional supplements," "Clothing and performance apparel, namely, t-shirts, sweatshirts, pants, shorts, tank tops, yoga pants, tights," "search engine optimization and marketing services; marketing consulting in the field of social media," and "charitable fundraising services," filed with the USPTO on July 26, 2016, and registered on the Principal Register on October 2, 2018;

- Reg. No. 5590801, IMPOSSIBLE FITNESS (stylized), for "Clothing and performance apparel, namely, t-shirts, sweatshirts, pants, shorts, tank tops, yoga pants, tights," filed with the USPTO on August 3, 2016, and registered on the Principal Register on October 23, 2018;

- Reg. No. 5603025, IMPOSSIBLE FITNESS, for "Clothing and performance apparel, namely, T-shirts, sweatshirts, pants, shorts, tank tops, yoga pants, tights," filed with the USPTO on November 16, 2017, and registered on the Principal Register on November 6, 2018;

- Reg. No. 5620625, IMPOSSIBLE, for "Nutritional supplements," "Clothing and performance apparel, namely, t-shirts, sweatshirts, pants, shorts, tank tops, yoga pants, tights and underwear," "Search engine optimization for promotion and marketing services; marketing consulting in the field of social media," and "Providing a website featuring information in the field of personal fitness, endurance athletics, storytelling, and adventure activities, namely, bungee jumping, skydiving, trekking, mountaineering, surfing, and kite surfing," filed with the USPTO on January 15, 2018, and registered on the Principal Register on December 4, 2018; and

- Reg. No. 6571603, IMPOSSIBLE (animated), for "clothing and performance apparel, namely, t-shirts, sweatshirts, pants, shorts, tank tips, yoga pants, tights and underwear," and "Providing a website featuring information in the field of personal fitness, endurance athletics, storytelling and adventure recreational activities, filed with the USPTO on April 19, 2018, and registered on the Principal Register on November 30, 2021.

1    Records reflecting Impossible's valid and subsisting trademark rights are attached as Exhibit 1.

2    These registrations are *prima facie* evidence of Impossible's ownership of, and exclusive rights

3    to use, the associated marks. These registered marks and Impossible's common law trademark

4    rights are referred to collectively as the "IMPOSSIBLE Marks."

5          37.     Reg. Nos. 4260617, 4624158, and 5155646 have achieved incontestable status,

6    which renders the registrations *conclusive* evidence of Impossible's ownership of, and exclusive

7    rights to use, the associated marks. A declaration of incontestability for at least one other

8    registration is pending before the USPTO and Impossible expects it to issue during the pendency

9    of this action.

10           **Impossible Foods' Encroachment on Impossible's Trademark Rights**

11         38.     Impossible Foods began as Maraxi, Inc. In 2016, Maraxi, Inc. sought to rebrand,

12   and adopted the business name Impossible Foods, Inc.

13         39.     Impossible Foods uses the mark IMPOSSIBLE standing alone, in a particular

14   stylization substantially indistinguishable from that of Impossible:

15
16   # IMPOSSIBLE™

17         40.     Impossible Foods claims to have adopted the IMPOSSIBLE mark because the

18   mark is suggestive of Impossible Foods' products and services.

19
20         41.     Impossible Foods was aware of Impossible and its use of the IMPOSSIBLE

21   marks prior to Impossible Foods' name change and adoption of its own use of IMPOSSIBLE.

22         42.     Impossible Foods learned of Impossible at least as early as October 9, 2013,

23   through a trademark search report that revealed Impossible's trademark Reg. No. 4260617, and

24   also Impossible's company websites at impossiblehq.com and impossiblenutrition.com.

25         43.     As of the date that the aforementioned search report identified and directed

26   Impossible Foods to Impossible's website at impossiblehq.com, that website was actively and

27   prominently marketing Impossible's IMPOSSIBLE apparel products:

28



(Archive.org WayBack Machine records for <u>impossiblehq.com</u> on October 5, 2013).

44.     Impossible Foods' initial (and to this day, core) offerings were artificial meat products: its first product was the "Impossible Burger Made From Plants." Today, it offers other artificial plant-based versions of animal products, including beef, sausage, chicken, pork, and meatballs.

45.     After gaining a foothold in its niche market of artificial meat products, Impossible Foods sought to capture as much of the food-related market as it could. For example, in 2018, Impossible Foods sought to register the mark IMPOSSIBLE BURGER for "restaurant and café services; catering services; providing of food and drink via mobile truck," U.S. App. Ser. No. 87924479. However, the application was abandoned due to Impossible Foods' failure to actually begin offering the listed services.

46.     As another example, in 2019, Impossible Foods filed a trademark application for IMPOSSIBLE TASTE PLACE, seeking to expand into loyalty and incentive programs, to include purchase of t-shirts and other promotional goods. Publicly available USPTO records reflect that Impossible Foods began actually using the mark in commerce in 2020.

47.     Impossible Foods' plans for use of its IMPOSSIBLE mark frequently have changed since transitioning from the MARAXI brand—resulting in over fifty (50) now abandoned federal trademark applications filed by Impossible Foods.

48.     Impossible Foods' attempted expansion included a push toward recipe and nutrition services, in or around 2020.

49.     On April 1, 2020, Impossible Foods filed a trademark application for the mark

1   IMPOSSIBLE directed to "Providing information about recipes, ingredients and cooking

2   information; providing an online computer database to consumers featuring information about

3   recipes, ingredients and cooking information," under Trademark Act Section 1(b) reflecting an

4   intent to commence use of the mark in the future.

5       50.     On information and belief, at some point in 2020, Impossible Foods launched a

6   "Recipes" subpage at its website at impossiblefoods.com.

7       51.     On or around July 2020, Impossible Foods published "IMPOSSIBLE: The

8   Cookbook." The book was made available for purchase on Impossible's website, as well as on

9   Amazon.com and other retailers.

10      52.     Notwithstanding Impossible's longstanding use and federal registration of the

11  IMPOSSIBLE Marks and, on information and belief, Impossible Foods' knowledge of such

12  senior trademark rights, Impossible Foods has sought to expand into other products and services

13  that directly overlap with Impossible's offerings. These products include apparel products, to

14  which the IMPOSSIBLE mark is conspicuously applied, e.g.:



24      53.     Impossible Foods uses its apparel bearing the IMPOSSIBLE mark in high-profile,

25  high-publicity settings, including interviews with its President:



and events with public figures such as competitive eater Joey Chestnut:



On information and belief, many of these events have occurred since this present action commenced.

54.     Impossible Foods has sought to bolster its public image by engaging in philanthropy. On information and belief, beginning in 2020, Impossible Foods began several philanthropic initiatives, including work with Feeding America and the Know Your Rights Camp. Impossible Foods publicized its efforts through its own website and third-party outlets, including through use of the social media tag #IMPOSSIBLECOMMUNITY. While such efforts are admirable, Impossible Foods' publicization of such efforts through use of the IMPOSSIBLE mark led to overlap with Impossible's activities, e.g.:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



19

(Instagram search for #IMPOSSIBLECOMMUNITY).

20       55.      Impossible Foods also sought to capture new categories of consumers, including

21  those interested specifically in fitness and athletics. On information and belief, beginning in

22  2021, Impossible Foods began sponsoring endurance athletic events, including high-profile half-

23  marathon races. As part of its promotional efforts in association with these races, Impossible

24  Foods offered recipe services geared toward runners, and placed its IMPOSSIBLE mark on the

25  race website, official race gear, and displays at associated fitness expos. Impossible Foods has

26  sponsored such races as recently as November of 2023, and race organizers are publicizing

27  Impossible Foods' sponsorship of such races into 2024.

28       56.      Impossible Foods sought this expansion with actual and constructive notice of

1    Impossible's trademarks.

2         57.    On information and belief, based at least on the improbable adoption of a

3    stylization of IMPOSSIBLE nearly identical to Impossible's registered stylization, and based

4    upon the likelihood that Impossible Foods conducted trademark searches prior to adopting and

5    using its marks, Impossible Foods had actual notice of Impossible and its trademarks.

6         58.    Despite Impossible's senior use, reflected on the USPTO's Principal Register

7    prior to Impossible Foods' rebranding in 2016, Impossible Foods has not sought, and does not

8    have, Impossible's authorization to use the IMPOSSIBLE Marks.

9         59.    Impossible   has   received   numerous   communications   indicating   confusion

10   regarding the source of the parties' products and services, and affiliation between the parties.

11   These instances of actual confusion stem both from individuals well acquainted with Impossible

12   and from those well acquainted with Impossible Foods.

13        60.    With respect to those acquainted with Impossible, numerous acquaintances of Mr.

14   Runyon reached out to him when they learned of Impossible Foods, assuming that there was an

15   affiliation between Impossible's activities and Impossible Foods' offerings. Several of these

16   acquaintances specifically identified the similarity of the parties' stylizations of IMPOSSIBLE as

17   contributing to their confusion.

18        61.    With respect to those acquainted with Impossible Foods, Impossible has received

19   correspondence regarding Impossible Foods' products, demonstrating that consumers believe the

20   two entities are the same and/or that Impossible is somehow associated with Impossible Foods.

21   For instance, in July 2023, a regular consumer of Impossible Foods' products (who claimed to

22   eat them "three to five days a week") reached out to Impossible regarding questions and

23   concerns with Impossible Foods' food additives. A consumer in September 2023 reached out to

24   Impossible to request that Impossible Foods begin offering non-soy products to address allergy

25   concerns. And as recently as this February 2024, a consumer reached out to ask if her

26   IMPOSSIBLE artificial meat product that she had accidentally allowed to thaw was still safe to

27   eat. These examples are attached as Exhibit 2.

28

## **FIRST CLAIM FOR RELIEF**

*Federal Trademark Infringement Under the Lanham Act*

62.     Impossible repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

63.     At the time Impossible Foods began using IMPOSSIBLE, Impossible possessed valid federal trademark rights in the IMPOSSIBLE Marks.

64.     Impossible Foods' use of IMPOSSIBLE is a use in commerce.

65.     Impossible Foods' use of IMPOSSIBLE affects Impossible's ability to use its IMPOSSIBLE Marks in commerce.

66.     Impossible Foods has no valid rights in the IMPOSSIBLE mark as directed to products or services in the fields of fitness, health, athletics, and philanthropy.

67.     Impossible Foods has no valid rights in any mark incorporating the IMPOSSIBLE formative as directed to nutrition and recipe information, as well as apparel products.

68.     At the time Impossible Foods commenced use of IMPOSSIBLE, Impossible Foods was on actual and/or constructive notice, pursuant to Section 22 of the Lanham Act, 15 U.S.C. § 1072, of the existence of Impossible's superior rights in its IMPOSSIBLE Marks, at least by reason of the existence, at that time, of Impossible's aforementioned federal trademark registrations.

69.     Use by Impossible Foods of IMPOSSIBLE as a standalone mark for products or services in the fields of fitness, health, athletics, and philanthropy, or any mark incorporating the IMPOSSIBLE formative for nutrition and recipe information as well as apparel products, is without the permission or authorization of Impossible.

70.     The aforesaid use is likely to cause and continue to cause confusion, mistake and/or deception among consumers and the public, leading the public falsely to believe that Impossible Foods' products and services are those of, are sponsored or approved by, or are in some way connected with Impossible, and/or Impossible Foods' junior use will overshadow Impossible's senior use, causing the public to falsely associate Impossible's products and services with Impossible Foods.

71.     The aforesaid use constitutes direct infringement of Impossible's registered trademark rights in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

72.     The aforesaid acts have caused, and are causing, great and irreparable harm to Impossible and the public.  The harm to the public includes confusion regarding the source and quality of products and services being acquired. The harm to Impossible includes harm to the value and goodwill associated with its IMPOSSIBLE Marks. Money cannot fully compensate either of these harms. Unless permanently restrained and enjoined by this Court, said irreparable harm will continue.

<h3 style="text-align:center"><u>SECOND CLAIM FOR RELIEF</u></h3>

<em>Unfair Competition Under the Lanham Act</em>

73.     Impossible repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

74.     Impossible Foods is engaged in acts of unfair competition under § 43(a)(1) of the Federal Trademark Act, 15 U.S.C. § 1125(a)(1), and at federal common law.

75.     Impossible Foods' use of IMPOSSIBLE as a standalone mark for products or services in the fields of fitness, health, athletics, and philanthropy, or any mark incorporating the IMPOSSIBLE formative to offer nutrition and recipe information as well as apparel products, in the manner hereinabove alleged constitutes a violation of § 43(a)(1) of the Federal Trademark Act, 15 U.S.C. § 1125(a)(1) in that Impossible Foods' use of IMPOSSIBLE is likely to cause confusion, to cause mistake, and/or to deceive the public as to an affiliation, connection, or association between Impossible and Impossible Foods, and as to the origin, sponsorship, and/or approval of the parties' respective products and services.

76.     The nature and probable tendency and effect of Impossible Foods' use of IMPOSSIBLE in the manner hereinabove alleged is to enable Impossible Foods to confuse or deceive the public and others by misrepresenting that Impossible Foods' services and products are in some way sponsored or approved by Impossible and/or that Impossible Foods is affiliated with Impossible, and/or by misrepresenting that Impossible's senior use of IMPOSSIBLE is in some way affiliated with, sponsored, or approved by Impossible Foods.

77.     As a direct and proximate result of Impossible Foods' unfair competition, Impossible Foods has been unjustly enriched, and Impossible has suffered actual damages that it is entitled to recover in this action.

78.     Unless enjoined by this Court, Impossible Foods will continue said acts of unfair competition, thereby causing Impossible immediate and irreparable injury for which it has no adequate remedy at law.

### THIRD CLAIM FOR RELIEF

*False Association Under the Lanham Act*

79.     Impossible repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

80.     Impossible Foods' use in commerce of IMPOSSIBLE as a standalone mark for products or services in the fields of fitness, health, athletics, and philanthropy, or any mark incorporating the IMPOSSIBLE formative in association with nutrition and recipe information as well as apparel products, constitutes a false representation that the products and services originated from, are associated with, or are endorsed by Impossible.

81.     Impossible Foods' use of IMPOSSIBLE as a standalone mark for products or services in the fields of fitness, health, athletics, and philanthropy, or any mark incorporating the IMPOSSIBLE formative in association with nutrition and recipe information as well as apparel products, constitutes a false endorsement that wrongly and falsely designates that goods and services marketed and sold by Impossible Foods now, or in the future, originate from or are connected with, authorized by, or otherwise associated with Impossible.

82.     The above acts by Impossible Foods constitute false association in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

83.     The foregoing actions of Impossible Foods have been knowing, deliberate, willful, and in utter disregard of Impossible's rights.

84.     The foregoing actions of Impossible Foods have caused great and irreparable injury to Impossible and, unless said acts are enjoined by this Court, said acts will continue and Impossible will continue to suffer great and irreparable injury for which monetary relief will not

suffice.

### **FOURTH CLAIM FOR RELIEF**

*Counterfeiting Under the Lanham Act*

85.    Impossible repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

86.    Impossible Foods recently admitted in discovery that it learned of Impossible's uses and registration of the IMPOSSIBLE mark long prior to Impossible Foods' recent distribution of clothing bearing the IMPOSSIBLE mark.

87.    Impossible possesses statutory trademark rights in its IMPOSSIBLE Marks directed to certain apparel products by virtue of its ownership of U.S. Reg. Nos. 4260617, 5576376, 5590801, 5603025, and 5620625.

88.    At the time Impossible Foods began using IMPOSSIBLE on apparel products, Impossible was using the IMPOSSIBLE Marks on apparel products.

89.     At the time Impossible Foods began using IMPOSSIBLE on apparel products, Impossible possessed valid federal trademark rights in the IMPOSSIBLE Marks directed toward apparel products.

90.    Impossible Foods' use of IMPOSSIBLE on apparel products is a use in commerce.

91.    Impossible Foods' use of IMPOSSIBLE on apparel products is identical to, and/or substantially indistinguishable from, Impossible's use of its IMPOSSIBLE Marks on apparel products.

92.    Impossible Foods' use of IMPOSSIBLE affects Impossible's ability to use its IMPOSSIBLE Marks in commerce.

93.    Impossible Foods has no valid rights in any mark incorporating the IMPOSSIBLE formative as directed to apparel products.

94.    At the time Impossible Foods commenced use of IMPOSSIBLE with apparel products, Impossible Foods was on actual and/or constructive notice, pursuant to Section 22 of the Lanham Act, 15 U.S.C. § 1072, of the existence of Impossible's superior rights in its

1    IMPOSSIBLE Marks, at least by reason of the existence, at that time, of Impossible's

2    aforementioned federal trademark registrations, as well as a search report that revealed

3    Impossible's uses of the IMPOSSIBLE mark to Impossible Foods.

4         95.    Impossible Foods intentionally used in commerce Impossible's IMPOSSIBLE

5    mark directed to apparel products, without Impossible's permission or authorization.

6         96.    Impossible Foods knew that its use of the IMPOSSIBLE mark directed to apparel

7    products was counterfeit.

8         97.    The aforesaid use is likely to cause and continue to cause confusion, mistake

9    and/or deception among consumers and the public, leading the public falsely to believe that

10   Impossible Foods' apparel products are those of, are sponsored or approved by, or are in some

11   way connected with Impossible, and/or Impossible Foods' junior use will overshadow

12   Impossible's senior use, causing the public to falsely associate Impossible's products with

13   Impossible Foods.

14        98.    The aforesaid use constitutes counterfeiting in violation of Section 32(1) of the

15   Lanham Act, 15 U.S.C. § 1114(1), Section 34(d) of the Lanham Act, 15 U.S.C. § 1116(d).

16        99.    The aforesaid acts have caused, and are causing, great and irreparable harm to

17   Impossible and the public.  The harm to the public includes confusion regarding the source and

18   quality of products and services being acquired. The harm to Impossible includes harm to the

19   value and goodwill associated with its IMPOSSIBLE Marks. Money cannot fully compensate

20   either of these harms. Unless permanently restrained and enjoined by this Court, said irreparable

21   harm will continue.

22                          **FIFTH CLAIM FOR RELIEF**

23                          *Denial of Trademark Registration*

24        100.   Impossible repeats and realleges each and every allegation set forth in the

25   foregoing paragraphs, as though fully set forth herein.

26        101.   As a cause of action and ground for relief, Impossible seeks an order directing the

27   United States Patent and Trademark Office to refuse Trademark Application Serial No.

28   88855875.

102.    Impossible Foods' use of the mark set forth in Trademark Application Serial No. 88855875 and/or the filing of such trademark application is well subsequent to Impossible's use of the IMPOSSIBLE Marks.

103.    Impossible Foods' use of the mark set forth in Trademark Application Serial No. 88855875 in association with the services set forth therein is likely to cause confusion, mistake, or deception as to the source, sponsorship, affiliation or approval of Impossible Foods' goods and services by Impossible and/or with respect to the IMPOSSIBLE Marks, thereby warranting denial of Impossible Foods' application for federal trademark registration under 15 U.S.C. § 1119.

## SIXTH CLAIM FOR RELIEF

*Common Law Trademark Infringement Under California Law*

104.    Impossible repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

105.    As alleged in detail above, Impossible Foods' use of the IMPOSSIBLE formative trademarks in the state of California constitutes an infringement of Impossible's trademark rights.

106.    Moreover, Impossible Foods' willful conduct was and is committed knowingly and willfully, thereby justifying an award of exemplary damages in addition to Impossible's actual damages.

## SEVENTH CLAIM FOR RELIEF

*Unfair Competition Under California Law*

107.    Impossible repeats and realleges each and every allegation set forth in the foregoing paragraphs, as though fully set forth herein.

108.    As alleged in detail above, Impossible Foods' use and advertising of the IMPOSSIBLE formative trademarks in the state of California without authorization, constitutes unlawful, unfair, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code Section 17200 *et seq.*

109.   Impossible has suffered injury in fact and has lost money or property as a result of Impossible Foods' unfair competition in the form of damage to its goodwill, lost consumer adoption, loss of its intellectual property and other actual damages.

110.   The harm to Impossible and to members of the general public far outweighs the utility of Impossible Foods' business practices.

111.   The unlawful, unfair, and/or fraudulent business practices of Impossible Foods, as described in this Complaint, present a continuing threat to members of the public in that they are likely to cause confusion as to the source of Impossible Foods' services and goods in that the general public is likely to believe that Impossible Foods' offerings originate from, or are affiliated or associated with Impossible, or are otherwise sponsored or endorsed by Impossible.

112.   As a direct and proximate result of Impossible Foods' wrongful acts as alleged in this Complaint, Impossible Foods obtained unlawful profits to the detriment of Impossible.

113.   Unless restrained, Impossible Foods will continue the acts and conduct set forth in this cause of action, to Impossible's great and irreparable injury, for which damages will not afford adequate relief. Impossible is therefore entitled to an injunction prohibiting Impossible Foods' wrongful acts.

114.   Impossible Foods committed the wrongful acts willfully, intending to gain business and a share of the market by riding on Impossible's reputation and goodwill. Impossible Foods' conduct justifies an award of exemplary damages. Upon proof, Impossible is entitled to recover its costs, including attorneys' fees, under California Code of Civil Procedure Section 1021.5.

## JURY DEMAND

115.   Impossible demands a trial by jury, for all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Impossible respectfully requests of this Court:

1.   That judgment be entered in favor of Impossible on its claims of trademark infringement, unfair competition, and false association;

2.   That Impossible Foods and each of its respective principals, owners, agents,

1   employees, servants, attorneys, successors, and assigns, and all others in privity or acting in

2   concert therewith, be preliminarily and permanently enjoined from:

3           a.      Using IMPOSSIBLE (either standard character or stylized) as a standalone

4   mark (e.g., used without the word FOODS appearing immediately adjacent to IMPOSSIBLE, in

5   the same size, font, emphasis, and stylization) in association with products or services in the

6   fields of fitness, health, athletics, and philanthropy,

7           b.      Using the mark IMPOSSIBLE FOODS in association with nutrition and

8   recipe information (excluding the mere listing of nutritional facts as may be required by law) and

9   apparel products,

10          c.      Using any other trademark, service mark, trade name, corporate name,

11  domain name, social media presence, or other commercial indication of origin that consists of or

12  incorporates the word IMPOSSIBLE or any other trademark, service mark, trade name,

13  corporate name, domain name, social media presence, and/or other commercial indication of

14  origin that is confusingly similar to IMPOSSIBLE, with respect to nutrition and recipe

15  information (excluding the mere listing of nutritional facts as may be required by law) and

16  apparel products;

17          d.      Otherwise infringing the IMPOSSIBLE Marks; and

18          e.      Filing any application in the U.S. Patent and Trademark Office to register

19  any trademark or service which includes the word IMPOSSIBLE or any other word confusingly

20  similar thereto directed to nutrition and recipe information, as well as apparel products.

21      3.      That the Court order the U.S. Patent and Trademark Office to deny Trademark

22  Application Serial No. 88855875;

23      4.      That all papers, documents, advertising materials, signs, goods and/or all other

24  materials utilizing IMPOSSIBLE and/or IMPOSSIBLE FOODS in an infringing manner be

25  destroyed or delivered to the Court for destruction;

26      5.      Disgorgement of profits and/or damages as appropriate under 15 U.S.C. §

27  1117(a), enhanced as appropriate to compensate Plaintiff for the damages caused thereby;

28      6.      Awarding Plaintiff statutory damages under 15 U.S.C. § 1117(c);

1        7.      Awarding Plaintiff punitive and exemplary damages as the Court finds appropriate

2  to deter any future willful infringement;

3        8.      That the Court order an award of costs and reasonable attorneys' fees incurred by

4  Impossible in connection with this action, pursuant to 15 U.S.C. § 1117(a); and

5        9.      That the Court order an award to Impossible of such other and further relief as the

6  Court may deem just and proper.

Respectfully submitted,

Date:  October 1, 2024                   By:  /s/ Adrienne J. Kosak

Mike L. Rodenbaugh (SBN 179059)
RODENBAUGH LAW
548 Market Street, Box 55819
San Francisco, CA 94104
Phone: (415) 738-8087
Email:  mike@rodenbaugh.com
docket@rodenbaugh.com

David E. Weslow
Adrienne J. Kosak
WILEY REIN LLP
2050 Street, N.W.
Washington, D.C.  20036
202.719.7000 (telephone)
dweslow@wiley.law (email)
akosak@wiley.law (email)

*Attorneys for Defendant*
*Impossible LLC*

1

## CERTIFICATE OF SERVICE

2

3

     I hereby certify that on October 1, 2024, the foregoing was filed electronically using the

4

Court's CM/ECF system, which will send notification of such filing to party counsel, all of

5

whom are registered ECF filers.

6

                                   */s/ Adrienne J. Kosak*
                                    Adrienne J. Kosak

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28