| | |
|---|---|
| KOLLIN J. ZIMMERMANN (SBN 273092)<br>KILPATRICK TOWNSEND & STOCKTON LLP<br>1801 Century Park East<br>Suite 2300<br>Los Angeles, California 90067<br>Telephone: (310) 248-3830<br>Facsimile: (310) 860-0363<br>kzimmermann@ktslaw.com<br><br>R. CHARLES HENN JR. (*pro hac vice*)<br>H. FORREST FLEMMING, III (*pro hac vice*)<br>ERICA CHANIN (*pro hac vice*)<br>1100 Peachtree Street NE<br>Suite 2800<br>Atlanta, Georgia 30309<br>Telephone: (404) 815-6572<br>Facsimile: (404) 541-3240<br>chenn@ktslaw.com<br>fflemming@ktslaw.com<br>echanin@ktslaw.com<br><br>Attorneys for Plaintiff/Counter-Defendant<br>IMPOSSIBLE FOODS INC. | J. Noah Hagey, Esq. (SBN: 262331)<br>   hagey@braunhagey.com<br>Adam S. Cashman, Esq. (SBN: 255063)<br>   cashman@braunhagey.com<br>Greg Washington, Esq. (SBN: 318796)<br>   gwashington@braunhagey.com<br>BRAUNHAGEY & BORDEN LLP<br>747 Front Street, 4th Floor<br>San Francisco, CA 94111<br>Telephone: (415) 599-0210<br><br>Faith Barksdale, Esq. (*pro hac vice* admission)<br>   barksdale@braunhagey.com<br>BRAUNHAGEY & BORDEN LLP<br>118 W 22nd Street, 12th Floor<br>New York, NY 10011<br>Telephone: (646) 829-9403<br><br>[Other counsel of record indicated on docket.]<br><br>*Attorneys for Defendants / Counter-Plaintiffs*<br>*IMPOSSIBLE LLC and JOEL RUNYON* |

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| IMPOSSIBLE FOODS INC., a Delaware corporation,<br><br>                    Plaintiff/Counter-Defendant<br><br>          v.<br><br>IMPOSSIBLE LLC, a Texas limited liability company, and JOEL RUNYON,<br><br>                    Defendants/Counter-Plaintiffs. | Case No. 5:21-cv-02419-BLF (SVK)<br><br>**JOINT STATEMENT REGARDING DEFENDANT IMPOSSIBLE LLC'S SUBPOENAS TO THIRD PARTIES**<br><br>Judge: Hon. Beth Labson Freeman |

**JOINT STATEMENT REGARDING**
**DEFENDANT IMPOSSIBLE LLC'S SUBPOENAS TO THIRD PARTIES**

Pursuant to Section 7 of Magistrate Judge Susan van Keulen's Civil and Discovery Referral Matters Standing Order, Plaintiff Impossible Foods Inc. ("Impossible Foods")

respectfully requests an order quashing deposition notices and subpoenas served by Defendant Impossible LLC. There are 10 days left until the close of discovery. Impossible Foods's compromise asks that Defendant Impossible LLC withdraw its deposition notices and subpoenas of several third parties.

Attached as **Exhibit A** is a joint chart as required by Section 7 of the Standing Order.

## Impossible Foods's Position

**Background on Defendants' Improper Attempts to Gain Settlement Leverage**

Over the last year of fact discovery, Defendants served several sets of discovery requests on Impossible Foods, as well as some third-party discovery. For example, in March 2024, Defendants served a deposition and document subpoena on third-party Lexicon Branding, which oversaw the selection of some of the IMPOSSIBLE marks at issue in this case. At the end of February and early March of this year, Defendants also began attempting to serve three former Impossible Foods employees with deposition subpoenas. And on March 3, Defendants asked Impossible Foods to provide the availability for deposition of three current employees: Caitlyn Hatman; Keaton Schwarz; and Megan Krogius. With six weeks remaining in fact discovery, the parties worked closely to coordinate these party depositions and the four third-party depositions (a fifth was just added). Separately, on March 18, Impossible Foods reached out to Defendants' new counsel about resuming settlement discussions, which had stalled after the mediation last year with prior counsel.

One week after this settlement invitation, on March 25, and without first asking Impossible Foods to provide availability like before, Defendants served notices of deposition for three high-level executives at Impossible Foods: CEO Peter McGuiness; Chief Demand Officer Meredith Madden; and founder, long-time CEO, and current board member Patrick Brown. This move—with less than 3 weeks in fact discovery—appeared to be nothing more than an attempt to put pressure on Impossible Foods to settle.

On March 26, Impossible Foods requested an explanation for these notices, citing the apex witness doctrine. The parties exchanged several emails on the issue and had a video conferral, but Defendants refused to provide *any* explanation for the notices, and Impossible Foods was forced to

1  serve a Joint Statement on March 27.

2  "Virtually every court that has addressed deposition notices directed at an official at the highest level or 'apex' of corporate management has observed that such discovery creates a tremendous potential for **abuse or harassment**." *Groupion, LLC v. Groupon, Inc.*, No. 11–0870 MEJ, 2012 WL 359699, at *2 (N.D. Cal. Feb. 2, 2012) (emphasis added, citation omitted). "For that reason, parties seeking to depose a high ranking corporate officer must first establish that the executive (1) has unique, non-repetitive, firsthand knowledge of the facts at issue in the case, and (2) that other less intrusive means of discovery, such as interrogatories and depositions of other employees, have been exhausted without success." *Id.*

Defendants *never* attempted to establish the "unique" knowledge of Ms. Madden—nor could they, given that she just joined the company a month ago. Similarly, Defendants never attempted to explain their deposition notice for Mr. McGuinness, who joined the company two years *after* the parties' dispute began. Instead, Defendants withdrew those deposition notices after receiving Impossible Foods's Joint Statement, implicitly confirming Impossible Foods's belief that the notices were intended solely to increase Defendants' settlement leverage by harassing its highest-level executives.

Nonetheless, Defendants' pursuit of settlement leverage continued—this time with the numerous third-party subpoenas at issue in this motion. On March 26, Defendants served document subpoenas on eight of Impossible Foods's investors (**Exhibit B**, the "Investor Subpoenas"), and on March 27, Defendants served document and deposition subpoenas on two large agencies managing celebrities who have worked with Impossible Foods (**Exhibit C**, the "Agency Subpoenas", and together with the Investor Subpoenas, the "Disputed Subpoenas"). The Disputed Subpoenas do not represent a good-faith effort to obtain discovery, but rather a bad-faith attempt to harass Impossible Foods by straining its relationships with its investors and with celebrity collaborators and their powerful agencies. Accordingly, Impossible Foods is entitled to a protective order, as well as reasonable fees incurred in bringing this motion.

**The Court Should Enter a Protective Order With Regard to the Disputed Subpoenas**

"[A] party may seek to protect [its interests related to relevance and burden] through a

1   protective order pursuant to Rule 26(c) regarding a subpoena issued to a nonparty if it believes its
2   own interest is jeopardized by the discovery sought from that nonparty." *In re Uber Techs., Inc.,*
3   *Passenger Sexual Assault Litig.*, No. 23-md-03084-CRB (LJC), 2024 WL 3416644, at *3 (N.D.
4   Cal. July 14, 2024) (citation omitted, alterations in original); *see also Strategic Partners, Inc. v.*
5   *FIGS, Inc.*, No. CV 19-22860GW(KSx), 2020 WL 6143607, at *2 (C.D. Cal. Sept. 3, 2020)
6   (holding that a party has standing to move for a protective order under Rule 26(c) if nonparty
7   subpoenas seek "irrelevant and overbroad discovery"). And courts consistently find that a
8   protective order is appropriate where, as here, nonparty subpoenas might harm a party's business
9   relationships. *See, e.g.*, *HDSherer LLC v. Nat. Molecular Testing Corp.*, 292 F.R.D. 305, 308
10  (D.S.C. 2013) ("[I]t is more than likely that the subpoenas, based on the types of documents
11  sought, will cause a degree of harm to Defendant's customer relationships that is sufficient to
12  satisfy the interest requirement of Rule 26(c)."); *Accusoft Corp. v. Quest Diagnostics, Inc.*, No.
13  12-40007-FDS, 2012 WL 1358662, at *10 (D. Mass. Apr. 18, 2012) ("[I]t is more than likely that
14  the breadth and intrusiveness of the subpoenas will cause a degree of harm to defendants'
15  customer relationships that is sufficient to satisfy the interest requirement of Rule 26(c).");
16  *Graham v. Casey's Gen. Stores*, 206 F.R.D. 251, 256–57 (S.D. Ind. 2002) (finding "a subpoena
17  sent to [the party's] current employer under the guise of a discovery request could be a tool for
18  harassment and result in difficulties for her in her new job").
19          Defendants are improperly using the subpoena power of the Court to create settlement
20  leverage by harassing Impossible Foods's investors and collaborators.
21          On their face, the Investor Subpoenas seek documents that could be obtained from
22  Impossible Foods. The same is true of the Agency Subpoenas. Three of the seven document
23  requests seek "communications with Impossible Foods," two seek documents "provided by
24  Impossible Foods," one seeks agreements with Impossible Foods, and the other seeks guidelines
25  and policies for Impossible Foods's "products or campaigns." The deposition topics essentially
26  mirror the document requests. Thus, it is plain that Defendants did not serve the Disputed
27  Subpoenas (with less than 3 weeks in fact discovery) to obtain unique information.
28          The numerous Disputed Subpoenas are also disproportionate to the needs of the case. The

Investor Subpoenas ostensibly relate to several issues in the case, but Defendants cannot establish how subpoenas *to eight investors* would be useful in obtaining discovery on those issues. Why would an investor have unique documents about *Impossible Foods's* "licenses" of *its own marks* to "third parties?" What is the possible relevance of an investor's documents about *Defendants*, unless those documents were exchanged with Impossible Foods?

Defendants' best argument here would be that an investor might have unique information "regarding the value of Impossible Foods's trademarks"—for example, if the person privately investigated that issue before investing. But the actual request here is: "All communications *with Impossible Foods* regarding the value of Impossible Foods's trademarks." Thus, Defendants cannot establish the proportionality of any of the requests in the Investor Subpoenas.

As to the Agency Subpoenas, Impossible Foods's work with celebrities is *potentially* relevant to two *Sleekcraft* factors: (1) whether the parties' marketing channels converge and (2) the commercial strength of Impossible Foods's marks. But in the very few trademark cases in this Circuit mentioning celebrity endorsements, they barely feature. *E.g., Moroccanoil, Inc. v. Zotos Int'l, Inc.*, 230 F. Supp. 3d 1161, 1173 (C.D. Cal. 2017) ("Its products have had tremendous success and received recognition from celebrities, runway stylists and consumers"). But probing every possible detail of numerous celebrity collaborations through third-party subpoenas to their agencies at the very end of discovery will not help resolve the issues of commercial strength and marketing convergence. Defendants have more than ample evidence establishing Impossible Foods's marketing channels, including the celebrity collaborations, which Defendants can compare to their own (if any). And Defendants have more than ample evidence concerning the commercial strength of Impossible Foods's marks, or the lack thereof, including extensive sales and advertising data.

During an April 2, 2025 conferral, Defendants argued that the Disputed Subpoenas were necessary because Impossible Foods failed to conduct adequate document searches. That argument makes no sense because Impossible Foods has disclosed every single aspect of its document collection and has acceded to *all* of Defendants' related demands, with one exception: a search string that yielded hundreds of thousands of non-responsive hits. In other words, there has not

been a dispute amongst the parties regarding Impossible Foods's document collection for many weeks now.

Then, in their first version of this Joint Statement served April 3, Defendants argued *for the first time in this case* that Impossible Foods failed to produce documents "regarding the value" of Impossible Foods's marks. That can't be it either. Defendants served their *first* (overbroad) RFP concerning the "value" of Impossible Foods's marks on March 14, with Impossible Foods's response due the last day of fact discovery, April 14: "Produce documents concerning any valuations performed of [Impossible Foods] and its assets, including all drafts and final versions, shared with any potential investors from 2011 to the present." And Defendants deposed Impossible Foods's 30(b)(6) witness on the topic "The commercial value of [Impossible Foods's] marks" on April 3, meaning their compromise "offer" (read: demand) that Impossible Foods comply with all the RFPs in the subpoenas and also "provide a witness to testify" about valuations is nothing more than an attempted last-minute do-over for discovery Defendants waited too long to take.

Because Defendants served the Disputed Subpoenas at the very end of fact discovery with no valid justification but to upset Impossible Foods's relationships with its investors and celebrity collaborators for purposes of settlement leverage (or at best, to get a "do-over" on discovery related to trademark valuations), and because the Disputed Subpoenas are disproportionate to the needs of the case, the Court should enter an order under Rule 26(c) "limiting the scope of disclosure" by precluding enforcement of the subpoenas. In light of Defendants' conduct, the Court should also award fees under Rules 26(c)(3) and 37(a)(5). Under Rule 54(d)(2)(C), Impossible Foods requests that the Court first decide Defendants' liability for these fees, a "fair estimate" of which is $4,000 under Rule 54(d)(2)(B)(iii).

Impossible Foods's Compromise Position: Defendants withdraw the Disputed Subpoenas.

**Impossible LLC's Position**

Impossible LLC has sought throughout the course of this litigation to obtain information regarding the valuation of the Impossible Foods trademarks asserted in this case, and to identify the individuals most knowledgeable about those topics. Yet, as of the mutually-agreed March 24

deadline for substantial completion of document production, Impossible Foods had not produced documents or communications demonstrating the value of the trademarks at issue, explaining Impossible Foods's plan to avoid infringing on Impossible LLC's senior rights to the IMPOSSIBLE® marks, setting forth guidelines for third parties displaying or discussing Impossible Foods's brand or marks in public, or discussing the dispute with Impossible LLC and Mr. Runyon in light of Impossible Foods's branding strategy and roadmap for future expansion.

Faced with those gaps in the record, and cognizant of the rapidly approaching deadline for the close of fact discovery, Impossible LLC issued valid Rule 45 subpoenas to third parties from whom Impossible Foods raised funds to determine whether Impossible Foods had shared such relevant materials or participated in such communications with these third parties. Similarly, Impossible LLC also served subpoenas on several talent management agencies who manage Impossible Foods's celebrity endorser partners, to determine whether they possess any documents or communications with Impossible Foods regarding the use and depiction of the Impossible Foods trademarks and brand, which are at the core of both sides' trademark infringement claims. All of these materials should have been produced by Impossible Foods in response to Impossible LLC's document requests, but were not.

Given the foregoing, Impossible Foods's assertions regarding "settlement leverage" are unfounded, and its admissions that the information sought by the subpoenas are relevant and subject to discovery demonstrates that there is no basis on which to quash them. Indeed, if Impossible Foods was truly interested in avoiding "disruption" to its business relationships, it could and should have produced these materials itself in response to the multiple document requests issued under Rule 34.

In particular, Impossible LLC attempted to avoid third party subpoena practice by first seeking these materials from Impossible Foods. In the course of discovery, Impossible LLC issued numerous Requests for Production seeking the same categories of information requested by the subpoenas. But those materials were for the most part absent from Impossible Foods's productions, for reasons Impossible LLC has been trying to investigate since the undersigned counsel appeared in the case. Ultimately, those gaps in Impossible Foods's production prompted

Impossible LLC to seek an explanation through a custodian of records deposition, which the Court recently compelled. But whatever the explanation, Impossible LLC has diligently sought these materials in discovery yet has been unable to obtain them from Impossible Foods, thereby necessitating Impossible LLC's efforts to obtain them through third party subpoenas.

Lack of documents aside, Impossible LLC has also been unable to obtain this information from an Impossible Foods witness. Impossible LLC's Rule 30(b)(6) notice included as a topic the "commercial value of [Impossible Foods's]-formative Marks." Impossible Foods designated Keaton Schwartz to testify to that topic, but he was unprepared to do so at his April 3 deposition, where he testified that he was not knowledgeable about the commercial value of Impossible Foods's marks and had made no efforts to investigate that in preparation for his testimony.

Neither may Impossible Foods make any credible claim that Impossible LLC is improperly harassing its business partners or interfering in its relationships. The requests in the subpoenas are few and narrowly tailored; for example, the document subpoenas request communications with Impossible Foods regarding the value of Impossible Foods's trademarks and as well as branding guidelines and policies relating to any promotional activity undertaken in relation to the trademarks at issue. That is fair and proportionate to the needs of the case, and Impossible Foods does not argue otherwise. And the recipients of the subpoenas require no special protections, as they represent some of the largest, most powerful, and best-resourced investment firms and global talent management agencies in the world. All have ready access to the world's most powerful law firms, and all are more than capable of defending themselves from any undue harassment (although none have claimed any). Yet several have already been in contact with Impossible LLC's undersigned counsel to request routine extensions of time to collect and produce responsive documents, but otherwise indicating an intent to comply.

Finally, Impossible Foods's claims of business disruption ring particularly hollow in light of its own third-party subpoena practice. Over the course of this case, Impossible Foods has issued seven third-party document subpoenas, including to Impossible LLC's product manufacturers, such as Ten Thousand Inc., which produces Impossible LLC's apparel, and Bactolac Pharmaceutical, Inc., Impossible LLC's crucial supplement manufacturer. In contrast to

the hypothetical and unsubstantiated "business disruption" that forms the centerpiece of Impossible Foods's argument, Impossible Foods's subpoenas to Impossible LLC's business partners have caused *actual* disruption to those relationships and Impossible LLC's business. Indeed, multiple partners have expressly stated that they will not continue working with Impossible LLC in light of the subpoenas they received from Impossible Foods. If Impossible LLC—a small business run by a single individual with no venture capital investors—can be forced to persist through such adversity, surely Impossible Foods and the subpoena recipients can be troubled to locate and produce the narrow categories of relevant documents identified in the subpoenas (and, if necessary, attend half-day depositions to testify about them).

    <u>Impossible LLC's Compromise Position:</u> Impossible LLC will withdraw the Disputed Subpoenas if Impossible Foods timely produces the information requested therein and provides a witness to testify about the contents of those documents.

| | | |
|---|---|---|
| DATED: April 4, 2025 | By: | /s/ H. Forrest Flemming, III |

R. Charles Henn Jr. (*pro hac vice*)
H. Forrest Flemming, III (*pro hac vice*)
Erica Chanin (*pro hac vice*)
KILPATRICK TOWNSEND & STOCKTON
1100 Peachtree Street NE, Suite 2800
Atlanta, Georgia 30309
Telephone: (404) 815-6572
Facsimile: (404) 541-3240
Email: chenn@ktslaw.com
         fflemming@ktslaw.com
         echanin@ktslaw.com

Kollin J. Zimmermann (SBN 273092)
KILPATRICK TOWNSEND & STOCKTON
1801 Century Park East
Suite 2300
Los Angeles, California 90067
Telephone: (310) 248-3830
Facsimile: (310) 860-0363
kzimmermann@ktslaw.com

*Attorneys for Plaintiff/Counter-Defendant*
IMPOSSIBLE FOODS INC.

DATED: April 4, 2025     By:

/s/ *Adam S. Cashman*

J. Noah Hagey, Esq. (SBN: 262331)
   hagey@braunhagey.com
Adam S. Cashman, Esq. (SBN: 255063)
   cashman@braunhagey.com
Greg Washington, Esq. (SBN: 318796)
   gwashington@braunhagey.com
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210

Faith Barksdale, Esq. (*pro hac vice*)
   barksdale@braunhagey.com
BRAUNHAGEY & BORDEN LLP
118 W 22nd Street, 12th Floor
New York, NY 10011
Telephone: (646) 829-9403

[Other counsel of record indicated on docket.]

*Attorneys for Defendants / Counter-Plaintiffs*
*IMPOSSIBLE LLC and JOEL RUNYON*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 4, 2025, a true and correct copy of JOINT STATEMENT REGARDING DEFENDANT IMPOSSIBLE LLC'S SUBPOENAS TO THIRD PARTIES was filed electronically using the Court's CM/ECF system, which will send notification of such filing to counsel for Defendants Impossible LLC and Joel Runyon, addressed as follows:

| | | |
|---|---|---|
| J. Noah Hagey<br>Adam S. Cashman<br>Gregory D. Washington<br>BRAUNHAGEY & BORDEN LLP<br>747 Front Street, 4th Floor<br>San Francisco, CA 94111<br>hagey@braunhagey.com<br>cashman@braunhagey.com<br>gwashington@keker.com | Faith Barksdale<br>BRAUNHAGEY & BORDEN LLP<br>118 W 22nd Street, 12th Floor<br>New York, NY 10011<br>barksdale@braunhagey.com | David E. Weslow<br>Adrienne J. Kosak<br>WILEY REIN LLP<br>2050 M Street NW<br>Washington, DC 20036<br>dweslow@wiley.law<br>akosak@wiley.law |

/s/ H. Forrest Flemming, III
H. Forrest Flemming, III