J. Noah Hagey, Esq. (SBN: 262331)
hagey@braunhagey.com
Adam S. Cashman, Esq. (SBN: 255063)
cashman@braunhagey.com
Greg Washington, Esq. (SBN: 318796)
gwashington@braunhagey.com
J. Tobias Rowe, Esq. (SBN: 305596)
rowe@braunhagey.com
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210

Marissa R. Benavides (*pro hac vice* admission)
benavides@braunhagey.com
BRAUNHAGEY & BORDEN LLP
200 Madison Avenue, 23rd Floor
New York, NY 10016
Telephone: (646) 829-9403

[Other counsel of record indicated on docket.]

*Attorneys for Defendants / Counter-Plaintiffs Impossible LLC and Joel Runyon*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| IMPOSSIBLE FOODS INC.,<br><br>Plaintiff / Counter-Defendant,<br><br>v.<br><br>IMPOSSIBLE LLC and JOEL RUNYON,<br><br>Defendants / Counter-Plaintiffs. | Case No. 5:21-cv-02419-BLF (SVK)<br><br>**DEFENDANTS/COUNTER-PLAINTIFFS IMPOSSIBLE LLC AND JOEL RUNYON'S OPPOSITION TO PLAINTIFF/COUNTER-DEFENDANT IMPOSSIBLE FOODS INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**Judge:** Hon. Beth Labson Freeman<br>**Mag. Judge:** Hon. Susan van Keulen<br>**Compl. Filed:** April 2, 2021<br>**Third Am. Compl. Filed:** March 7, 2025<br>**Hearing Date:** October 23, 2025<br>**Hearing Time:** 9:00 A.M. |

## TABLE OF CONTENTS

INTRODUCTION ........ 1

FACTS ........ 1

A. Impossible LLC and Joel Runyon ........ 1

B. The IMPOSSIBLE® Marks and Impossible LLC's Federal Registrations ........ 2

C. Impossible LLC's Success and Goodwill Under the IMPOSSIBLE® Marks ........ 3

D. Impossible Foods' Infringing IMPOSSIBLE Marks ........ 4

E. The Infringing Products ........ 5

F. Impossible LLC Suffers Consumer Confusion and Injury ........ 6

G. Impossible LLC's Business Decline Following Release of the Infringing Products ........ 8

ARGUMENT ........ 9

I. EVIDENCE OF INJURY TO IMPOSSIBLE LLC'S GOODWILL AND REPUTATION PRECLUDES SUMMARY JUDGMENT ........ 9

A. Impossible LLC Established Valuable Goodwill and Reputation Under the IMPOSSIBLE® Marks ........ 10

B. Impossible LLC Suffered Injury to its Goodwill and Reputation Under the IMPOSSIBLE® Marks ........ 10

1. Impossible Foods' "Valuation" Argument is Without Merit ........ 11

2. Evidence of Actual Confusion Confirms Harm to Impossible LLC's Goodwill and Reputation ........ 14

3. Other Evidence Demonstrates Harm to Impossible LLC ........ 16

4. Evidence of Financial Decline Following Infringement Confirms Harm to Impossible LLC's Goodwill and Reputation ............................. 17

5. Expert Testimony Confirms Harm to Impossible LLC ........................... 17

C. Apportionment of Damages Among the Family of Marks Is Not Required ........ 18

D. Evidence that Impossible Foods' Infringement Caused Impossible LLC's Injuries Precludes Summary Judgment ............................................................ 19

II. DISPUTED MATERIAL FACTS PRECLUDE SUMMARY JUDGMENT ON PUNITIVE OR EXEMPLARY DAMAGES ................................................................. 22

III. DISPUTED FACTS PRECLUDE SUMMARY JUDGMENT ON LACHES ................ 24

IV. IMPOSSIBLE FOODS FAILS TO CARRY ITS BURDEN OF PRODUCTION AS TO UNCLEAN HANDS, WAIVER, ACQUIESCENCE, AND ESTOPPEL................. 25

CONCLUSION.......................................................................................................... 25

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Adray v. Adry-Mart, Inc.*,
76 F.3d 984 (9th Cir. 1995) .......... 22, 23

*Binder v. Disability Grp., Inc.*,
772 F. Supp. 2d 1172 (C.D. Cal. 2011) .......... 16

*Caesars World, Inc. v. Milanian*,
247 F. Supp. 2d 1171 (D. Nev. 2003) .......... 18

*City of Carlsbad v. Shah*,
850 F. Supp. 2d 1087 (S.D. Cal. 2012) .......... 23

*Cohn v. Petsmart, Inc.*,
281 F.3d 837 (9th Cir. 2002) .......... 14

*Computer Access Tech. Corp. v. Catalyst Enters., Inc.*,
273 F. Supp. 2d 1063 (N.D. Cal. 2003) .......... 20

*Delta Forensic Eng'g, Inc. v. Delta V Biomechanics, Inc.*,
402 F. Supp. 3d 902 (C.D. Cal. 2019) .......... 14

*El Corte Ingles, S.A. v. City Lights, LLC*,
No. 119CV00213, 2019 WL 6918276 (E.D. Cal. Dec. 19, 2019) .......... 25

*Hansen Beverage Co. v. CytoSport*, Inc.,
No. CV 09-0031, 2010 WL 11914746 (C.D. Cal. Apr. 9, 2010) .......... 11, 17, 22

*HM Elecs., Inc. v. R.F. Techs., Inc.*,
No. 12-CV-2884, 2015 WL 1757804 (S.D. Cal. Apr. 17, 2015) .......... 11, 18

*Int'l Oddities v. Rec.*,
No. CV 12-3934, 2013 WL 3864050 (C.D. Cal. July 22, 2013) .......... 19

*Ironhawk Techs., Inc. v. Dropbox, Inc.*,
2 F.4th 1150 (9th Cir. 2021) .......... 21

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
304 F.3d 829 (9th Cir. 2002) .......... 24, 25

*Jason Scott Collection, Inc. v. Trendily Furniture, LLC*,
68 F.4th 1203 (9th Cir. 2023) .......... 9, 19

*Lodestar Anstalt v. Bacardi & Co.*,
No. 216CV06411, 2019 WL 8105378 (C.D. Cal. July 3, 2019) .......... 15, 16

*Marketquest Grp., Inc. v. BIC Corp.*,
316 F. Supp. 3d 1234 (S.D. Cal. 2018)........................................................... 10, 11, 17

*Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*,
210 F.3d 1099 (9th Cir. 2000) ........................................................................... 1, 25

*Pacific Shores Props., LLC v. City of Newport Beach*,
730 F.3d 1142 (9th Cir. 2013) ................................................................... 19, 20, 21, 22

*Prolacta Bioscience, Inc. v. Prolact Ltd.*,
No. 2:24-CV-10392, 2025 WL 2078270 (C.D. Cal. June 18, 2025)........................................... 19

*QS Wholesale, Inc. v. World Mktg., Inc.*,
No. SA12CV0451, 2014 WL 12586120 (C.D. Cal. Jan. 7, 2014) ....................................... 23, 24

*Quia Corp. v. Mattel, Inc.*,
No. C 10-1902, 2011 WL 2749576 (N.D. Cal. July 14, 2011)............................................. 12, 17

*Skydive Arizona, Inc. v. Quattrocchi*,
673 F.3d 1105 (9th Cir. 2012) ........................................................................... passim

*Snapp v.United Transp. Union*,
889 F.3d 1088 (9th Cir. 2018) ........................................................................... 13

*Stone Brewing Co., LLC v. Molson Coors Beverage Co. USA LLC*,
No. 23-3142, 2024 WL 5244556 (9th Cir. Dec. 30, 2024)........................................................ 18

*Stone Creek, Inc. v. Omnia Italian Design, Inc.*,
875 F.3d 426 (9th Cir. 2017) ........................................................................... 14, 15

*Thrive Nat. Care, Inc. v. Thrive Causemetics, Inc.*,
No. CV 20-9091, 2021 WL 4813257 (C.D. Cal. Oct. 6, 2021)................................................... 16

*U-Haul Int'l, Inc. v. Jartran, Inc.*,
793 F.2d 1034 (9th Cir. 1986) ........................................................................... 16

*Wag Hotels, Inc. v. Wag Labs, Inc.*,
No. 20-CV-01326-BLF, 2023 WL 3605977 (N.D. Cal. May 22, 2023).......................... 12, 13, 17

**STATUTES**

15 U.S.C.A § 1117........................................................................................ 11
Cal. Civ. Code § 3294...................................................................................... 23
Cal. Civ. Code § 3294(c) ................................................................................. 23

**RULES**

Fed. R. C. P. 56(a) ........................................................................................ 9

## INTRODUCTION

Impossible Foods' Motion for Summary Judgment (Dkt. 259) raises no challenge to Impossible LLC's allegations or evidence demonstrating Impossible Foods' willful and widespread infringement of Impossible LLC's senior trademarks. Instead, Impossible Foods seeks to wipe away Impossible LLC's infringement and unfair competition claims based on the dubious assertion that no harm has been caused by its misconduct, and that there is accordingly nothing for a fact finder to adjudicate. But that glib assessment crumbles under even the lightest scrutiny, as it ignores extensive record evidence demonstrating actual confusion and extensive harm to Impossible LLC's brand and reputation, and is further premised upon incorrect statements of law. When considered under the correct legal standards, the record here requires that a jury evaluate the robust evidence of harm attributable to Impossible Foods' willful infringement.

Impossible Foods fares no better in seeking summary judgment as to Impossible LLC's affirmative defenses. As to laches, Impossible Foods asserts that it brought its claims within two years of discovery, however the record demonstrates without contradiction that Impossible LLC began selling the nutritional supplement products at issue in 2017—some *seven years* before Impossible Foods brought claims targeting those products. And as to the other defenses, Impossible Foods once again fails to carry its burden because it merely asserts that Impossible LLC lacks evidence, when controlling precedent holds that is "never enough" to prevail at summary judgment. *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1105 (9th Cir. 2000). The Motion should therefore be denied in its entirety.

## FACTS

### A. Impossible LLC and Joel Runyon

Joel Runyon founded the business that ultimately became Impossible LLC in 2010, after graduating from college in the midst of the financial crisis. (Declaration of Joel Runyon ("Runyon Decl.") ¶ 1.) Mr. Runyon set out to forego what was realistic and safe to embrace challenges that seem impossible. (*Id.*) To crystalize his new direction, Mr. Runyon wrote out a list of goals that he called his "Impossible List." (*Id.* ¶ 2.) Although he had never run a competitive race in his life, Mr. Runyon's first impossible task was to run a triathlon. (*Id.*) When he finished after months of

training, Mr. Runyon struck that goal from his Impossible List. (*Id.*)

Inspired by completing his first impossible task, Mr. Runyon launched a personal blog in April 2010. (*Id.* ¶ 3.) He created a simple but meaningful logo: the word IMPOSSIBLE, sometimes rendered with a strikethrough to denote the accomplishment of crossing something off the list:

IMPOSSIBLE

(*Id.*) In his tagline, Mr. Runyon encouraged readers to "do something impossible." As the blog grew, Mr. Runyon focused on fitness, nutrition, diet, and wellness. (*See* Dkts. 262-5–262-8.)

Building on the success of his blog, Mr. Runyon developed Impossible X LLC (later renamed Impossible LLC) to serve as the business vehicle for his Impossible-centered offerings. (Runyon Decl. ¶ 4.) Along the way, Mr. Runyon developed several health, nutrition, and fitness-focused product offerings under the Impossible brand. (*Id.* ¶¶ 5-11.) By October 2011, Impossible launched IMPOSSIBLE HQ, a new hub for everything Impossible online, and started selling performance apparel. (*Id.* ¶ 6; *see* Dkt. 262-9.) In February 2012, Impossible offered its triathlon training guide, which included recipes and nutritional information. (*Id.* ¶ 7; *see* Dkt. 262-8.) Two years later, Impossible expanded its diet- and nutrition-focused offerings by launching its first recipe-focused mobile application in July 2014. (*Id.* ¶ 8.) Several years later, in August 2017, Impossible made the natural expansion from dietary and nutritional offerings to selling nutritional supplements with IMPOSSIBLE® Krill Oil. (*Id.* ¶ 10; *see* Dkts. 262-11–262-12.) In the fifteen years since its founding, Impossible LLC has grown to offer goods and services directed to health and nutrition; recipes and dietary information; training and athletics; philanthropy and coaching; apparel and nutritional supplements; and business consulting on search engine optimization. (*Id.* ¶ 5; *see* Dkt. 262-7; Dkt. 262-13–262-15; Dkt. 262-4 at 87:1-94:20, 64:6-14.)

**B. The IMPOSSIBLE® Marks and Impossible LLC's Federal Registrations**

Impossible LLC markets its products and services, including those related to apparel, health and nutrition, and recipes and dietary information, under a family of IMPOSSIBLE-formative marks, including IMPOSSIBLE, IMPOSSIBLE FITNESS, IMPOSSIBLE X, IMPOSSIBLE HQ,

IMPOSSIBLE NUTRITION, and DO SOMETHING IMPOSSIBLE (the "IMPOSSIBLE® Marks"). (*Id.* ¶ 11.) It owns multiple federal trademark registrations for the IMPOSSIBLE® Marks, including Reg. No. 4260617 for IMPOSSIBLE (stylized)®, Reg. No. 4624158 for IMPOSSIBLE FITNESS®, Reg. No. 5155646 for IMPOSSIBLE X®, Reg. No. 5179974 for IMPOSSIBLE HQ®, Reg. No. 5376208 for IMPOSSIBLE (stylized)®, Reg. No. 5387588 for IMPOSSIBLE NUTRITION (stylized) ®, Reg. No. 5576376 for DO SOMETHING IMPOSSIBLE ®, Reg. No. 5590801 for IMPOSSIBLE FITNESS (stylized)®, Reg. No. 5603025 for IMPOSSIBLE FITNESS®, Reg. No. 5620625 for IMPOSSIBLE®, and Reg. No. 6571603 for IMPOSSIBLE (animated)®. (*Id.* ¶ 12; *see* Dkts. 262-17–262-27.)

### C. Impossible LLC's Success and Goodwill Under the IMPOSSIBLE® Marks

Impossible LLC has made significant investments building its goodwill and reputation under the IMPOSSIBLE® Marks. In itemized costs alone, Impossible LLC and Mr. Runyon invested approximately [redacted] in brand-building expenditures between 2011 and 2023, including general advertising, direct marketing, social media marketing, blogging, podcasting, content generation and creation, and marketing and promotional software. (*Id.* ¶ 13; Dkt. 259-09 (Vanderhart Rep.) ¶ 26.) These investments, which reflect only "hard costs" that were specifically itemized in Impossible LLC's historical financial records, offer a conservative calculation and undercount the total value of its investments. (Runyon Decl. ¶ 14.) Mr. Runyon also has devoted years of "sweat equity" into promoting his IMPOSSIBLE® products and services, through regular attendance and participation in athletic events, conferences, and other gatherings, and through extensive promotion of the brand on his personal social media. (*Id.* ¶ 15.)

As a lean, social media-savvy business, Impossible LLC has been able to leverage its marketing investments through "viral" marketing approaches that yield value far exceeding the amount invested. (Runyon Decl. ¶ 16; Dkt. 259-08 (Palmatier Rep.) at 13-16.) Impossible LLC generates content such as YouTube videos, social media posts, blogs, podcasts, and endorsements, which are then reposted by other users or influencers and used by third parties in ways that generate valuable unpaid media impressions. (Runyon Decl. ¶ 16; Dkt. 259-08 ¶ 24.) As one example among many, one of Impossible LLC's sponsored athletes, professional BASE jumper

Dante Wardlaw, posted a video of himself jumping with an IMPOSSIBLE®-branded parachute from a cliff in Norway. (*Id.*) The video was reposted by the official account of the camera maker GoPro, which has 21 million follows. (*Id.*) The cost of reaching an equivalent audience through paid advertising would be at least tens of thousands of dollars. (Runyon Decl. ¶ 17.) Similar successes in creating viral content over the last 15 years have generated millions of dollars in marketing value under the IMPOSSIBLE® Marks. (*Id.* ¶ 18.)

As an extension of this organic marketing strategy, Impossible LLC's products and services have received significant coverage in the media, including in Vice.com, Runner's World, Competitor.com, GQ, Oprah.com, The Huffington Post, Discover Magazine, Fox News, GQ, TIME, Inc, Fast Company, The Guardian, ProBlogger, LifeHack.org, Lifehacker, CNBC, Daily Mail, and others. (*Id.* ¶ 19; Dkt. 259-08 ¶ 25.) Collectively, these publications and websites have many millions of subscribers and users. (*Id.* ¶ 20.) This unpaid media exposure has further allowed Impossible LLC to generate brand awareness and a unique and valuable brand identity. (*Id.* ¶ 20; Dkt. 259-08 ¶ 24.)

**D. Impossible Foods' Infringing IMPOSSIBLE Marks**

Before settling on "Impossible" as its new brand, Impossible Foods was known as Maraxi, Inc. In 2013, [redacted]. (Dkt. 262-31–262-33.) [redacted] (Dkt. 262-30 at 272:15-23.)

Once Maraxi had identified "Impossible" as the leading choice for its "new" brand, it [redacted]

Impossible Foods openly copied Impossible LLC as it re-launched its business under the IMPOSSIBLE name. As Maraxi looked to [redacted]

[redacted] The stylized IMPOSSIBLE logo that Impossible Foods ultimately adopted was virtually identical to Impossible LLC's stylized IMPOSSIBLE® mark that Impossible Foods personnel had noted and shared:

IMPOSSIBLE IMPOSSIBLE™

Despite Impossible Foods' admitted awareness of Impossible LLC and discussion of its marks and brand, Impossible Foods produced virtually no documents regarding potential confusion between the brands. [redacted], whom Impossible Foods asserted had "the most knowledge" regarding Impossible LLC, the search reports identifying Impossible LLC's usage of the IMPOSSIBLE® mark, and Impossible Foods's adoption of its highly similar IMPOSSIBLE brand. (Dkt. 262-37 at 8-11.)

**E. The Infringing Products**

Rather than confine itself to the alternative meat products it characterizes as its "core business," Impossible Foods has knowingly infringed the IMPOSSIBLE® Marks by applying its virtually identical IMPOSSIBLE mark to the same products offered by Impossible LLC. [redacted] (Dkt. 262-30 (Deposition of Caitlin Hatman) at 129:18–21.)

These infringing products have swamped the market. At the low end, Impossible Foods spent at least [redacted] on swag items. (Dkt. 262-30 at 129:18–21; Dkt. 259-09 ¶ 9.) However, other evidence indicates that actual expenditures were far higher, as Impossible Foods's financial statements suggest it spent [redacted] for "swag creation" between 2021 and 2024 alone. (Dkt. 259-09 ¶ 46 n.117).

In 2020, Impossible Foods began using the IMPOSSIBLE mark on another line of infringing products, this time through its launch of IMPOSSIBLE: The Cookbook. (Dkt. 259-18.) Like the infringing swag products, the infringing cookbook uses an IMPOSSIBLE mark virtually identical to the IMPOSSIBLE® mark that Impossible LLC uses to market its own products and services related to health, nutrition, and recipes. (Dkt. 262-7; Dkts. 262-13–262-16; Dkt. 262-4 at 64:6-14, 87:1-94:20.) The infringing cookbook appears to serve primarily as a form of advertising, based on Impossible Foods' disclosure that it spent approximately [redacted] on these promotional goods, without [redacted] (Dkt. 259-09 ¶ 9.)

**F. Impossible LLC Suffers Consumer Confusion and Injury**

Impossible Foods' infringement of the IMPOSSIBLE® Marks has caused widespread confusion among consumers and other market participants, who mistakenly believe that Impossible LLC and its products and services are affiliated with or originate from Impossible Foods. When Mr. Runyon wears his IMPOSSIBLE® apparel in public or to promote his brand, he is frequently approached by individuals who mistakenly believe that the apparel originates from or is associated with Impossible Foods. (Runyon Decl. ¶¶ 23-24.) The examples are legion:

In late 2017, Mr. Runyon entered a restaurant in New York City wearing an IMPOSSIBLE® shirt and was approached by an individual who stated they were "trying [his] burger," apparently referring to Impossible Foods. (Dkt. 263-08 at 18.) In March 2019, Mr. Runyon attended an industry event with a well-known podcast host; when Mr. Runyon introduced himself, the host assumed he worked for Impossible Foods based on his IMPOSSIBLE® shirt. (*Id.*) In June 2019, Mr. Runyon presented at a conference where he was approached by multiple attendees asking if he was associated with Impossible Foods based upon his IMPOSSIBLE® shirt. (*Id.*) In June 2020, Mr. Runyon organized the Longest Day Race in Austin, Texas, which was covered by local news. (*Id.*) While Mr. Runyon spoke with the media, a reporter asked whether Impossible was the same as Impossible Foods, forcing Mr. Runyon to explain the difference. (*Id.*)

The confusion persists. In October 2022, Impossible LLC was a sponsor of the Bridge Day festival in Fayetteville, West Virginia. (*Id.*) Multiple people approached the booth during the festival asking Mr. Runyon if he was affiliated with the "fake meat" company. (*Id.*) On October 6,

2024, while attending the Austin City Limits music festival, Mr. Runyon was confused by an employee of LiveNation for someone affiliated with Impossible Foods. (*Id.*) On November 2, 2024, while attending the Chili Cookoff in Terlingua, Texas, Mr. Runyon was stopped by an attendee who remarked on Mr. Runyon's shirt, "IMPOSSIBLE? We don't eat that junk." (*Id.*) On January 3, 2025, Mr. Runyon met with a prominent investor who informed Mr. Runyon that he no longer wears his IMPOSSIBLE® t-shirt because he is frequently mistaken for someone affiliated with Impossible Foods. (*Id.*)

The confusion has even extended to individuals who know Impossible LLC and Mr. Runyon personally and thus would be expected to be able to differentiate the two marks. On October 10, 2024, an acquaintance saw Mr. Runyon wearing his IMPOSSIBLE t-shirt and inquired whether he worked for Impossible Foods. (*Id.* at 17.) On February 4, 2025, Mr. Runyon received a Direct Message on Instagram from an athlete sponsored by Impossible LLC that read "spotted in SF," and included a photo of an Impossible Foods logo, confusing it for an IMPOSSIBLE® mark. (*Id.* at 18.)

Consumers online have equally been confused into believing that Impossible LLC and its goods and services are affiliated with Impossible Foods. (Runyon Decl. ¶ 25.) In July 2023, a self-described regular consumer of Impossible Foods' products (who claimed to eat them "three to five days a week") contacted Impossible LLC regarding health concerns with food additives. (Dkt. 259-14.) Another consumer contacted Impossible LLC to request that Impossible Foods begin offering non-soy products to address allergy concerns. (*Id.*) In February 2024, a consumer asked if her IMPOSSIBLE artificial meat product that she had accidentally allowed to thaw was still safe to eat. (Dkt. 259-16.) Even industry insiders, who would be expected to be more highly informed than individual consumers, have been confused: in September 2023, a representative of *LUXlife* magazine mistakenly invited Impossible LLC to participate in the 2023 Global Vegan Awards—an invitation plainly intended for Impossible Foods, since Impossible LLC's products and services are unrelated to veganism. (Dkt. 259-15.) Impossible LLC is also frequently tagged in social media, including on TikTok, Instagram, and Facebook, for posts intended to reference Impossible Foods, including posts for vegan food. (Runyon Decl. ¶ 25.)

In many of these instances of confusion, consumers have expressly attributed negative attributes to Impossible LLC based upon their mistaken belief that its products and services are related to Impossible Foods—accusing Impossible LLC of promoting "junk," "fake meat," dubious food additives, and allergens. (Dkt. 259-08 ¶¶ 54, 56; Dkt. 259-09 ¶¶ 29, 34; Dkt. 259-14; Dkt. 263-08.) Even where the confusion is not expressly negative, *any* confusion is harmful to Impossible LLC's brand and business because one of its core customer demographics has been individuals interested in athletics-focused nutrition using real, natural foods—for example, through the Paleo diet and similar approaches. (Runyon Decl. ¶ 26.) These consumers are not typically interested in highly processed, artificial food products, and the persistent confusion deprives Impossible LLC of the ability to effectively target this core audience. (*Id.* ¶ 26; Dkt. 259-08 ¶ 69.)

This infringement has swamped Impossible LLC in the marketplace and prevented it from developing goodwill and reputation under its own IMPOSSIBLE® Marks. (Runyon Decl. ¶ 27; Dkt. 259-08 ¶ 68.) Rather than building on Impossible LLC's existing goodwill, Mr. Runyon is forced to spend the first few minutes of virtually every interaction with customers or business contacts dispelling confusion about Impossible LLC's association or affiliation with Impossible Foods. (Runyon Decl. ¶ 27.) This confusion creates a massive drag on Impossible LLC's business and its ability to maintain goodwill and reputation under the IMPOSSIBLE® Marks—effectively requiring Mr. Runyon to engage in constant, *ad hoc* corrective advertising. (*Id.*) It also has required Impossible LLC to incur increased advertising expenses to cut through the "noise" of Impossible Foods' infringement, either through increased ad costs, decreased conversion rates, or both. (Dkt. 259-07 at 311:4-18.) But this is insufficient because confusion continues to occur and Impossible LLC lacks the resources to engage in the broader corrective advertising that would be required to counteract the confusion in the market (Runyon Decl. ¶ 28; Dkt. 259-08 ¶ 78, Dkt. 259-09 ¶ 47.)

### G. Impossible LLC's Business Decline Following Release of the Infringing Products

Impossible LLC's business performance has declined dramatically following the release of Impossible Foods' infringing products. By 2016, Impossible LLC earned [redacted] in total income—a modest sum by the standards of a mega-startup like Impossible Foods, but which

nonetheless placed it on a trajectory for continued growth. (Dkt. 259-09 at Ex. C-2.) According to Impossible Foods, it began distributing its infringing apparel that same year. (Cashman Decl. Ex. 2 (Hatman Dep.) at 129:18-130:9.) Immediately thereafter, Impossible LLC's income [redacted]. (Dkt. 259-09 at Ex. C-2.) It [redacted]. (*Id.*)

Mr. Runyon eventually returned Impossible LLC to growth. Total income increased to [redacted] (*Id.*) Then, in mid-2020, Impossible Foods released its infringing cookbook. (Dkt. 259-18.) In 2021, Impossible LLC suffered a more than [redacted], with only slight improvement the following year. (Dkt. 259-09 at Ex. C-2.) Mr. Runyon eventually increased income to [redacted] in 2023—still [redacted] than the peak predating the release of the infringing cookbook. (*Id.*)

## <u>ARGUMENT</u>

### I. EVIDENCE OF INJURY TO IMPOSSIBLE LLC'S GOODWILL AND REPUTATION PRECLUDES SUMMARY JUDGMENT

While Impossible LLC need only demonstrate a "genuine dispute as to [a] material fact," Fed. R. C. P. 56(a), it has presented strong evidence that its goodwill, reputation, and business have been injured as a result of Impossible Foods' infringement of the IMPOSSIBLE® Marks. Courts "assess trademark damages 'in the same manner as tort damages: the reasonably foreseeable harms caused by the wrong.'" *Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1221 (9th Cir. 2023), *cert. denied,* 144 S. Ct. 550 (2024). "[T]he nature of the proof required to support a jury award depends on the circumstances of the case and is 'subject to the principles of equity.'" *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1112 (9th Cir. 2012). Thus, "there is some flexibility in assessing reasonably foreseeable damages under the Lanham Act[.]" *Jason Scott,* 68 F.4th at 1220-21. In cases of "intentional infringement," courts "accept 'crude' measures of damages based upon reasonable inferences so long as those inferences are neither 'inexorable ... [nor] fanciful.'" *Skydive Arizona*, 673 F.3d at 1112.

Impossible Foods' motion focuses on corrective advertising and attempts to portray the legal standard governing such damages as somehow heightened or different from ordinary Lanham Act principles. (Mot. at 5.) Not so. Corrective advertising damages are warranted where (1)

plaintiff has established goodwill and reputation, (2) plaintiff has suffered harm to that goodwill and reputation, and (3) corrective advertising is appropriate to restore that damage. *Skydive Arizona*, 673 F.3d at 1113; *accord Marketquest Grp., Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1301 (S.D. Cal. 2018) (corrective advertising requires only "non-speculative evidence that [plaintiff's] goodwill and reputation—that is, the value of its mark—was damaged *in some way*") (citation omitted and emphasis added). Impossible LLC has presented more than sufficient evidence to support the conclusion that its goodwill and reputation have been damaged by Impossible Foods' infringement, which is all that the law requires. *Skydive Arizona*, 673 F.3d at 1113.

**A. Impossible LLC Established Valuable Goodwill and Reputation Under the IMPOSSIBLE® Marks**

To begin with, Impossible LLC has presented extensive evidence of the valuable goodwill and reputation it has built up under the IMPOSSIBLE® Marks. "In measuring harm to goodwill, a jury may consider a plaintiff's expenditures in building its reputation in order to estimate the harm to its reputation after a defendant's bad acts." *Skydive Arizona,* 673 F.3d at 1112; *see also Marketquest*, 316 F. Supp. 3d at 1270 n.22 ("commercial strength may be demonstrated by commercial success, extensive advertising, length of exclusive use, and public recognition"). Impossible LLC has presented evidence of substantial investments building the value of the IMPOSSIBLE® Marks since 2011, its viral marketing success, and millions of dollars of brand exposure in mainstream publications and websites. (Runyon Decl. ¶¶ 13-14, 16-20; Dkt. 259-08 ¶¶ 24-25; Dkt. 259-09 ¶ 26.) This far exceeds the "three [] exhibits" of advertising expenditures that the Ninth Circuit found sufficient in *Skydive Arizona*, 673 F.3d at 1112. Impossible Foods' motion does not dispute that the IMPOSSIBLE® Marks are valuable and that the jury may consider that value in estimating the harm inflicted by its infringement.

**B. Impossible LLC Suffered Injury to its Goodwill and Reputation Under the IMPOSSIBLE® Marks**

Impossible Foods' infringing apparel and recipe products have confused consumers and harmed Impossible LLC's goodwill and reputation in these long-established product categories. Proof of injury to goodwill and reputation can take many forms, including evidence of "customer

confusion," *Skydive Arizona*, 673 F.3d at 1113, a decline in "sales and profits," *Marketquest*, 316 F. Supp. 3d at 1301, or other evidence that, in the "totality of the circumstances," supports an inference that plaintiff was harmed. *Hansen Beverage Co. v. CytoSport*, Inc., No. CV 09-0031, 2010 WL 11914746, at *2 (C.D. Cal. Apr. 9, 2010) (citing 15 U.S.C.A § 1117) (denying summary judgment on corrective advertising). "A plaintiff need not show a specific measure of harm to its goodwill and reputation in order to recover corrective damages." *HM Elecs., Inc. v. R.F. Techs., Inc.*, No. 12-CV-2884, 2015 WL 1757804, at *3 (S.D. Cal. Apr. 17, 2015) (same).

Impossible LLC has presented extensive evidence that consumers have been confused as a result of Impossible Foods' infringement, predominantly in the form of "reverse confusion" whereby consumers mistakenly believe that Impossible LLC's products are affiliated with or originate from the junior user, Impossible Foods. (Dkt. 263-08 at 17-18; Dkt. 259-08 ¶ 5.) This confusion has been acutely harmful to Impossible LLC, both because it has caused consumers to falsely believe Impossible LLC is associated with "junk," "fake meat," and processed foods, and because association with Impossible Foods is antithetical to Impossible LLC's target consumer demographics. (Dkt. 259-08 ¶¶ 54, 56; Dkt. 259-09 ¶¶ 29, 34; Runyon Decl. ¶ 26.) Impossible LLC will also present testimony from Professor Robert Palmatier, a preeminent marketing expert, explaining how such infringement degrades brand equity and the need for corrective advertising to repair these injuries. (Dkt. 259-08 ¶ 69.) And Impossible LLC has also proffered evidence that the infringement has caused decreased business performance, increased advertising costs, and reduced placement in online search results as a result of swamping by Impossible Foods. (Dkt. 259-08 ¶ 69; Dkt. 259-07 at 311:4-18; Dkt. 259-09 ¶ 33(e); Runyon Decl. ¶ 27.)

Impossible Foods' Motion largely ignores this evidence or argues that the Court should draw inferences unfavorable to Impossible LLC. But that is backwards at this stage, where every reasonable inference must be drawn in favor of the non-moving party.

**1. Impossible Foods' "Valuation" Argument is Without Merit**

Impossible Foods' primary argument is that because Mr. Runyon did not quantify the precise numerical "values" of the IMPOSSIBLE® Marks at his deposition, or because he agreed that Impossible LLC's reputation is generally "good," he cannot show that the value of its marks

"declined at any point." (Mot. at 5-6.) This fails as a matter of law because a plaintiff is not required to precisely value its trademarks or otherwise "provide a specific mathematical formula" to sustain a corrective advertising award. *Skydive Arizona,* 673 F.3d at 1112. Indeed, in *Skydive Arizona*, the Ninth Circuit affirmed a corrective advertising award where plaintiff's evidence consisted of "expenditures it made to build up the goodwill and reputation of its mark," "declarations and witness testimony proving that customers were very angry with, and blamed [plaintiff] for, problems caused by [defendant]," and an explanation of "[plaintiff's] need to undertake corrective advertising." *Id*. at 1113. Impossible LLC has exceeded that showing here: it has presented evidence of extensive investments promoting and building the IMPOSSIBLE® Marks over more than 14 years (Runyon Decl. ¶¶ 11-12; Dkt. 259-09 ¶ 26); evidence of actual consumer confusion and attribution of negative qualities to Impossible LLC as a result of the confusion (Runyon Decl. ¶¶ 25-26; Dkt. 263-08 at 17-18); and expert testimony explaining that corrective advertising is necessary to correct this confusion. (Dkt. 259-08 ¶¶ 72-77.) That is sufficient under *Skydive Arizona*. There is no requirement that a plaintiff provide snapshot valuations of its trademarks to recover corrective advertising damages, and Impossible Foods therefore errs in its arguments to the contrary. (Mot. at 5-7, 10-12.)

Impossible Foods' cases are not the contrary. *Quia Corp. v. Mattel, Inc.*, No. C 10-1902, 2011 WL 2749576 (N.D. Cal. July 14, 2011), did not require the plaintiff to quantify the value of its trademarks; it simply noted that a plaintiff must show its "goodwill and reputation—that is, the value of its mark—was damaged *in some way*." *Id*. at *5 (emphasis added). As the full quotation makes clear, "value of a trademark" is simply another way of referring to the "goodwill and reputation" that plaintiff has established. *Id*. As detailed above, Impossible LLC has presented extensive evidence of both the goodwill and reputation it has established under the IMPOSSIBLE® Marks and the harm to that goodwill and reputation it has suffered. By contrast, the plaintiff in *Quia* offered "no evidence" of actual instances of confusion, nor any evidence of damage to "goodwill"—circumstances that clearly distinguish it from those present here. *Id*. at *6.

Impossible Foods' heavy reliance on *Wag Hotels, Inc. v. Wag Labs, Inc.*, No. 20-CV-01326-BLF, 2023 WL 3605977 (N.D. Cal. May 22, 2023), is also misplaced. In *Wag Hotels*, the

plaintiff argued in cursory fashion that because "consumers were confused by [defendant's] use of its mark," it was automatically "entitled to corrective advertising damages in the amount of 25% of [defendant's] advertising budget." *Id*. at *9. This Court held that, where plaintiff had "failed to present admissible, non-speculative evidence of loss to its goodwill or reputation," its "corrective advertising theory of damages fails." *Id*. at *10. Here, Impossible LLC has gone far beyond the cursory showing at issue in *Wag Hotels* by presenting extensive evidence of its valuable goodwill and reputation under the IMPOSSIBLE® Marks, the harm to that goodwill as a result of the confusion and wrongful attribution of negative qualities to Impossible LLC, and the resulting damage to Impossible LLC and its brand. (Runyon Decl. ¶¶ 1-28; Dkt. 259-08 ¶ 68.) Impossible LLC has also presented evidence that its financial performance dropped following the launch of Impossible Foods' infringing apparel in 2016 and the launch of Impossible Foods' Infringing cookbook in 2020 (Dkt. 259-09 at Ex. C-2), which the Court noted was absent in *Wag Hotels*. 2023 WL 3605977 at *10.

Given that clear law, Impossible Foods cannot persuasively seek summary judgment by ignoring the evidence of harm and instead focusing exclusively on a few sentences from Mr. Runyon's deposition regarding Impossible LLC's generally "good" reputation or the absence of a technical valuation of his trademarks. Indeed, in so doing, Impossible Foods also overlooks passages from the same deposition in which Mr. Runyon testified at length about instances of consumer confusion (Cashman Decl. Ex. 1 (April 10, 2025 Deposition of Joel Runyon) at 257:13-258:17, 261:9-262:17, 263:11-15, 279:11-280:4, 281:6-282:13, 285:1-287:9, 288:1-21), the negative impact of that confusion to his IMPOSSIBLE® mark (*id*. at 312:18-313:16), and the harm it has caused to Impossible LLC's business. (*Id*. 309:11-16, 311:4-18, 314:6-19). And Impossible Foods' own case, *Snapp v.United Transp. Union*, 889 F.3d 1088 (9th Cir. 2018), held that a triable issue of fact existed in analogous circumstances because "[t]he jury was entitled to, and did, hear the full evidence" rather than "isolated sentences" from a deposition. *Id*. at 1103. While Impossible Foods is free to argue that the jury should draw different inferences from the trial record, a jury could easily conclude that Impossible LLC's goodwill and reputation were "damaged in some way" as a result of Impossible Foods' infringement. That alone precludes summary judgment.

### 2. Evidence of Actual Confusion Confirms Harm to Impossible LLC's Goodwill and Reputation

Impossible Foods next argues that the Court should overlook or discount the numerous instances in which consumers have confused Impossible LLC's apparel and other products for those affiliated with Impossible Foods. (Mot. at 7-10.) But that is erroneous as a matter of law, as "courts may not ignore competent evidence of actual confusion" at summary judgment. *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 433 (9th Cir. 2017).

First, Impossible Foods argues that some (but not all) instances of confusion constitute "inquiries" about whether the parties are related. (Mot. at 8.) Impossible Foods cites only two examples, one of which is labelled "General Inquiry" only because it was submitted through a website form; in substance, it clearly demonstrates confusion because the consumer contacted Impossible LLC in the mistaken belief that she was interacting with Impossible Foods. (Dkt. 259-14.) As to the other example of an individual who "wondered if [Impossible LLC] had an affiliation with [Impossible Foods]" (Dkt. 259-17.), the very case that Impossible Foods cites acknowledges that such "enquiry evidence is admissible and relevant" as long as it is accompanied by "some other evidence of actual confusion." *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 843 n. 7 (9th Cir. 2002). Here, there are numerous such instances, thereby meeting this standard.

Second, Impossible Foods argues that "misdirected communications" cannot constitute evidence of actual confusion. (Mot. at 8.) That is also wrong as a matter of law. In *Stone Creek,* the trial court granted summary judgment and "disregarded" evidence that consumers "misdirected their queries" regarding defendant's products to plaintiff, reasoning that this did not show "actual confusion." 875 F.3d at 433. The Ninth Circuit reversed, holding that "When we widen the lens to embrace the full scope of qualifying actual confusion evidence, we credit the examples of customers seeking to purchase furniture or having already purchased Bon-Ton furniture who misdirected their queries to Stone Creek." *Id*. Impossible Foods' sole case, *Delta Forensic Eng'g, Inc. v. Delta V Biomechanics, Inc.*, 402 F. Supp. 3d 902 (C.D. Cal. 2019), preceded *Stone Creek* and relied on an earlier district court decision that is no longer good law in light of the Ninth Circuit's decision. *Id*. at 910. Impossible LLC's evidence that numerous consumers and others have confused Impossible LLC with Impossible Foods and misdirected communications and complaints

to Impossible LLC is therefore competent evidence of actual confusion, which must be credited at the summary judgment stage. *Stone Creek*, 875 F.3d at 433. And regardless, Impossible LLC's confusion evidence is not limited to misdirected communications alone, as it includes numerous examples of individuals who encountered Impossible LLC's products and services and believed that they were affiliated with Impossible Foods, and vice-versa. (Runyon Decl. ¶¶ 25-26; Dkt. 263-08 at 17-18.) "These occasions of actual confusion cannot be dismissed out of hand," *Stone Creek*, 875 F.3d at 433, yet Impossible Foods fails to address them entirely.

Third, Impossible Foods suggests that actual confusion is *per se* insufficient to show injury to goodwill or reputation in absence of a trademark valuation or lost-profits analysis. (Mot. at 8-9.) But that too is incorrect as a matter of law. *Skydive Arizona* affirmed corrective advertising damages where plaintiff's sole evidence of injury to goodwill consisted of actual confusion among customers who "blamed [plaintiff] for problems caused by [defendant]." *Skydive Arizona*, 673 F.3d at 1112–13. Impossible LLC easily exceeds this showing here, offering evidence that customers have attributed negative qualities to Impossible LLC based on their mistaken belief that its products and services are affiliated with Impossible Foods—accusing Impossible LLC of promoting "junk," "fake meat," dubious food additives, and allergens. (Dkt. 259-08 ¶¶ 54, 56; Dkt. 259-09 ¶¶ 29, 34; Dkt. 259-14; Dkt. 263-08.) Even in instances where the comments are not expressly negative, *any* confusion with Impossible Foods is harmful to Impossible LLC's brand and business because Impossible Foods' product attributes are antithetical to Impossible LLC's consumers. (Runyon Decl. ¶ 27; Dkt. 259-08 ¶ 50.) And Impossible Foods' infringement has swamped Impossible LLC and prevented it from developing goodwill and reputation under its own IMPOSSIBLE® Marks by requiring Mr. Runyon to dispel confusion in virtually every interaction with consumers or business partners. (Runyon Decl. ¶ 27.) *Wag Hotels* and *Lodestar Anstalt v. Bacardi & Co.*, No. 216CV06411, 2019 WL 8105378 (C.D. Cal. July 3, 2019) did not involve any such evidence—in *Wag Hotels*, Plaintiff offered nothing to explain how consumer confusion had harmed its goodwill, and in *Lodestar*, plaintiff conceded no actual confusion had occurred. 2019 WL 8105378, at *15.

Fourth, Impossible Foods argues that isolated statements plucked from Mr. Runyon's deposition establish that Impossible LLC suffered no injury from the confusion. (Mot. at 9.) Not so.

Impossible Foods focuses on the absence of a formal valuation of the IMPOSSIBLE® Marks, one ambiguous answer regarding lost sales, and questions seeking legal conclusions regarding "causation." (*Id.*) But it conspicuously ignores Mr. Runyon's consistent testimony elsewhere that Impossible Foods' infringement had harmed his "business," that he had "lost out on" business opportunities and potential customers as a result (Cashman Decl. Ex. 1 at 312:14-17), that the infringement had made it difficult to conduct business under his trademarks (*id*. at 309:11-16, 312:18-313:16, 311:4-18, 314:6), and that consumers had become wary of his brand as a result of the confusion (*id* at 286:1-287:9). Considering all of this testimony along with the other evidence of actual confusion and resulting harm, a reasonable jury could easily conclude that the confusion harmed Impossible LLC's goodwill and reputation.

Finally, Impossible Foods argues that because Mr. Runyon has been able to dispel confusion in *some* instances, Impossible LLC is not entitled to corrective advertising. (Mot. at 9-10.) But Mr. Runyon has not always been able to correct misimpressions (Cashman Decl. Ex. 1 at 287:1-9), and Impossible Foods ignores that reported instances of confusion represent only the tip of the iceberg. (Dkt. 259-08 ¶ 40.) Impossible Foods' inference that *partial* success in dispelling some confusion necessarily means Impossible LLC has suffered no harm at all is unsupported and illogical. And the sole case it cites, *Binder v. Disability Grp., Inc.,* 772 F. Supp. 2d 1172, 1180 (C.D. Cal. 2011), involved a bench trial where the court weighed the evidence and made credibility determinations—neither of which is appropriate at summary judgment.

### 3. Other Evidence Demonstrates Harm to Impossible LLC

Impossible Foods' challenges to Impossible LLC's other evidence of harm to goodwill and reputation are also contrary to law. Impossible Foods argues that Impossible LLC's increased advertising costs are not compensable damages (Mot. at 7), but it is black-letter law that a plaintiff's advertising costs to dispel confusion are recoverable and evidence of harm. *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1041 (9th Cir. 1986); *see also* Ninth Circuit Model Trademark Instruction No. 15.27, Trademark Damages (jury may consider "[t]he expense of preventing customers from being deceived"). *Thrive Nat. Care, Inc. v. Thrive Causemetics, Inc.*, No. CV 20-9091, 2021 WL 4813257, at *7 (C.D. Cal. Oct. 6, 2021), is distinguishable because plaintiff

presented no evidence it had been forced to spend additional money to dispel confusion, but instead argued generally that the "cost of advertising" on search platforms had increased.

Impossible Foods also argues that evidence of Impossible LLC's reduced search rankings following infringement does not demonstrate injury, citing *Quia*. (Mot. at 6-7.) But *Quia* is distinguishable because the plaintiff there relied solely on search placement to establish harm, 2011 WL 2749576, at *3, whereas Impossible LLC has presented extensive evidence of actual confusion and related harm to its goodwill, reputation, and business. (*See supra* §§ F-G.) Because the trier of fact evaluates the "totality of the circumstances" to determine harm for purposes of corrective advertising, *Hansen*, 2010 WL 11914746, at *2, the jury is entitled to consider the documented swamping of Impossible LLC's search placement in evaluating harm to goodwill and reputation.

#### 4. Evidence of Financial Decline Following Infringement Confirms Harm to Impossible LLC's Goodwill and Reputation

In *Wag Hotels*, the Court noted that evidence of decreased "financial performance" can corroborate a plaintiff's showing of harm to goodwill and reputation. 2023 WL 3605977, at *10. While a lost-profits analysis or similar testimony is not required, *see Skydive Arizona,* 673 F.3d at 1112, Impossible LLC has presented evidence that it suffered a steep decline in business performance following the launch of Impossible Foods' infringing apparel products in 2016 and its infringing cookbook in 2020. (*See supra* § G.) This evidence of a rapid decline in Impossible LLC's business following the onset of infringing conduct provides yet another reason why summary judgment is improper. *See Marketquest*, 316 F. Supp. 3d at 1301 (evidence of actual confusion and financial decline precluded summary judgment on corrective advertising damages).

#### 5. Expert Testimony Confirms Harm to Impossible LLC

Further confirming the harm to its goodwill land reputation, Impossible LLC has proffered the opinion of Dr. Robert Palmatier (Dkt. 259-08), who explains the mechanisms by which trademarks work and generate value for their owners, the ways in which infringement degrades a trademark owner's brand equity, and the reasons why corrective advertising is necessary to repair these injuries. (*Id.* ¶¶ 5-6.) His testimony is grounded in the "Associative Network Memory" Model, a peer-reviewed marketing science methodology that explains brands as "nodes" in the

minds of consumers that generate value when they are linked to positive attributes and experiences— and which are degraded when those linkages are disrupted by infringement. (*Id.* ¶¶ 53-56.) As Dr. Palmatier explains, assuming liability (which Impossible Foods does not dispute for purposes of this motion), Impossible Foods' infringement causes harm to Impossible LLC's brand equity by (1) creating harmful and unwanted linkages to Impossible LLC's marks, (2) eroding Impossible LLC's unique brand identity, (3) destroying the source-identifying functions of Impossible LLC's marks, and (4) overwhelming Impossible LLC's brand through reverse confusion. (*Id.* ¶ 5.) His opinion in this regard is borne out by the evidence of harm to Impossible LLC's marks and brand discussed above.

Impossible Foods argues that the Court should disregard Dr. Palmatier's opinion and that of Dr. Jennifer Vanderhart, an esteemed economist who analyzed the parties' financial data and calculated the required range of corrective advertising damages, because they did not precisely "quantify" diminished brand equity or lost sales. (Mot. at 10-12.) However, no such quantification is required. *Skydive Arizona*, 673 F.3d at 1112; *HM Elecs*, 2015 WL 1757804, at *3 ("specific measure of harm" not required). And Impossible Foods' argument that Dr. Palmatier's use of the subjunctive or future tense in his report means that he is opining only "what could happen in the future" (Mot. at 11) is a mischaracterization. Dr. Palmatier methodically analyzed the evidence and explains the causal mechanism by which the infringement harmed Impossible LLC's brand equity. A jury could plausibly credit this testimony, along with the other evidence of harm to Impossible LLC, to find injury to goodwill and reputation. *Stone Brewing Co., LLC v. Molson Coors Beverage Co. USA LLC*, No. 23-3142, 2024 WL 5244556, at *3 (9th Cir. Dec. 30, 2024) (affirming damages award and approving Dr. Palmatier's methodology regarding same "theory on consumer habits").

### C. Apportionment of Damages Among the Family of Marks Is Not Required

Impossible Foods also errs in its assertion that because Impossible LLC has not apportioned damages between the various IMPOSSIBLE® Marks individually, it cannot recover damages at all. (Mot. at 12.) Once more, Impossible Foods' premise is unsupported and contrary to law because no valuation of the marks is required. And it also ignores that Impossible LLC owns a "family of marks" that share the common element IMPOSSIBLE. *See Caesars World, Inc. v. Milanian*, 247

F. Supp. 2d 1171, 1197 (D. Nev. 2003) ("A family of marks is a group of marks having a recognizable common characteristic, wherein the marks are comprised and used in such a way that the consuming public associates not only the individual marks, but the common characteristic of the family, with the trademark owner"). The family of IMPOSSIBLE® Marks collectively embody the goodwill and reputation that Impossible LLC has established in connection with its products and services. (Runyon Decl. ¶ 11.) Impossible Foods cites no authority requiring a plaintiff to allocate the diminution in goodwill and reputation to particular marks within a family, and its sole case, *Int'l Oddities v. Rec.*, No. CV 12-3934, 2013 WL 3864050 (C.D. Cal. July 22, 2013), contains no such requirement either as it did not involve a family of marks to begin with.

Because Impossible Foods' motion does not dispute either infringement or the amount of damages, it is unnecessary to apportion damages between trademarks at summary judgment. When a plaintiff owns a family of marks, the "use of this common prefix may alone be sufficient to cause confusion." *Prolacta Bioscience, Inc. v. Prolact Ltd.*, No. 2:24-CV-10392, 2025 WL 2078270, at *16 (C.D. Cal. June 18, 2025). Whether the jury ultimately attributes the injuries to infringement of the entire family of IMPOSSIBLE® Marks, to infringement of one particular Mark, or to the use of the IMPOSSIBLE family prefix, the recoverable damages will be the same: all "reasonably foreseeable harms caused by the wrong.'" *Jason Scott*, 68 F.4th at 1220.

### D. Evidence that Impossible Foods' Infringement Caused Impossible LLC's Injuries Precludes Summary Judgment

As a fallback position, Impossible Foods argues that the Court should infer that Impossible LLC's injuries were not caused by the infringing apparel and cookbook products, but rather by Impossible Foods' other products. (Mot. at 13.) But this overlooks that "[c]ausation is an intensely factual question that should typically be resolved by a jury." *Pacific Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1168 (9th Cir. 2013). Courts "assess trademark damages 'in the same manner as tort damages.'" *Jason Scott*, 68 F.4th at 1220. "At tort, plaintiffs bear the burden of demonstrating that the defendant's conduct caused some harm suffered by the plaintiffs," but "are 'not required to eliminate entirely all possibility that the defendant's conduct was not a cause.'" *Pacific Shores*, 730 F.3d at 1168. "[O]nce a plaintiff presents evidence that [it] suffered the sort of

injury that would be the expected consequence of the defendant's wrongful conduct, [it] has done enough to withstand summary judgment on the ground of absence of causation." *Id*.

Impossible Foods' motion fails to address or apply the correct standard for causation at summary judgment because it relies on *Computer Access Tech. Corp. v. Catalyst Enters., Inc.*, 273 F. Supp. 2d 1063, 1076 (N.D. Cal. 2003), a case that granted a motion for new trial on damages under Rule 59 rather than a motion for summary judgment. A court considering a Rule 59 motion "may weigh the evidence, assess the credibility of witnesses, and need not view the evidence in the light most favorable to the prevailing party," *id*. at 1076, which is the opposite of the summary judgment standard. Impossible Foods' invocation of the post-trial standard only confirms that it is relying on disputed factual inferences that are inappropriate at this stage.

Under the applicable standard, Impossible LLC's evidence precludes summary judgment because it establishes that it has "suffered the sort of injury that would be an expected consequence of" Impossible Foods' infringement. *Pacific Shores*, 730 F.3d at 1168. Impossible Foods launched infringing apparel and nutrition and recipe products, after which Impossible LLC was inundated by consumer confusion among individuals who saw Impossible LLC's apparel and nutrition and recipe products and believed they originated from or were affiliated with Impossible Foods. (*See supra* § F.) The infringement swamped Impossible LLC in the market, and consumers accused Impossible LLC of promoting "junk," "fake meat," dubious food additives, and allergens. (Dkt. 259-08 ¶¶ 54, 56; Dkt. 259-09 ¶¶ 29, 34; Dkt. 259-14; Dkt. 263-08.) Following the launch of the infringing apparel, Impossible LLC's financial performance declined dramatically, followed by another dramatic decline after the release of the infringing cookbook. (*See supra* § G.) One reasonable inference from these facts is that Impossible Foods' infringement caused Impossible LLC's injuries. At minimum, because Impossible LLC has shown the "sort of injury that would be an expected consequence" of Impossible Foods' infringement, it has "done enough to withstand summary judgment[.]" *Pacific Shores*, 730 F.3d at 1168; *see Skydive Arizona*, 673 F.3d at 1113.

Impossible Foods nonetheless argues that the Court should draw causal inferences in its favor for a variety of reasons, none of which has merit. First, Impossible Foods asserts that its infringing products use the IMPOSSIBLE mark in a "merely ornamental and non-trademark"

fashion. (Mot. at 13.) But the notion that the infringing products use the IMPOSSIBLE mark in a non-trademark fashion is absurd: among other things, Impossible Foods *uses a trademark "TM" symbol next to the IMPOSSIBLE mark* on the infringing products. (Dkt. 259-08 ¶¶ 45, 48)

Second, Impossible Foods argues that the Court should infer all instances of confusion were caused by its alternative meat products because the infringing products are "tangential" or a "small slice" of its business or because it claims the alternative meat products are better known. (Mot. at 13.) Of course, what is supposedly "tangential" to a multi billion-dollar corporation can easily dwarf the products of a smaller company like Impossible LLC—indeed, Impossible Foods [redacted] (Dkt. 274 at 23; *see* Dkt. 259-09 ¶ 9.) This disparity only exacerbates the harm to Impossible LLC from reverse confusion. *See Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1160 (9th Cir. 2021) ("the doctrine of reverse confusion is designed to prevent the calamitous situation [where] a larger, more powerful company usurp[s] the business identity of a smaller senior user"). While Impossible LLC is free to argue that there were alternative causes of confusion at trial, these arguments are premature at summary judgment, where "the plaintiff doesn't have to prove a series of negatives" and need not "positively exclude" every other possible cause. *Pacific Shores*, 730 F.3d at 1168.

Third, Impossible Foods surmises that *all* instances of confusion must have been caused by its artificial meat products because *some* (but not all) confused consumers mentioned "fake meat" or made similar comments, or because Mr. Runyon or Dr. Palmatier were not sure whether the confused consumers had first encountered Impossible Foods' infringing products or alternative meat products. (Mot. at 16.) This argument makes no sense and is contrary to the evidence. Even in the small subset of examples that Impossible Foods cites, the consumers did not think that they were looking at plant-based burgers when they saw Impossible LLC's apparel or Impossible LLC's nutrition and recipe products. Rather, they saw Impossible LLC's products and thought that they were Impossible Foods apparel, that Impossible LLC's website featuring nutrition and recipe products was affiliated with Impossible Foods, or that Impossible Foods and Impossible LLC were one and the same. (*See supra* § F.) That is classic reverse confusion: "when consumers dealing with the senior mark holder believe that they are doing business with the junior one." *Ironhawk*, 2 F.4th

at 1160. The reasonable inference from these facts is that Impossible Foods' entry into the apparel and recipe and nutrition categories caused consumers to believe that Impossible LLC's products in those categories originated from or were affiliated with Impossible Foods.

Regardless, even if Impossible Foods could show that *some* confusion was caused by its alternative meat products (which it has not), summary judgment would still be inappropriate. Impossible LLC does not need to establish that every single instance of confusion was attributable to the infringement, but only that a jury could reasonably infer that the infringement was "substantial factor" or "materially contributed" to Impossible LLC's injuries. *Pacific Shores*, 730 F.3d at 1169 (reversing summary judgment because "we ask not whether [plaintiffs] have proven that *all* of their business losses were attributable to [the wrongful conduct], but rather, we examine whether [plaintiffs] created a triable issue of fact that [defendant's] actions "materially contributed" to these losses"). The inference that Impossible Foods' infringement materially contributed to Impossible LLC's injuries is reasonable here for all the reasons detailed above.

Fourth, Impossible Foods argues at length that the Court should draw different inferences from evidence that Impossible LLC's search rankings declined following the onset of the infringement or that it was forced to incur increased advertising expenses. (Mot. at 14.) This argument misses the point because Impossible LLC's damages do not solely depend on either of these types of harm. They are, at minimum, part of the "totality of the circumstances" demonstrating that Impossible LLC has been swamped in the market by the infringing products and suffered harm to its goodwill and reputation, which is all that is required at summary judgment. *Hansen Beverage Co. v. CytoSport*, Inc., No. CV 09-0031, 2010 WL 11914746, at *2 (C.D. Cal. Apr. 9, 2010). Any argument about potential alternative causes must be reserved for trial because, in trademark cases, "the burden of any uncertainty in the amount of damages should be borne by the wrongdoer." *Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 989 (9th Cir. 1995).

## II. DISPUTED MATERIAL FACTS PRECLUDE SUMMARY JUDGMENT ON PUNITIVE OR EXEMPLARY DAMAGES

Impossible Foods is not entitled to summary judgment on punitive or exemplary damages. First, Impossible Foods argues that actual damages are required before punitive damages can be

awarded. (Mot. at 18.) Because Impossible Foods' arguments regarding actual damages fail as described above, this argument fails as well.

Second, Impossible Foods argues that "Impossible LLC cannot prove superior common-law rights" in California. (*Id.*) Not so. Impossible LLC has continuously sold apparel products to consumers in California since at least as early as October 4, 2011 and has continuously sold recipe and nutrition products since at least as early as September 4, 2012. (Runyon Decl. ¶ 22.) Its earliest records reflect sales to customers in multiple major markets, including San Francisco, Los Angeles, Orange County, and San Diego. (*Id.* ¶ 21.) The record therefore shows that Impossible LLC is the senior user of the IMPOSSIBLE® Marks as compared to Impossible Foods, which has no sales at all prior to 2016. And the jurisdictional briefing before the Ninth Circuit is not to the contrary, as Impossible LLC never claimed it had not sold products into California.

Third, Impossible Foods argues that its knowing infringement the IMPOSSIBLE® trademark is insufficient to show "oppression, fraud, or malice" as a matter of law. (Mot. at 18.) That is incorrect. By statute, "oppression" and "malice" both include misconduct by a defendant in "conscious disregard in the rights or safety of others." Cal. Civ. Code § 3294(c). Courts applying these provisions have found that intentionally adopting a plaintiff's trademark in conscious disregard of plaintiff's rights supports an award of punitive damages. *See QS Wholesale, Inc. v. World Mktg., Inc.*, No. SA12CV0451, 2014 WL 12586120, at *4 (C.D. Cal. Jan. 7, 2014) (affirming punitive damages award based on, *inter alia*, defendant's "knowledge of [plaintiff's] ownership of the mark," defendant's "knowledge that [plaintiff] was a small company […] that could be bullied," and defendant's "refusal to stop infringing activity after [plaintiff] asked it to stop"); *City of Carlsbad v. Shah*, 850 F. Supp. 2d 1087, 1117 (S.D. Cal. 2012) (finding that "[Defendant] is guilty of fraud and malice as defined by Cal. Civ. Code § 3294 and punitive damages are warranted" based on intentional trademark infringement). Impossible Foods' cases all address willfulness under the Lanham Act, which is a different body of law entirely. (Mot. at 19.)

Here, Impossible Foods (1) [redacted] and adopted an identical mark in a near-identical stylized design, (2) [redacted] (3) proceeded to launch infringing products in the

same categories where Impossible LLC had priority, (4) [redacted]; and (5) when Impossible LLC asked it to stop infringing, Impossible Foods filed a preemptive declaratory judgment action to preserve its ability to market infringing products that Impossible Foods now characterizes as meaningless or "tangential" to its business. (*See* Mot. at 13.) A jury could very well find that Impossible Foods' ongoing misappropriation of a smaller competitor's intellectual property in conscious disregard of its rights is oppressive, fraudulent, or malicious, supporting an award of punitive damages. *See QS Wholesale*, 2014 WL 12586120, at *4.

## III. DISPUTED FACTS PRECLUDE SUMMARY JUDGMENT ON LACHES

Impossible Foods argues that summary judgment should be granted on Impossible LLC's laches defense for the sole reason that Impossible Foods asserted its infringement claims within four years after two of Impossible Foods' supplement products, IMPOSSIBLE® SLEEP and IMPOSSIBLE® ENERGY, were launched in 2022. (Mot. at 19.) This argument fails because Impossible LLC began selling dietary supplements under the IMPOSSIBLE® brand in 2017. (Runyon Decl. ¶ 10.) Impossible Foods did not assert infringement claims until seven years later, well outside the four-year period for determining laches. *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 837 (9th Cir. 2002) (seven-year delay barred claims under Lanham Act because "if the claim is filed after the analogous limitations period has expired, the presumption is that laches is a bar to suit"). Under *Jarrow*, Impossible Foods' lengthy and prejudicial seven-year delay in filing suit establishes a triable issue of fact on laches.

To the extent Impossible Foods argues that laches does not apply because it identified certain supplements but not others in its complaint, that too fails because "[t]he presumption of laches is triggered if *any part of the claimed wrongful conduct* occurred beyond the limitations period." *Jarrow*, 304 F.3d at 837 (emphasis added). Here, the "claimed wrongful conduct" is not limited to the SLEEP and ENERGY products, but includes the use of the IMPOSSIBLE® mark on ***any*** "edible products", which applies to Impossible LLC's other supplements. (*See* Dkt. 151 (Third Am. Compl.) ¶¶ 9, 36, 37, 106, 112, 118.) Impossible Foods cannot evade laches by picking and

choosing which IMPOSSIBLE®-branded supplements to name in its complaint because that would "effectively swallow the rule of laches, and render it a spineless defense." *Jarrow*, 304 F.3d at 837.

## IV. IMPOSSIBLE FOODS FAILS TO CARRY ITS BURDEN OF PRODUCTION AS TO UNCLEAN HANDS, WAIVER, ACQUIESCENCE, AND ESTOPPEL

Impossible Foods' cursory argument as to unclean hands, waiver, acquiescence, and estoppel is misguided because it fails carry its initial burden of production. As the moving party without the burden of proof on these defenses, at summary judgment Impossible Foods "must either produce evidence negating an essential element of the nonmoving party's [] defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden" at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Absent this, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Id*.

Here, Impossible Foods fails to carry its burden of production because it does not cite any evidence to negate an essential element of the defenses or show that Impossible LLC lacks evidence to support them. Instead, Impossible Foods simply asserts that "no evidence supports the defenses" using various phrasings. (Mot. at 20-21.) That is insufficient as a matter of law because "[a] moving party may not require the nonmoving party to produce evidence supporting its claim or defense simply by saying that the nonmoving party has no such evidence." *Nissan*, 210 F.3d at 1102 (reversing grant of summary judgment); *El Corte Ingles, S.A. v. City Lights, LLC*, No. 119CV00213, 2019 WL 6918276, at *9 (E.D. Cal. Dec. 19, 2019) (denying summary judgment). Summary judgment should therefore be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff/Counter-Defendant's Motion for Partial Summary Judgment.

Dated: August 29, 2025

Respectfully submitted,

BRAUNHAGEY & BORDEN LLP

By: */s/ Adam S. Cashman*
Adam S. Cashman

*Attorneys for Defendants / Counter-Plaintiffs Impossible LLC and Joel Runyon*