# EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

IMPOSSIBLE FOODS INC., A DELAWARE CORPORATION,

PLAINTIFF/COUNTER-DEFENDANT,

v.

IMPOSSIBLE LLC, A TEXAS LIMITED LIABILITY COMPANY, AND JOEL RUNYON,

DEFENDANTS/COUNTER-PLAINTIFFS.

CASE NO. 5:21-cv-02419-BLF (SVK)

* * * * HIGHLY CONFIDENTIAL * * * *
* * * * ATTORNEYS' EYES ONLY * * * *

VIDEO-RECORDED DEPOSITION OF JOEL RUNYON
IN HIS PERSONAL AND 30(B)(6) CAPACITIES
THURSDAY, APRIL 10, 2025
8:59 A.M. PDT
SAN FRANCISCO, CALIFORNIA

REPORTED BY AUDRA E. CRAMER, CSR NO. 9901

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036

Q. What does your current inventory look like of Impossible Sleep?

A. I don't have the number in front of me. We have -- we have a bunch in the warehouse.

Q. What about Impossible Energy: What's your inventory look like?

A. Same.

Q. Okay. Can you find Exhibit 36 somewhere in there. It's probably in the first stack.

A. Oh, wow.

(Discussion held off the record.)

THE WITNESS: AI is not going to take your job.

BY MR. FLEMMING:

Q. Okay. Can you go to page 16 of Exhibit 36.

A. Okay.

Q. Do you see at line 20 it says "Interrogatory No. 13"?

A. Yep.

Q. And the first sentence of that reads,

"Describe in detail each instance of which Impossible LLC has actual or hearsay knowledge, directly or indirectly, of any confusion between Plaintiff and Defendant or any of the goods or services sold by Plaintiff or Defendant."

Do you see that?

A. Yeah.

Q. And then on the next page, page 17 --

A. Yep.

Q. -- do you see at line 15 "Supplemental Response to Interrogatory No. 13"?

A. Yep.

Q. All right. A few lines down, line 19, you see "on October 6."

Do you see that?

A. Yes. Yes.

Q. Okay. So you reference on October 6, 2024, an instance of confusion while you were attending the Austin City Limits Music Festival; is that right?

A. Yeah.

Q. Can you tell me everything that you

remember from that particular conversation on October 6, 2024.

A. Yeah. I was at a -- I was at an event, ACL. I think, like, Hulu was organizing it, and one of the people has, like, a Hulu-Live Nation combo-type thing they were putting together, you know.

And, I mean, it's just -- I was wearing my Impossible shirt like I normally do. I think they came up to me, and they were like, "Oh" -- you know, I introduced myself, "I'm Joel."

And they're like, "Oh, is that Impossible Foods?"

And I was like, "Actually, funny enough, no." And then I had to backtrack basically, like, "No, we're not associated. This is what we actually do."

Q. What were you doing -- was there any business for you to be at that Austin City Limits event?

A. We were at a -- I was helping one of my friends with a -- he had a video shoot that he

was on.

Q. And in what way were you helping that friend?

A. Emotional support. He had free badges at ACL, and we were going to ACL. So...

Q. So you were able to get into that ACL event for free?

A. Yeah, I mean, there were other things happening, but yeah.

Q. Through a friend of yours.

What's your friend's name?

A. His name's Will.

Q. What's his last name?

A. It is Roman.

Q. Do you know the name of the person that you were talking to -- the confused person that you were talking to?

A. I don't.

Q. Was it a man or a woman?

A. It was a woman.

Q. And how long was this conversation?

A. About the confusion or total

conversation?
Q. About the confusion.
A. Five minutes?
Q. And what-all did you discuss in that five minutes that you're talking about the confusion?
A. I don't recall.
Q. Did that employee from October 6, 2024, have anything negative to say about you or your company?
A. About me?
Q. Or your company.
A. No.
Q. Did they seem offended or upset?
A. About me?
Q. Did they seem offended or upset about the confusion?
A. They were not upset with me.
Q. Did they seem upset at all?
A. I don't think so.
Q. This person from October 6, 2024, did they say whether they had seen any Impossible

Foods apparel before?
A. I don't know. I don't -- I don't know.
Q. Did they say whether they had seen any particular -- encountered any particular Impossible Foods product or service?
A. I don't -- I don't know.
Q. All right. Still on page 17 of Exhibit 36.
Line 22, do you see the entry about October 10?
A. Yeah.
Q. All right. Can you tell me about that -- everything you remember about that instance of confusion.
A. Yeah. Again I'm wearing the shirt. People see me wearing the shirt, and they ask me like, "Oh, you do something with Impossible Foods?"
I have to be like, "No. Impossible Foods is my company."
Whoa. Impossible is my company. Impossible Foods is suing my company. Correct

the record.

Q. You describe this person as an acquaintance who identifies as a vegetarian; is that right?

A. Yeah, I think so.

Q. What's the acquaintance's name?

A. I don't even know.

Q. How do you know they're a vegetarian?

A. They said, "Oh, I'm a" -- they said, "Do you work for Impossible Foods? I'm a vegetarian."

Q. Was this also at Austin City Limits?

A. No. This was somewhere else around town.

Q. And how long was this is conversation on October 10 about the confusion?

A. About five minutes.

Q. And do you remember what you discussed during that five minutes about the confusion?

A. I don't -- I don't recall specifically.

Q. Did the vegetarian on October 10 say whether they had encountered any particular

product or service of Impossible Foods?
A. I don't recall.
Q. Was it a man or a woman?
A. I don't recall.
Q. Okay. Can you turn to the next page.
A. Yeah.
Q. All right. Page 18 of Exhibit 36, line 1, do you see a description of an instance of confusion in summer 2017?
A. Yep.
Q. Okay. What do you remember about this summer 2017 instance of confusion?
A. I think I was wearing an Impossible shirt. I entered into the restaurant, and someone mentioned that they're trying my burger.
Q. Did you have a conversation with that person?
A. I don't think so.
Q. So after the summer of 2017 conversation, were you concerned about potential confusion between Impossible LLC and Impossible Foods?

A. Concerned?
Q. Yeah.
A. Maybe.
Q. So after this summer 2017 conversation, did you conduct any investigation into Impossible Foods' trademark filings with the USPTO?
A. I don't remember.
Q. Did you conduct any investigation into Impossible Foods' use of the word "Impossible" after this summer 2017 conversation?
A. I don't remember.
Q. Have you ever looked at Impossible Foods' Instagram page?
A. I think so.
Q. Do you remember the earliest date that you would have looked at that Instagram page?
A. No.
Q. No way to approximate?
A. No.
MR. FLEMMING: Keep that in front of you, but I am going to hand you what I've marked

A. I'm not quite sure. It's -- at the time it sort of seemed like this, like, niche restaurant brand thing.
Q. In 2017 did you look into whether Impossible Foods was engaging in charity or philanthropy?
A. Like I said, it just seemed like there was a -- it was a niche restaurant service thing.
Q. But did you look into whether Impossible Foods was engaging in charity or philanthropy in 2017?
A. I don't recall.
Q. And did you look into whether Impossible Foods was making apparel with "Impossible" on it in 2017?
A. I don't recall.
Q. How about 2018?
A. I don't know.
Q. What about 2019?
A. I don't know.
Q. When did you first become aware that

Impossible Foods was making apparel with the word "Impossible" on it?
A. Oh, I'm not sure.
Q. Is there any way for you to estimate?
A. I don't know.
Again, I thought it was a niche restaurant brand.
Q. Can you pull back up Exhibit 36 with the interrogatory responses. It's at the bottom of your stack there.
Okay. On page 18 of Exhibit 36, can you see -- can you look at line 7.
And do you see a March 2019 entry?
A. Yeah.
Q. Can you tell me more about that instance of confusion in March 2019.
A. Yep. I was at an event, I was wearing my Impossible shirt, and, like I mentioned, I'd introduce myself, "Hey, I'm Joel with Impossible." I think the podcaster asked me if I was with Impossible Foods, and I was like, "No." I had to explain myself. Had a good

conversation afterwards, but -- that's common interaction.

Q. Who was the podcaster?

A. That was Rich Roll.

Q. Do you currently have a good relationship with Mr. Roll?

A. I wouldn't say we even have much of a relationship.

Q. Did the confusion have any impact on your relationship with Mr. Roll?

A. I don't know.

Q. Did Mr. Roll cover this lawsuit on his podcast?

A. Yes, he did.

Q. And did he -- was he critical of either party in the lawsuit?

A. I would have to watch the podcast again.

Q. Do you remember whether he was more in favor of your side or Impossible Foods' side?

A. I don't think he liked you guys litigating the case.

Q. And this was after the case was filed; right? So sometime --
A. Yeah.
Q. -- after 2021?
A. I don't have the date, but...
Q. Okay. All right. Let's keep going.
Line 11, do you see an entry for June 20, 2019.
A. Yep.
Q. Can you describe that instance for me.
A. Yep. I did a thing at -- collaborative. It was a conference hosted by Classy. Classy is a fundraising platform for nonprofits. So that's one of the ones that we used for Pencils of Promises.
Q. Uh-huh.
A. They asked me to come speak at one of their events about my Impossible challenges. I went out and did.
And then again, before I was onstage, I was wearing my shirt walking around the conference and had multiple of the same types of

interactions.
Q. So the confused people expressed their confusion after they saw your Impossible shirt?
A. Before the talk.
Q. Before the talk.
And how long did those conversations last?
A. Oh, they were under five minutes.
Q. Each or total -- or collectively?
A. I don't know. I mean, I was speaking at an event, so you're talking to a lot of people. So I would imagine collectively it's way more than five minutes.
Q. Did any of them have any negative reaction to your explanation that --
A. No. We have --
Q. -- you're not associated with Impossible Foods?
A. I think we have a universal positive rating.
Q. You have a -- you mean all of your people who have interacted with you have

universally --

A. People -- the brand is a very positive brand, and people have a positive reaction to the brand.

Q. But what about when they're expressing some confusion: Is that not a negative reaction to the brand?

A. Yeah. I have to overcome that in the first couple minutes of talking to them.

Q. Let's look at line 14.

A. Yes.

Q. See the June 2020 entry?

Can you tell me more about that one.

A. Yeah. I did a race -- we hosted a race in Austin called the Longest Day Race. We ran around the track all day long. Counted the number of laps at the end of it. Austin news wanted to cover it. I mentioned I was doing it for Impossible.

They were like, "Oh, is that Impossible Foods?"

I was like, "Nope. This is what we're

about." Explained it. Did the news story.

Q. At line 17 do could you see the August 2022 entry?

A. Yep.

Q. Do you know whether that woman is a US citizen?

A. I would assume that's not a US citizen.

Q. Okay. And, actually, going up to line 4, the --

A. 4?

Q. Yeah.

Line 4 mentions --

A. Yeah.

Q. -- something happening in Bali.

Do you know whether any of those folks were US citizens?

A. I couldn't tell you. Bali's a nomadic hub.

Q. True.

A. Yeah.

Q. Okay. Keep going. We're almost done with these.

Line 22 on page 18, Exhibit 36, do you
see a reference to October 2022?
A. Yes.
Q. Okay. So this mentions approximately
half a dozen people were confused; is that
right?
A. Yeah. It could have been more, but --
it was a lot.
Q. Did you get any of their names?
A. I did not.
Q. Did any of them end up, like, signing
up for a mailing list or purchasing anything
from you?
A. Yeah. We sold a bunch of T-shirts.
I -- well, I don't know if the people that got
confused were -- I don't know if those are the
same people.
Q. Uh-huh.
A. But at Bridge Day we sold a bunch of
shirts. Separately we also dealt with a lot of
people coming by, getting confused, and I think
we probably handed out a couple thousand

stickers.

Q. The people who were confused at the Bridge Day festival --

A. Yeah.

Q. -- did any of them seem, like, upset with you or upset with your business?

A. They were upset at the immediate -- there's almost -- yeah, I would say that they were -- "upset" is not the word. The word is more "suspect."

Normally the brand is very positive and outgoing and gets universal reception, and once we interact with someone or if they see me first, that's how they think about it. And then oftentimes since the confusion has started, there is a cautiousness that people -- wariness, if you will.

Q. Have you been able to get past that with these people who are confused, that wariness and suspicion?

A. One-on-one personally I'm getting pretty good at it.

Q. Can you think of any instances where you weren't able to get past that?

A. It's harder to do with without -- at scale.

Q. Can you think of any interaction that you've had with a confused person that, like, you failed to, like, get past that --

A. Short interactions where people don't have a lot of time are tough.

Q. Okay. So did any of the confused people that we've talked about so far, did any of them have any prior awareness of your company that you know of?

A. I'm unsure. I couldn't tell you that.

Q. Okay. All right. Let's look at line 26. I think we're -- it's at that same month.

So is that also October 2022?

A. Yeah.

Q. And you're talking about a member of the staff in Bangkok, Thailand?

A. Yep.

Q. Okay. Let's go to the next page, page 19 of Exhibit 36, line 1.

A. Yeah.

Q. Can you tell me about that November 2 entry --

A. Yeah.

Q. -- which seems a little bit more recent.

What happened there?

A. Yeah, I was at a chili cookoff in Terlingua, West Texas. I was wearing my shirt, and I was -- we were, like, handing out some koozies to people before, like, an event or something. I don't exactly remember what it was. Maybe I was handing out stickers or something.

And I was wearing my shirt, and this big, gruff guy's like, "Impossible. It's not that Impossible meat company? You're in the wrong place if do that." So I had to walk him off the edge.

Q. He was kind of aggressive?

A. Yeah, he was like a West Texas aggressive. He was harmless, but...
Q. Like, "not around these parts" type?
A. Yeah.
Q. Did you have a -- did you have a booth at the cookoff --
A. No.
Q. -- or were you walking around?
A. I was just walking around.
Q. A couple more here.
Line 5, the January 3, 2025 --
A. Uh-huh.
Q. -- instance, what happened there?
A. I was just meeting with a buddy.
Q. Okay. And what's your buddy's name?
A. His name's John Durant.
Q. Okay. And this describes Mr. Durant as an investor.
Does that mean just, like, he -- that's his job is investing?
A. Yeah, he's an investor in companies.
Q. Okay. He's not trying to invest in --

company.

A. They could bring me an offer, but I'm not valuing the company and soliciting it for a sale.

Q. So to confirm, you're not able to say whether any of the confusion that you've experienced has harmed the value of any Impossible marks?

MR. CASHMAN: Object to the form.

THE WITNESS: Can you say that again.

BY MR. FLEMMING:

Q. Are you able to say whether all the confusion you've experienced has harmed the value of any Impossible trademarks?

A. Yeah, I'm not a lawyer. I'm not sure.

Q. Has any of the confusion that you've experienced caused a decrease in Impossible LLC's sales?

A. I would need to look at our references, our documents.

Q. What type of document --

MR. CASHMAN: Sorry. Hang on one

second.

Audra, on 288/3 he said, "Yeah, I'm not a lawyer," not "I'm not aware."

THE REPORTER: Oh, it's probably just -- that's fine.

MR. CASHMAN: Okay. I just wanted to make sure.

MR. FLEMMING: I don't have the real-time in front of me, so I'll just ask the question again.

Q. Has any of the actual confusion that you've experienced harmed the value of any of the Impossible trademarks?

A. I would say it's significantly more difficult to continue doing business given Impossible Foods' space.

Q. But has the confusion harmed the value of any of the Impossible marks?

MR. CASHMAN: Object to the form.

THE WITNESS: I'm not sure how to do -- how to valuate that.

BY MR. FLEMMING:

Q. Has the -- are you able to say whether the confusion you've experienced has caused any harm to the Impossible marks?

I'm asking about causation here. Has it caused any harm?

A. To the business or to the marks?

Q. To the marks.

A. I'm unsure.

Q. Okay. Earlier I asked about decrease in sales.

So I'll ask again: Has any of the confusion that you've experienced caused a decrease in Impossible LLC's sales?

A. I'm unsure.

Q. And how would you go about finding that out?

MR. CASHMAN: Lacks foundation.

THE WITNESS: Yeah, I'm not -- I'm not sure.

BY MR. FLEMMING:

Q. Has any of the confusion you've

experienced caused any decrease in Impossible LLC's revenues?

A. I'm unsure.

Q. And has any of the confusion you've experienced caused an increase in Impossible LLC's costs and expenses?

A. I would assume so.

Q. How so?

A. Advertising costs go up. You have to carve out other information to make sure -- we talked earlier about me doing a lot of one-on-one work with people to make sure they're not confused. It's a lot harder to do with scale, where you don't have a human touch, and you usually end up counteracting that by just paying more, either by increased ad prices, decreased conversion, something along those lines.

Q. Other than what we've discussed, has Impossible Foods' trademark infringement hurt the value of any of your Impossible trademarks?

A. I'm not a lawyer. I don't know.

Q. And has Impossible Foods' trademark infringement harmed the value of the overall Impossible brand?
MR. CASHMAN: Lacks foundation.
THE WITNESS: I'm not sure.
BY MR. FLEMMING:
Q. Have you ever lost a sale because of Impossible Foods' trademark infringement?
A. I'm not sure how to...
Q. Have you ever, like, lost a sale or lost a customer because of confusion with Impossible Foods or anything like that?
A. I'm unsure.
Q. Have you ever lost out on a potential business opportunity or potential customer because of confusion with Impossible Foods?
A. I think so.
Q. Can you tell me about those.
A. I mean, from a Google standpoint, if you -- you know, from a long-standing time we're now buried under Impossible Foods. That's difficult.

The fact that the first 30 to 60 seconds of any interaction I have with someone personally has to be counteracting an impulse negative reaction, I would assume that compounds over time, and I would also assume that there's a lot more instances that I'm not aware of where that happens and I'm not next to the brand.

Q. You mentioned Google and being buried under Impossible Foods.

Are you talking about in search results pages?

A. Yes.

Q. Are you talking about in search ads?

A. In any of the algorithmic-ranked items. I think this also happens on Meta and Amazon.

Q. Okay.

A. I'm not an expert.

Q. And are you familiar with the algorithms Google uses to display search results?

A. Somewhat.

Q. How so?
A. I've done SEO over the years.
Q. And "SEO" stands for "search" --
A. "Search engine optimization."
Q. -- "engine optimization"?
Okay. We talked about advertising getting more expensive; having to devote more time and resources to resolve the confusion. We talked about being buried in Google results and probably under Meta and Amazon.
Other than those things, how else has Impossible Foods' infringement or the confusion hurt your business?
A. I mean, the broad swath of it is it's a -- I'm overcoming a negative reaction on the initial presentation of the brand. I can tell you the personal stories of it, but I think it also scales out to a lot of situations where I'm not aware of.
Q. Is there, like, an overall industry that Impossible LLC operates in or more than one industry?

A. Yeah. Health. Fitness. Wellness. That overarches a big range of stuff for us.

Q. How would you describe your company's reputation in the industries that it operates in?

A. I think very good.

Q. And has it always been very good?

A. I think so.

Q. What is Impossible LLC's reputation among consumers, just everyday people?

A. I think very good.

Q. Has it always been very good?

A. I think so.

MR. FLEMMING: All right. Why don't we take a break. I'm actually not that far away from being done. So...

THE VIDEOGRAPHER: We're going off the record. Time is 4:15.

(Recess taken.)

THE VIDEOGRAPHER: We're back on the record. Time is 4:36.

MR. FLEMMING: Earlier today we

STATE OF CALIFORNIA )
COUNTY OF SAN MATEO ) SS.

I, AUDRA E. CRAMER, CSR No. 9901, in and for the State of California, do hereby certify:

That, prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named, and thereafter reduced to typewriting under my direction, and the same is a true, correct and complete transcript of said proceedings;

I further certify that I am not interested in the event of the action.

Witness my hand this 14 day of April, 2025.

Certified Shorthand
Reporter for the
State of California