KOLLIN J. ZIMMERMANN (SBN 273092)
KILPATRICK TOWNSEND & STOCKTON LLP
1801 Century Park East
Suite 2300
Los Angeles, California 90067
Telephone: (310) 777-3755
Facsimile: (310) 362-8756
kzimmermann@ktslaw.com

R. CHARLES HENN JR. (*pro hac vice*)
H. FORREST FLEMMING, III (*pro hac vice*)
ERICA CHANIN (*pro hac vice*)
1100 Peachtree Street NE
Atlanta, Georgia 30309
Telephone: (404) 815-6572
Facsimile: (404) 541-3240
chenn@ktslaw.com
fflemming@ktslaw.com
echanin@ktslaw.com

Attorneys for Plaintiff/Counter-Defendant
IMPOSSIBLE FOODS INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

IMPOSSIBLE FOODS INC., a Delaware corporation,

Plaintiff/Counter-Defendant,

v.

IMPOSSIBLE LLC, a Texas limited liability company, and JOEL RUNYON,

Defendants/Counter-Plaintiffs.

Case No. 5:21-cv-02419-BLF (SVK)

**PLAINTIFF/COUNTER-DEFENDANT'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

**FILED UNDER SEAL**

Judge: Hon. Beth Labson Freeman
Date: October 23, 2025
Time: 9:00 a.m.

**NOTICE OF MOTION**

TO DEFENDANTS/COUNTER-PLAINTIFFS IMPOSSIBLE LLC AND JOEL RUNYON AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on October 23, 2025, before the Honorable Beth Labson Freeman, Courtroom 3, 5th floor, San Jose Courthouse, 280 South 1st Street, San Jose,

California 95113, at 9:00 a.m. or as soon thereafter as the matter may be heard, Plaintiff/Counter-Defendant Impossible Foods Inc. ("Impossible Foods") will and hereby does move for partial summary judgment on Impossible LLC's damages claims, its California common law trademark infringement claim, and its defenses of waiver, acquiescence, estoppel, unclean hands, and laches (the "Defenses").

Impossible Foods's motion for partial summary judgment is based on this Notice of Motion and Memorandum and Points of Authorities in Support, the Declaration of R. Charles Henn Jr. attached as **Exhibit 1**, the Declaration of Caitlyn Hatman attached as **Exhibit 2**, the pleadings and papers on file in this action, and such other written or oral argument as may be presented.

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. BACKGROUND ON THE PARTIES AND THEIR MARKS ..... 1

A. Plaintiff Impossible Foods Inc. ..... 1

B. Defendants Joel Runyon and Impossible LLC ..... 2

III. SUMMARY JUDGMENT STANDARD ..... 4

IV. ARGUMENT ..... 4

A. No Evidence Supports a Corrective Advertising Award ..... 4

1. Fact Discovery Revealed No Evidence of the Fact of Damages ..... 5

a) Search Results Pages and "Rankings" ..... 6

b) Alleged Increased Advertising Expenses ..... 7

c) Confusion Evidence ..... 7

2. Expert Discovery Yielded No Evidence of the Fact of Harm ..... 10

3. Impossible LLC Cannot Show the Fact of Damage to Any One Mark ..... 12

4. Impossible LLC Cannot Show Causation ..... 13

a) Search Results Pages and "Rankings" ..... 14

b) Alleged Increased Advertising Expenses ..... 16

c) Confusion Evidence ..... 16

B. No Evidence Supports an Award of Damages for Reputational Harm ..... 17

C. Punitive (or Exemplary) Damages Are Unavailable as a Matter of Law ..... 18

D. Defendants' Laches Defense Fails as a Matter of Law ..... 19

E. Defendants' Estoppel, Acquiescence, Waiver, and Unclean Hands Defenses Fail as a Matter of Law ..... 20

V. CONCLUSION ..... 21

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adray v. Adry-Mart, Inc.*, 76 F.3d 984 (9th Cir. 1995) ..... 5, 14

*AirWair Int'l Ltd. v. Schultz*, 84 F. Supp. 3d 943 (N.D. Cal. 2015) ..... 21

*Am. Auto. Assoc. of N. Cal. v. Gen. Motors LLC*, 367 F. Supp. 3d 1072 (N.D. Cal. 2019) ..... 19

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ..... 19

*Binder v. Disability Grp., Inc.*, 772 F. Supp. 2d 1172 (C.D. Cal. 2011) ..... 9, 10

*Broan Mfg. Co., Inc. v. Associated Distribs., Inc.*, 923 F.2d 1232 (6th Cir. 1991) ..... 5

*Cohn v. Petsmart, Inc.*, 281 F.3d 837 (9th Cir. 2002) ..... 8

*Computer Access Tech. Corp. v. Catalyst Enters., Inc.*, 273 F. Supp. 2d 1063 (N.D. Cal. 2003) ..... 13, 17

*Delta Forensic Eng'g, Inc. v. Delta V Biomechanics, Inc.*, 402 F. Supp. 3d 902 (C.D. Cal. 2019) ..... 8

*Dept. of Parks & Rec. v. Bazaar Del Mundo Inc.*, 448 F.3d 1118 (9th Cir. 2006) ..... 18

*Eat Right Foods Ltd. v. Whole Foods Mkt., Inc.*, 880 F.3d 1109 (9th Cir. 2018) ..... 19, 20

*Huynh v. Quora, Inc.*, 508 F. Supp. 3d 633 (N.D. Cal. 2020) (Freeman, J.) ..... 4

*Impossible Foods Inc. v. Impossible X LLC*, Case No. 21-16977 (9th Cir. 2022) ..... 18

*Int'l Metaphysical Ministry, Inc. v. Wisdom of Heart Church*, 2022 WL 19691043 (N.D. Cal. Dec. 19, 2022) ..... 17

*Int'l Oddities v. Record*, No. CV 12-3934-CAS, 2013 WL 3864050 (C.D. Cal. July 22, 2013) ..... 9, 13

*Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866 (9th Cir. 2002) .......... 20

*Kizer v. Cnty. of San Mateo*, 53 Cal. 3d 139 (1991) .......... 18

*Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400 (9th Cir. 1993) .......... 5, 9

*Lodestar Anstalt v. Bacardi & Co.*, 2019 WL 8105378 (C.D. Cal. July 3, 2019), *aff'd*, 31 F.4th 1228 (9th Cir. 2022) .......... 8, 10

*Magic Kitchen LLC v. Good Things Int'l, Ltd.*, 153 Cal. App. 4th 1144 (2007) .......... 19

*Marketquest Grp., Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234 (S.D. Cal. 2018) .......... 8

*McGlinchy v. Shell Chem. Co.*, 845 F.2d 802 (9th Cir. 1988) .......... 4

*Novell, Inc. v. Weird Stuff, Inc.*, No. C92-20467 JW/EAI, 1993 WL 13767335 (N.D. Cal. Aug. 2, 1993) .......... 20, 21

*OpenAI, Inc. v. Open A.I., Inc.*, 719 F. Supp. 3d 1033 (N.D. Cal. 2024), *aff'd,* No. 24-1963, 2024 WL 4763687 (9th Cir. Nov. 13, 2024) .......... 20

*Optimal Pets, Inc. v. Nutri-Vet, LLC*, 877 F. Supp. 2d 953 (C.D. Cal. 2012) .......... 18

*PetConnect Rescue, Inc. v. Salinas*, 656 F. Supp. 3d 1131 (S.D. Cal. 2023) .......... 21

*Quia Corp. v. Mattel, Inc.*, 2011 WL 2749576 (N.D. Cal. July 14, 2011) .......... 5, 7, 15

*Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1139 (9th Cir. 2006) .......... 20

*Ryoo Dental, Inc. v. Thomas D. Han DMD*, 2016 WL 6138413 (C.D. Cal. Apr. 25, 2016) .......... 15

*Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105 (9th Cir. 2012) .......... 5

*Snapp v. United Transp. Union*, 889 F.3d 1088 (9th Cir. 2018) .......... 6

*Thrive Nat. Care, Inc. v. Thrive Causemetics, Inc.*,
2021 WL 4813257 (C.D. Cal. Oct. 6, 2021) .......... 7

*Tri-Union Seafoods LLC v. Otis McAllister, Inc.*,
No. 17-CV-06646-JSW, 2020 WL 1550233 (N.D. Cal. Jan. 8, 2020) .......... 21

*Unicorn Energy AG v. Tesla Inc.*,
740 F. Supp. 3d 930 (N.D. Cal. 2024) (Freeman, J.) .......... 4

*Wag Hotels, Inc. v. Wag Labs, Inc.*,
2023 WL 3605977 (N.D. Cal. May 22, 2023) (Freeman, J.) .......... *passim*

*Zazu Designs v. L'Oreal, S.A.*,
979 F.2d 499 (7th Cir. 1992) .......... 14, 15

**Statutes**

Cal. Code § 3294(a) .......... 18

**Rules & Regulation**

Fed. R. Civ. P. 26(b)(1)(A)(iii) .......... 17

Fed. R. Civ. P. 30(b)(6) .......... 6

Fed. R. Civ. P. 37(c)(1)(C) .......... 17

## I. INTRODUCTION

Defendant Impossible LLC is the only party seeking damages in this case and therefore is the only party entitled to a jury trial. But Impossible LLC adduced no evidence during discovery to support any of its damages theories—namely, corrective advertising damages, reputational damages, and punitive damages. As shown below, Impossible LLC can prove neither (1) the fact of damages nor (2) causation for any of these theories. Thus, the Court should grant partial summary judgment in Impossible Foods's favor on those theories, and the parties can proceed to a streamlined bench trial.

As to the five Defenses, each fails because Impossible LLC adduced no evidence to support many of the essential elements of those defenses. Accordingly, the Court should streamline trial even further by entering summary judgment against Impossible LLC on the Defenses.

## II. BACKGROUND ON THE PARTIES AND THEIR MARKS

### A. Plaintiff Impossible Foods Inc.

Impossible Foods's mission is to help the planet by making delicious meat from plants. Hatman Decl. ¶ 2. Meat from plants has a fraction of the environmental impact of animal meat, so by offering plant-based meat, Impossible Foods is helping people and companies reduce greenhouse emissions and the use of crucial resources like fresh water. *Id.* ¶ 3.

After operating since 2011 under various names, including "Maraxi," Impossible Foods adopted the name Impossible Foods and the mark IMPOSSIBLE in 2015. *Id.* ¶¶ 4-5. In July 2016, the company released its first product: the Impossible Burger. *Id.* ¶ 6. Over the next few years, the Impossible Burger received widespread acclaim as a groundbreaking beef alternative that, thanks to the company's proprietary ingredient "heme," looks and tastes and smells like animal meat. *Id.* ¶ 7. Thousands of restaurants nationwide started offering Impossible Burgers on their menus, including Gott's Roadside, Jardinière, and Public House. *Id.* ¶ 8. In September 2019, Impossible Foods began offering IMPOSSIBLE-branded ground meat and other products in grocery stores, and in January 2020, the company debuted IMPOSSIBLE-branded sausage, with IMPOSSIBLE-branded chicken debuting the next year. *Id.* ¶¶ 9-11.

From June 2016 to 2024, Impossible Foods used the below IMPOSSIBLE branding:

IMPOSSIBLE




These designs were created by professional branding agency West Studios in March 2015. *Id.* ¶ 5. The word "Impossible" appeared in a publicly available font called "Druk," and the line of colors underneath it represented the colors of the Earth. *Id.*

In 2024, Impossible Foods overhauled its branding to focus on the color red, "inspired by the craveability of meat." *Id.* ¶ 12; Henn Decl. Ex. E (Krogius Dep.) at 111:7–113:3.




Impossible Foods owns several federal registrations for IMPOSSIBLE-formative marks, including in connection with "meat substitutes" and "restaurant services." Henn Decl. Ex. R.

**B. Defendants Joel Runyon and Impossible LLC**

Defendant Joel Runyon is an entrepreneur, blogger, and fitness enthusiast who has pursued numerous ventures since 2011, some of them under one or more "Impossible" names, like Impossible Fitness and Impossible HQ. *See* ECF 241 at 58-60. Mr. Runyon's use of

"impossible" comes from his idea in 2010 to create a personal "Impossible List" of things that might seem impossible at first but will eventually be accomplished. *Id.* Ex. F (Runyon Apr. 10 Dep.) at 104:10–105:8. From that idea, Mr. Runyon created the Blog of Impossible Things and encouraged his readers to "Do the Impossible." *Id.*

Mr. Runyon's IMPOSSIBLE logo uses the publicly-available "League Gothic" font in all caps, but with a strike through the middle, similar to the iconic MISSION: IMPOSSIBLE logo. *Id.* at 21:17–22:11.






Since 2010, Mr. Runyon—the sole member, owner, and employee of Defendant Impossible LLC—has dabbled in search engine optimization, marketing consulting, running ultramarathons, social media influencing, fitness advice, blogging, diet advice (the Paleo diet, in particular), developing mobile apps, selling T-shirts and other apparel, and selling sleep and energy powders. *Id.* Ex. B (Rog 8). This broad swath of endeavors is reflected in the various federal registrations Defendant Impossible LLC owns for marks like IMPOSSIBLE FITNESS, IMPOSSIBLE HQ, IMPOSSIBLE, and IMPOSSIBLE NUTRITION. *Id.* Ex. K.

In its counterclaims, Impossible LLC alleges that Impossible Foods is engaging in infringement through a few *extremely narrow* aspects of Impossible Foods's business. ECF 80 at 23–25. In particular, Impossible LLC alleges that Impossible Foods's use of IMPOSSIBLE on T-

shirts and other apparel "swag"—which is merely ornamental and non-trademark use, on products that Impossible Foods does not *sell* but merely gives to its employees and distributes at some events—infringes Impossible LLC's rights in connection with apparel. *Id.* Impossible LLC also challenges Impossible Foods's sale of a cookbook called Impossible: The Cookbook, which has [redacted] Henn Decl. Ex. Q. Finally, Impossible LLC challenges the use of IMPOSSIBLE in connection with "philanthropy" and other services that Impossible LLC cannot actually identify with particularity, such as "health," "nutrition," and "fitness." *Id.* Ex. A (Rog 1). For purposes of this motion, these goods and services challenged by Impossible LLC, which are ancillary *at best* to Impossible Foods's actual business of creating and selling plant-based meat, are referred to as the "Accused Products."

## III. SUMMARY JUDGMENT STANDARD

"A party is entitled to summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Huynh v. Quora, Inc.*, 508 F. Supp. 3d 633, 641 (N.D. Cal. 2020) (Freeman, J.) (citation omitted). "A dispute as to a material fact is 'genuine'" only "if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party." *Id.* (citation omitted). Where, as here, "the moving party does not have the burden of proof on an issue at trial," it is sufficient to "show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Unicorn Energy AG v. Tesla Inc.*, 740 F. Supp. 3d 930, 940 (N.D. Cal. 2024) (Freeman, J.) (citation omitted).

## IV. ARGUMENT

### A. No Evidence Supports a Corrective Advertising Award

The Court should grant summary judgment to Impossible Foods on Impossible LLC's request for a prospective corrective advertising award for two reasons. ***First***, Impossible LLC cannot show that it has suffered the requisite damage to the value of its marks. ***Second***, Impossible LLC cannot show that any alleged damage to the value of its marks was caused by Impossible Foods's allegedly unlawful conduct. In other words, Impossible LLC can show neither the fact of damages nor causation. *See McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 808

(9th Cir. 1988) (affirming summary judgment due to lack of evidence of "causation or fact of damages").

"[I]n trademark cases[,] courts draw a sharp distinction between proof of the *fact* of damages and proof of the *amount* of damage." *Broan Mfg. Co., Inc. v. Associated Distribs., Inc.*, 923 F.2d 1232, 1235 (6th Cir. 1991) (emphasis original). It is only after the trademark owner proves "the *fact* of damages"—including "proving causation"—that the "evidentiary burden relaxes . . . ." *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1112 (9th Cir. 2012) (emphasis original). So, although "the burden of any uncertainty in the *amount* of damages should be borne by the [alleged] wrongdoer," *Adray v. Adry-Mart, Inc.*, 76 F.3d 984 (9th Cir. 1995) (emphasis added), the trademark owner bears the burden of proving the *fact* of damages—including causation—"with reasonable certainty." *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993); *Quia Corp. v. Mattel*, 2011 WL 2749576, at *4 (N.D. Cal. July 14, 2011) (holding that corrective advertising damages "must be established with reasonable certainty"). Impossible LLC fails to carry this burden.

**1. <u>Fact Discovery Revealed No Evidence of the Fact of Damages</u>**

The parties—including Impossible LLC's expert, Dr. Vanderhart—agree with the holding in *Quia Corp. v. Mattel, Inc.* that a party seeking corrective advertising "must present non-speculative evidence that goodwill and reputation—that is, the value of its mark—was damaged in some way" by the infringement. *Id.*, 2011 WL 2749576, at *5 (N.D. Cal. July 14, 2011); Henn Decl. Ex. H (Vanderhart Rep.) at 22 n.91. This Court quoted and applied the same rule in *Wag Hotels, Inc. v. Wag Labs, Inc.*, 2023 WL 3605977, at *9 (N.D. Cal. May 22, 2023) (Freeman, J.), referencing the Ninth Circuit's holding that corrective advertising awards are intended only to "restore the value plaintiff's trademark has lost due to defendant's infringement." *Adray*, 76 F.3d at 984.

Impossible LLC failed to adduce any evidence that the value of any of its marks was damaged *at all*. At his 30(b)(6) deposition, Mr. Runyon was unable to say what the value of his business or his marks were at any point in the last ten years, meaning he could not say whether those values declined at any point. Henn Decl. Ex. F (Runyon Apr. 10 Dep.) at 305:2–306:12.

Mr. Runyon further admitted that Impossible LLC's "reputation in the industries that it operates in" is, and has "always been[,] very good." *Id.* at 315:3-8. And he similarly admitted that Impossible LLC's "reputation among consumers, just everyday people" is also, and has "always been[,] very good." *Id.* at 315:9-13. Thus, Mr. Runyon confirmed that at no time has Impossible LLC or any of its marks suffered harm to their reputation or goodwill.

Mr. Runyon's testimony echoes that of the plaintiff in *Wag Hotels*, 2023 WL 3605977 (Freeman, J.). In *Wag Hotels*, the plaintiff's CFO testified that the company had "not done any particular analysis on" whether the defendant's conduct had "done anything to impact the financial performance" of the plaintiff. *Id.* at *9. She also confirmed that the company had not done an "analysis" on whether the defendant's "alleged misconduct 'impacted the value of [plaintiff's] goodwill.'" *Id.* Here, as in *Wag Hotels*, the "failure to provide any evidence of diminution of value of [Impossible LLC's marks] that was caused by [Impossible Foods] is fatal to [the] request for corrective advertising damages." *See id.*

Mr. Runyon's binding 30(b)(6) testimony discussed above dooms Impossible LLC's ability to show the fact of damage to the value of any of the company's marks. *See Snapp v. United Transp. Union*, 889 F.3d 1088, 1103 (9th Cir. 2018) (holding that a party "is not allowed to defeat a motion for summary judgment based on an affidavit that . . . contains information that the Rule 30(b)(6) deponent professed not to know."). But for the sake of completeness, below, Impossible Foods addresses each of the ways Impossible LLC has contended (through interrogatory responses *before* the 30(b)(6) deposition and expert reports) it has been harmed. Ultimately, even if the Court accepts these as showings of "harm" generally, no evidence shows that the value—i.e., the goodwill and reputation—of any of Impossible LLC's marks was harmed by Impossible Foods's alleged infringement. Thus, no genuine dispute of material fact exists.

#### ***a) Search Results Pages and "Rankings"***

Impossible LLC contends that it has been harmed because, when consumers search for "impossible" on Google, Amazon, or Meta's platforms, *two* of Impossible LLC's various websites (and not its most important one, <Impossible.co>) appear lower in the search results pages than they appeared previously. Henn Decl. Ex. G (Palmatier Rep.) ¶ 69. Significantly,

Impossible LLC's chart of "Google Page Ranks" shows that rankings for <ImpossibleHQ.com> have vacillated wildly, with no clear trend line, while rankings for <ImpossibleGear.com> have trended sharply *upward*. *Id.* at Ex. L. But even if Impossible LLC's strained interpretation of these rankings is accepted for summary judgment purposes, such a decrease in search result rankings is not equivalent to harm to the "goodwill" or "reputation" of any of Impossible LLC's marks. *See Quia*, 2011 WL 2749576, at *6 ("[E]ven if web traffic has been diverted from its site, Plaintiff has not shown that any underlying or resulting confusion has damaged its goodwill."). For confirmation of this point, the Court can look to the report of Impossible LLC's expert on harm to "Brand Equity," which mentions the search results rankings but does not opine that lower rankings equate to harm to the value of any marks. Henn Decl. Ex. G (Palmatier Rep.) ¶ 69. *See also id.* Ex. I (Palmatier Dep.) at 192:3-10 ("Q. Were you able to in your research to isolate the effect that Impossible Foods's distribution of free clothing had on Mr. Runyon's Google search results or placement? A. No, I was not asked to do that and I did not do that. I was not able to evaluate the change in the level of ranking due to clothing or cookbooks.").

***b) Alleged Increased Advertising Expenses***

Next, Impossible LLC contends that it has been harmed because it now ends up "just paying more, either by increased ad prices [or] decreased conversion" for advertising. *Id.* Ex. F (Runyon Apr. 10 Dep.) at 311:4-18; *id.* Ex. H (Vanderhart Rep.) ¶ 33(e). Again, increased advertising costs do not equate to harm to the goodwill or reputation of any of Impossible LLC's marks themselves. *See Thrive Nat. Care, Inc. v. Thrive Causemetics, Inc.*, 2021 WL 4813257, at *7 (C.D. Cal. Oct. 6, 2021) (cited favorably by *Wag Hotels*) (evidence that infringement "caused the price of advertising to rise" was insufficient to "show that Plaintiff's mark itself has lost value").

***c) Confusion Evidence***

Finally, Impossible LLC contends that it has been harmed in that consumers have actually been confused between Impossible LLC and Impossible Foods. This confusion, Impossible LLC contends, has forced Mr. Runyon to "first explain" to potential customers "that Impossible has no relationship with Impossible Foods." Henn Decl. Ex. B (Rog 19); *id.* Ex. H

(Vanderhart Rep.) ¶ 32. This usually takes "30 to 60 seconds." *Id.* Ex. F (Runyon Apr. 10 Dep.) at 312:14–313:8; *id.* Ex. H (Vanderhart Rep.) ¶ 33(a). And because Mr. Runyon is not aware of whether others might be confused, Impossible LLC alleges that it "is losing out on unquantifiable sales and customer recruitment opportunities." *Id.* Ex. B (Rog 19); *id.* Ex. H (Vanderhart Rep.) ¶ 32.

As an initial matter, almost every instance of "confusion" consists merely of "inquiries . . . about whether the parties [are] related," which "are too ambiguous to demonstrate actual confusion." *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 n.7 (9th Cir. 2002). One of Defendants' examples of confusion is an email labeled "General Inquiry," Henn Decl. Ex. M, and another states, "I just wondered if you had an affiliation with [Impossible Foods] . . . I didn't know about them before and just thought it interesting." *Id.* Ex. P. The rest of Defendants' evidence consists of "misdirected communications," which "are generally not evidence of actual confusion." *Delta Forensic Eng'g, Inc. v. Delta V Biomechanics, Inc.*, 402 F. Supp. 3d 902, 910 (C.D. Cal. 2019).

In any event, as this Court observed in *Wag Hotels*, even competent evidence of actual confusion does not equate to damage to the value of a mark. In *Wag Hotels*, the plaintiff argued that evidence of actual confusion is sufficient to survive summary judgment on the issue of corrective advertising, citing *Marketquest Grp., Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234 (S.D. Cal. 2018). *See Wag Hotels*, 2023 WL 3605977, at *10. The Court disagreed, pointing out that the plaintiff in *Marketquest* "presented evidence that this confusion resulted in damage to the value of its mark by comparing its profits before and after the infringement. Here, Wag Hotels has made no such comparison or otherwise shown damage to the value of its mark." *Wag Hotels*, 2023 WL 3605977, at *10. The court in *Lodestar Anstalt v. Bacardi & Co*. reached the same conclusion, holding that corrective advertising damages were unavailable because the plaintiff failed to show that the "actual consumer confusion . . . damaged its goodwill." *Id.*, 2019 WL 8105378, at *15 (C.D. Cal. July 3, 2019), *aff'd*, 31 F.4th 1228 (9th Cir. 2022).

In this case, even if actual confusion has occurred, Impossible LLC cannot show that the confusion has "damage[d] the value of its mark[s]." *Wag Hotels*, 2023 WL 3605977, at *10.

During his deposition, Mr. Runyon confirmed that none of the actual confusion he was aware of had harmed his company's or his marks' value. When asked whether "any of the actual confusion you've experienced, confusion between Impossible [LLC] and Impossible Foods" had "harmed the value of any of [the] Impossible trademarks," Mr. Runyon responded: "I'm not aware. I wouldn't know. But it seems like it could be." Henn Decl. Ex. F (Runyon Apr. 10 Dep.) at 306:1-20. When asked again, "Are you able to say whether all the confusion you've experienced has harmed the value of any Impossible trademarks," Mr. Runyon responded: "Yeah, I'm not a lawyer. I'm not sure." *Id.* at 308:12-15. Mr. Runyon was "unsure" whether he had ever "lost a sale" or "customer" because of Impossible Foods. *Id.* at 312:7-13. And even when deposing counsel clarified, "I'm asking about causation here. Has it caused any harm?" Mr. Runyon responded, "I'm unsure." *Id.* at 310:2-9. Impossible LLC not only fails to demonstrate any damage to the company or marks, but the allegations of harm are entirely speculative and thus fail as a matter of law. *See Lindy Pen*, 982 F.2d at 1408 (holding that "damages" in a trademark case cannot be "speculative"); *Int'l Oddities v. Record*, No. CV 12-3934-CAS (VBKx), 2013 WL 3864050, at *14 (C.D. Cal. July 22, 2013) ("[P]laintiff's speculation as to the harm that it has suffered as a result of defendant's conduct is insufficient to support an award of compensatory damages for corrective advertising costs.").

Mr. Runyon went even further to confirm that the goodwill and reputation of Impossible LLC's marks had not been negatively affected by any of the confusion. He was asked to discuss the alleged instances of actual confusion during his deposition, and in each case, Mr. Runyon admitted that the confusion did not appear to have any negative effect on the confused individuals or their opinions of Impossible LLC. Henn Decl. Ex. F (Runyon Apr. 10 Dep.) at 260:8-20; 261:12–262:7; 263:11–264:12. The allegedly confused individuals did not "have anything negative to say" about Mr. Runyon or his company, nor did they seem "offended" or "upset at all." *Id.*

Corrective advertising awards are unavailable where, as here, "[t]he only known individuals who had negative opinions of Plaintiffs as a result of Defendants' acts have all had their opinion of Plaintiffs restored, and there is no indication they harbor any lasting ill-will."

*Binder v. Disability Grp., Inc.*, 772 F. Supp. 2d 1172, 1180-81 (C.D. Cal. 2011). As Impossible LLC admits, the purported confusion was *always* resolved, and *always* resolved quickly. According to Impossible LLC, "Mr. Runyon has had success in explaining the differences between Impossible and Impossible Foods during individual interactions." Henn Decl. Ex. B (Rog 19); *id.* Ex. H (Vanderhart Rep.) ¶ 32. And according to Mr. Runyon, it takes "30 to 60 seconds" to remedy the confusion. *Id.* Ex. F (Runyon Apr. 10 Dep.) at 312:14–313:8; *id.* Ex. H (Vanderhart Rep.) ¶ 33(a).

Thus, like in *Wag Hotels*, *Lodestar Anstalt*, and *Binder*, Impossible LLC cannot show that the alleged actual confusion damaged the value of any of the company's marks.

**2. <u>Expert Discovery Yielded No Evidence of the Fact of Harm</u>**

In response to this motion, Impossible LLC will rely heavily on the reports of its two experts, Dr. Palmatier and Dr. Vanderhart. Impossible LLC may also cite the rebuttal report of Impossible Foods's expert, John Plumpe, in an attempt to manufacture a "battle of the experts" that might preclude summary judgment. In light of Impossible LLC's likely strategy, it is critically important to understand how Impossible LLC strategically crafted these two expert reports to make it *appear* as if the experts opined that the value of Impossible LLC's marks had been damaged, when they did not.

Dr. Palmatier—the marketing and branding expert—never opines that the value of Impossible LLC's brand or marks *has been* damaged by the alleged infringement. And though he mentions instances of alleged confusion, he deliberately avoids opining on whether any of those instances damaged the value of any mark. Henn Decl. Ex. G (Palmatier Rep.) ¶¶ 38–40. During his deposition, Dr. Palmatier admitted that: **<u>(a)</u>** <u>he had not done any quantitative assessment of Impossible LLC's brand equity or harm to the brand</u>, Henn Decl. Ex. I (Palmatier Dep.) at 165:19-166:1 ("Q. [] But in this case, you did not undertake to actually measure Impossible LLC's brand equity at any point in time, past, present, future? A. That is correct. It was beyond the scope of what I was asked to do."); 173:3-19 ("Q. Did you undertake in your work in this case any effort to measure the extent of the reduction in brand equity that you say could occur? A. That was beyond the scope of what I was asked to do. So I did not do an empirical analysis of

that. Q. Similarly with regard to potential customers who are less likely to buy products now and in the future, did you undertake any analysis or offer any opinion concerning the extent to which customers would be less likely to buy the products? [] A. I was not asked to do that -- to do a specific analysis of the impact of brand equity on future purchases for either firm."); **and (b)** he was unaware of any lost sales or lost customer. *Id.* at 173:21-174:19 ("Q. [] I think you already said you weren't aware of any lost sales in the present? You're not aware of Impossible LLC's having lost a customer yet? A. I did not see any data showing that Impossible LLC's lost a customer due to a drop in brand equity. Q. [] Put another way, you haven't seen a lost customer due to anything Impossible Food has done with regard to T-shirts or cookbooks or otherwise? [] A. Yes, it was -- on the data I was provided and the scope I was provided, I did not see any specific loss of Impossible LLC's customer due to a drop in brand equity from negative attributes from T-shirts or clothing or recipe books marketed by Impossible Foods.").

Instead, Dr. Palmatier opines only as to what could happen *in the future*. He states that he was asked to "[a]ssume the ***likelihood*** of consumer confusion" and "evaluate the impact of such [likely] confusion on Impossible LLC's brand." *Id.* Ex. G (Palmatier Rep.) ¶ 2. In his "Summary of Opinions," he states that confusion "***would*** damage Impossible LLC's brand equity" and "***would*** negatively impact Impossible LLC's brand equity." *Id.* ¶¶ 4-5. He opines that association "***can*** result in Impossible LLC's brand identity including [unwanted] attributes;" "linkages" between the two "***will be*** diffused," which "***would*** reduce Impossible LLC's brand equity;" "***if*** consumers associate the [Impossible] brand" with Impossible Foods, "this ***could create*** such incongruity;" and reduction "of a unique identity through these mechanisms ***would*** reduce the [sic] Impossible LLC's brand equity." *Id.* ¶ 60 (all emphasis added).

In turn, Dr. Vanderhart—who is not a marketing or branding expert—purports to discuss "Harm to Impossible brand." But in that section of her report, she merely quotes what she "understand[s]" about Dr. Palmatier's report and then includes evidence of actual confusion and search results page rankings. Henn Decl. Ex. H (Vanderhart Rep.) ¶ 31. *See also id.* Ex. J (Vanderhart Dep.) at 45:15-45:20 ("Q. Are you offering any independent opinion of your own concerning whether or not there would be harm to Impossible LLC's brand equity? A. So I think

that's a little bit hard to say directly. I am relying on Dr. Palmatier for that statement."); 51:20-52:11 ("Q. My question is, are you offering any opinions about those subjects, meaning whether harm to brand equity occurs, whether linkages will occur, or are you relying on Dr. Palmatier to offer those opinions in this case? A. So to answer your first question, I'm not offering any opinions as to whether linkages have occurred. And I think we've discussed my opinions regarding harm to the brand. In terms of who I'm relying on to provide that information, I think that it's -- I don't -- I haven't specified or I don't have any idea as to exactly who would be proving that up, say, at trial."); 56:16-57:4 ("Q. Do you also assume for purposes of your report that that confusion causes harm to the brand of Impossible LLC… A. I do not prove harm specifically in that sense, but I do assume that there has been harm that needs to be corrected."). Like Dr. Palmatier, Dr. Vanderhart never affirmatively opines that the value of Impossible LLC's brand or marks has been damaged.

Because neither Dr. Palmatier nor Dr. Vanderhart actually opines that the value of any mark has been damaged, their reports do not create a genuine dispute of material fact concerning whether Impossible LLC has established the fact of damage to the value of its marks.

**3. Impossible LLC Cannot Show the Fact of Damage to Any One Mark**

The Palmatier and Vanderhart reports—like all Impossible LLC's purported evidence of the fact of damages—are doubly irrelevant to the corrective advertising inquiry because they do not discuss whether the value of *any particular mark* has been damaged. Neither side disputes that Impossible LLC bears the burden of proving "that the value of its mark was damaged" with reasonable certainty. *Wag Hotels*, 2023 WL 3605977, at *9. But Impossible LLC never once identifies a "mark" that has been "damaged."

Has the value of the DO SOMETHING IMPOSSIBLE mark been damaged? Impossible LLC adduced no evidence on that question. The same goes for IMPOSSIBLE X, IMPOSSIBLE HQ, IMPOSSIBLE FITNESS, IMPOSSIBLE NUTRITION, the IMPOSSIBLE word mark, the various IMPOSSIBLE stylized marks, and even the animated IMPOSSIBLE mark. Impossible LLC wishes to convince the Court that the *company* or the *brand* (whatever that means in this context) has been damaged, but Impossible LLC must prove that the value of each of its *marks*

has been damaged. Because Impossible LLC adduced no "non-speculative evidence" that the value of any particular mark has been damaged, Impossible LLC cannot meet its summary judgment burden. *See Int'l Oddities*, 2013 WL 3864050, at *14 ("But in all such circumstances, an award of compensatory damages based on potential 'corrective advertising' costs must be tied to 'non-speculative evidence' that the goodwill associated with the plaintiff's mark has actually been diminished by the defendant's conduct.").

Accordingly, Impossible LLC cannot show the fact of damage to the value of any of its marks with reasonable certainty, and its request for corrective advertising fails as a matter of law. *See Wag Hotels*, 2023 WL 3605977, at *10 ("Absent admissible evidence of damage or diminution in value of Wag Hotels's trademark, Wag Hotels has failed to present admissible, non-speculative evidence of loss to its goodwill or reputation and thus its corrective advertising theory of damages fails.").

**4. <u>Impossible LLC Cannot Show Causation</u>**

Even if the record contained non-speculative evidence that the value of any of its marks has been damaged (which it does not), Impossible LLC cannot show that such damage was *caused by Impossible Foods's allegedly unlawful conduct*. "[T]he law requires plaintiffs to distinguish between damages caused by lawful and unlawful conduct." *Computer Access Tech. Corp. v. Catalyst Enters., Inc.*, 273 F. Supp. 2d 1063, 1076 (N.D. Cal. 2003).

Impossible Foods is, and always has been, a plant-based meat company. Impossible LLC does not contest Impossible Foods's use of IMPOSSIBLE-formative marks in connection with Impossible Foods's core business. Instead, Impossible LLC contests Impossible Foods's (merely ornamental and non-trademark) use of IMPOSSIBLE-formative marks in connection with a very limited set of products or services tangential to its core business; i.e., the Accused Products. Impossible LLC must therefore show that any compensable harm was specifically caused by use of IMPOSSIBLE marks on the Accused Products, as opposed to Impossible Foods's uncontested and widespread use of those same marks for its core business: plant-based meat products. *See Computer Access Tech. Corp.*, 273 F. Supp. 2d at 1076 ("CATC did not distinguish between damages caused by trademark infringement, as opposed to Catalyst's

lawful use of the design as a trade dress or copyright."); *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 506 (7th Cir. 1992) ("To justify damages to pay for corrective advertising a plaintiff must show that *the confusion caused by* the defendant's mark injured the plaintiff" (emphasis added)), *cited approvingly by Adray*, 76 F.3d at 988 (holding that corrective advertising is meant to "restore the value plaintiff's trademark has lost ***due to defendant's infringement***" (emphasis added)).

***a) Search Results Pages and "Rankings"***

As noted above, Impossible LLC contends that it has been harmed because when consumers search for "impossible" on Google, Amazon.com, and on Meta's platforms, (1) Impossible Foods is near the top and (2) two of Impossible LLC's websites are lower than they used to be. In this regard, Impossible Foods fails at every link in the causal chain.

***First***, Impossible LLC adduced no evidence that Impossible Foods's placement near the top of search results pages has anything to do with (much less is *caused by*) the allegedly unlawful activity: i.e., Impossible Foods's use of IMPOSSIBLE-formative marks in connection with the Accused Products. For example, Impossible LLC does not—and cannot—point to any Impossible Foods search results for "impossible" mentioning any of the Accused Products, nor any significant advertising activities in connection with those tangential goods and services.

***Second***, Impossible LLC adduced no evidence that its own websites' placements on search results pages have anything to do with Impossible Foods, much less its use of IMPOSSIBLE with the Accused Products. Although Impossible LLC complains about lower rankings (with the actual documents showing no clear trend downward), it has not shown that Impossible Foods is occupying more than one spot in the rankings. Put another way, Impossible LLC does not even attempt to show, e.g., that <ImpossibleHQ.com> enjoys a Google Page Rank of 31 while Impossible Foods occupies 25 of the first 30 rankings. And Impossible LLC deliberately avoids discussing the ranking of its <u>primary</u> website, <Impossible.co>, likely because the results have been entirely unaffected. *See* Henn Decl. Ex. L (showing comparative search results for *only* <ImpossibleHQ.com> and <ImpossibleGear.com>, not <Impossible.co>).

***Third***, Impossible LLC adduced no evidence that these rankings—whether Impossible Foods's rankings or Impossible LLC's rankings—have been affected by *confusion from the Accused Products*. Henn Decl. Ex. I (Palmatier Dep.) at 192:3-10 ("Q. Were you able . . . in your research to isolate the effect that Impossible Foods' distribution of free clothing had on Mr. Runyon's Google search results or placement? A. No, I was not asked to do that and I did not do that. I was not able to evaluate the change in the level of ranking due to clothing or cookbooks.").

Impossible LLC will likely argue that, because it is asserting a "reverse confusion" theory that involves the "swamping" of the senior user, evidence of Impossible Foods "swamping" search results (which has not been shown in any event) is sufficient. Not so. Even in reverse confusion cases, infringement only exists where the junior user's conduct creates a likelihood of confusion. In other words, it is *confusion*, not *swamping*, that is relevant to harm and causation. *See Quia Corp.*, 2011 WL 2749576, at *6 (harm was based on "conjecture" where no evidence showed that "diversion" from internet search pages "resulted from initial interest confusion"); *Zazu Designs*, 979 F.2d at 506 ("To justify damages to pay for corrective advertising a plaintiff must show that the ***confusion*** *caused by* the defendant's mark injured the plaintiff" (emphasis added)). Here, Impossible LLC adduced no evidence or expert testimony that *confusion* has caused higher rankings for Impossible Foods's websites, lower rankings for Impossible LLC's websites, or diverted web traffic.

This exact causation issue was discussed at length in *Ryoo Dental, Inc. v. Thomas D. Han DMD*, 2016 WL 6138413 (C.D. Cal. Apr. 25, 2016), a copyright case. In that case, unlike this one, the plaintiff's expert affirmatively opined that the defendant's infringement caused lower "Google search positioning" and "a decline in traffic from new Google users." *Id.* at *7. The court found the expert opinion "inadequately supported" and "speculative," however, because the expert merely showed a "correlation" between the timing of the infringement and the lower Google positioning and traffic. *Id.* Here, Impossible LLC was unable to convince an expert to provide an (unsupported) opinion similar to that in *Ryoo Dental*, and its paper-thin evidence of correlation is insufficient to carry Impossible LLC's burden of showing "more than

FILED UNDER SEAL

speculation that [its] website lost its first page ranking as a result of [Impossible Foods's] alleged infringement." *See id.* (granting summary judgment on "actual damages").

***b) Alleged Increased Advertising Expenses***

As with the search results pages, Impossible LLC failed to adduce any evidence that the company's purported increase in the cost of advertising was caused by Impossible Foods's allegedly unlawful activity with regard to the Accused Products. Indeed, [redacted] Henn Decl. Ex. D (Rog 21).

***c) Confusion Evidence***

Impossible LLC adduced no evidence that any instance of alleged confusion was caused by Impossible Foods's allegedly unlawful conduct (i.e., by use of IMPOSSIBLE *on the Accused Products* as opposed to on plant-based meat products or general business use and advertising). At his 30(b)(6) deposition, Mr. Runyon was unable to say whether any confused person had encountered any of Impossible Foods's Accused Products. Henn Decl. Ex. F (Runyon Apr. 10 Dep.) at 261:3-6; 262:21–263:2. Impossible LLC's expert, Dr. Palmatier, agreed, testifying "In my review of the documents, [and] in discussion with Mr. Runyon, there was *nothing* that can specifically -- a specific case of confusion that could be identified linked to either the Impossible Foods clothing or cookbook." *Id.* Ex. I (Palmatier Dep.) at 206:3-13 (emphasis added). And of the "confusion" communications produced by Defendants, nearly all reference plant-based meat products. *See id.* Exs. M ("your vegetarian beef product" and "heme"); N ("Vegan Awards"); O ("plant based meat"); P at '190 ("Soy" products).

Impossible LLC may argue that the fact finder could reasonably *infer* that the confusion was due to the Accused Products. But that would not be a reasonable inference; it would be rank speculation, for at least two reasons. ***First***, it is undisputed that [redacted] Henn Decl. Ex. Q. It would be unreasonable to infer that a consumer would be familiar with Impossible Foods because of its swag apparel, poorly selling cookbook, and philanthropy activities, and not because of, e.g., the

Impossible Burger that has appeared on thousands of menus across the country and garnered attention in *The New York Times*, *The San Francisco Chronicle*, CNN, and *Delish*. Henn Decl. Ex. C (Rog 10).

***Second***, to the extent certain instances of purported confusion were triggered by the consumer seeing Mr. Runyon wearing *his own* plain T-shirt with the word IMPOSSIBLE across the front, they are not relevant to the asserted claims. It would be unreasonable to infer that a consumer seeing a plain T-shirt would draw a connection to Impossible Foods's *T-shirts* (which are not sold but only given away sometimes as swag to employees and at events) or to its philanthropy efforts or cookbook—as opposed to the well-known Impossible Burger. Indeed, Runyon's purported examples of confusion entirely center on Impossible Foods's Impossible Burger and other meats made from plants rather than the Accused Products. Henn Decl. Ex. F (Runyon Apr. 10 Dep.) 263:11-18; 262:2-11; *id*. Ex. I (Palmatier Dep.) at 194:15-206:13.

Again, "the law requires plaintiffs to distinguish between damages caused by lawful and unlawful conduct." *Computer Access Tech. Corp.*, 273 F. Supp. 2d at 1076. Impossible LLC adduced no evidence showing that Impossible Foods's allegedly unlawful conduct, as opposed to its lawful conduct, caused the purported confusion. Thus, Impossible LLC fails as a matter of law to carry its burden on the issue of causation.

**B. No Evidence Supports an Award of Damages for Reputational Harm**

Impossible LLC's experts do not address reputational damages, but because Impossible LLC claimed such damages in its initial disclosures, Impossible Foods moves for partial summary judgment on that issue. For the same reasons described above, no evidence shows (1) harm to Impossible LLC's reputation (2) caused by the alleged infringement. Further, Impossible LLC never provided a "computation" of such damages under Rule 26(b)(1)(A)(iii), so dismissal of the claim for reputational damages is appropriate under Rule 37(c)(1)(C). Henn Decl. Ex. S (initial disclosures). *Int'l Metaphysical Ministry, Inc. v. Wisdom of Heart Church*, 2022 WL 19691043, at *6 (N.D. Cal. Dec. 19, 2022).

**C. Punitive (or Exemplary) Damages Are Unavailable as a Matter of Law**

The Court should enter summary judgment against Impossible LLC on its request for punitive/exemplary damages (which are only available in connection with Impossible LLC's California common-law infringement claim) for three independent reasons.

***First***, "[i]n California, as at common law, actual damages are an absolute predicate for an award of exemplary or punitive damages." *Kizer v. Cnty. of San Mateo*, 53 Cal. 3d 139, 147 (1991). As established above, no evidence of actual damages exists, so punitive damages are not available as a matter of law.

***Second***, Impossible LLC cannot prove superior common-law rights in California. To do so, Impossible LLC "must prove that, in that [State], (1) it is the senior user of the mark, and (2) it has established legally sufficient market penetration." *Optimal Pets, Inc. v. Nutri-Vet, LLC*, 877 F. Supp. 2d 953, 959 (C.D. Cal. 2012); *see also Dept. of Parks & Rec. v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1126 (9th Cir. 2006) ("Registration under the Lanham Act has no effect on the registrant's rights under the common law . . . ."). The use also must be "continuous and not interrupted." *Dept of Parks & Rec.*, 448 F.3d at 1126.

As Impossible LLC informed the Ninth Circuit, since at least 2016, Impossible LLC has had no "substantial connections to California," "does not specifically target California," and "does not tailor advertising to California." Answering Brief of Impossible X LLC at 18, *Impossible Foods Inc. v. Impossible X LLC*, Case No. 21-16977 (9th Cir. 2022). Because Impossible LLC cannot show "sufficient market penetration" in California, including "continuous and uninterrupted" use of its marks in the State, its California common-law infringement claim fails as a matter of law, and summary judgment on that claim should be entered in Impossible Foods's favor.

And ***third***, on the merits, Impossible LLC failed to adduce any evidence, much less "clear and convincing evidence," of the "oppression, fraud, or malice" required to recover punitive damages. Cal. Code § 3294(a). At summary judgment, courts must take into account the "clear and convincing" standard by asking "whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the

defendant." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). Here, based on the record evidence, the jury could not reasonably find clear and convincing evidence of malice, oppression, or fraud.

Like seemingly every run-of-the-mill trademark case, Impossible LLC *can* show that Impossible Foods had prior knowledge of Impossible LLC's IMPOSSIBLE marks because Impossible Foods conducted a trademark search prior to adopting its IMPOSSIBLE branding—a search that disclosed numerous IMPOSSIBLE-formative marks used by numerous third parties. But what Impossible LLC *cannot* show is "clear and convincing" evidence of oppression, fraud, or malice, because mere knowledge is not enough to prove any of those things. *See, e.g.*, *Am. Auto. Assoc. of N. Cal. v. Gen. Motors LLC*, 367 F. Supp. 3d 1072, 1103 (N.D. Cal. 2019) ("Mere knowledge . . . is not sufficient" to show "willfulness" in context of profits disgorgement). Indeed, California law provides that to show *willfulness*—arguably a lower standard than malice, oppression, or fraud—the plaintiff must prove that the alleged infringer knew "not only that its [mark] mimics another, but that its mimicking . . . constitutes trade [mark] infringement." *Magic Kitchen LLC v. Good Things Int'l, Ltd.*, 153 Cal. App. 4th 1144 (2007).

Here, no such evidence exists, only implication arising from knowledge and similarity. And again, Impossible LLC must adduce clear and convincing evidence of malice, oppression, or fraud *as to the Accused Products*. Absolutely no evidence even suggests that Impossible Foods decided to give away apparel "swag," or release a cookbook, or engage in philanthropic activities, with "malice" or "fraud." No reasonable jury could conclude otherwise, so summary judgment is warranted three times over on Impossible LLC's request for punitive damages.

**D. Defendants' Laches Defense Fails as a Matter of Law**

Defendants contend that Impossible Foods's trademark claims challenging Defendants' IMPOSSIBLE SLEEP and IMPOSSIBLE ENERGY powders (the "Powders") are barred by the doctrine of laches. The Court should enter summary judgment against Defendants on that defense because Defendants cannot show "both an unreasonable delay by the plaintiff and prejudice to [Defendants]." *Eat Right Foods Ltd. v. Whole Foods Mkt., Inc.*, 880 F.3d 1109,

1115 (9th Cir. 2018).

In California federal courts, there is a "strong presumption against laches" if the claim is brought within four years of the date the claimant "knew (or should have known) of the allegedly infringing conduct." *Id.*; *OpenAI, Inc. v. Open A.I., Inc.*, 719 F. Supp. 3d 1033, 1050 (N.D. Cal. 2024), *aff'd,* No. 24-1963, 2024 WL 4763687 (9th Cir. Nov. 13, 2024) (four years). Here, Defendants began selling the Powders in 2022, and Impossible Foods moved to assert claims against the Powders on July 23, 2024 (Dkt. 91). Thus, there is a strong presumption that Impossible Foods's "delay" was reasonable. As to prejudice, no record evidence shows that Defendants were prejudiced by Impossible Foods's two-year "delay" in challenging the Powders. *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1139 (9th Cir. 2006) ("It is extremely rare for laches to be effectively invoked when a plaintiff has filed his action before limitations in an analogous action at law has run." (quoting *Shouse v. Pierce Cty.*, 559 F.2d 1142, 1147 (9th Cir. 1977))).

### E. Defendants' Estoppel, Acquiescence, Waiver, and Unclean Hands Defenses Fail as a Matter of Law

Defendants' affirmative defenses of unclean hands, waiver, acquiescence, and estoppel—all of which only apply to Impossible Foods's claims of fraud and abandonment—fail as a matter of law because no evidence supports the defenses. Beginning with unclean hands, Defendants cannot point to any evidence that Impossible Foods acted inequitably specifically with respect to the fraud and abandonment claims. *Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 870 (9th Cir. 2002) (holding that a defendant "must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims" (emphasis added)). Indeed, this "defense" is nonsensical because Impossible Foods could not have engaged in any "inequitable conduct" that "relates to" Impossible LLC's own fraudulent acts in registering its marks and then abandoning them.

As to waiver, Defendants allege only that Impossible Foods delayed in bringing its fraud and abandonment claims. But "waiver" is "the intentional relinquishment of a known right with knowledge and the intent to relinquish it." *Novell, Inc. v. Weird Stuff, Inc.*, No. C92-

20467 JW/EAI, 1993 WL 13767335, at *12 (N.D. Cal. Aug. 2, 1993). And "failure to act, without more, is insufficient evidence of a trademark owner's intent to waive its right . . . ." *Id.* Thus, Defendants' waiver defense fails.

Defendants' acquiescence defense fails along similar lines. Defendants cannot show that Impossible Foods made an "active representation" that it would not assert the fraud or abandonment claims, as required. Henn Decl. Ex. T; *PetConnect Rescue, Inc. v. Salinas*, 656 F. Supp. 3d 1131, 1180 (S.D. Cal. 2023). And the law is clear that a delay or prior "failure[] to act" is insufficient to show such an "active representation." *Id.*; *see also Tri-Union Seafoods LLC v. Otis McAllister, Inc.*, No. 17-CV-06646-JSW, 2020 WL 1550233, at *4 (N.D. Cal. Jan. 8, 2020) ("Acquiescence requires 'active consent' while laches implies 'merely passive consent.'"). Nor can Defendants meet the remaining elements of the defense, which overlap with laches.

Finally, the estoppel defense (if applicable at all to fraud and abandonment claims, which is denied) would require proof of all four of the following: (1) Impossible Foods knew that Impossible LLC had fraudulently procured and also abandoned its marks; (2) Impossible Foods's failure to act led Impossible LLC to reasonably believe Impossible Foods would not bring fraud or abandonment claims; (3) Impossible LLC did not know Impossible Foods believed there was fraud or abandonment; and (4) due to its reliance on Impossible Foods's inaction, Impossible LLC would be "materially prejudiced" if the fraud and abandonment claims proceed." *See AirWair Int'l Ltd. v. Schultz*, 84 F. Supp. 3d 943, 958 (N.D. Cal. 2015). Defendants adduced no evidence on any of these elements, and summary judgment is thus appropriate on the estoppel defense.

## V. CONCLUSION

For the foregoing reasons, Impossible Foods's motion should be granted, and this more streamlined case should proceed to a bench trial.

DATED: August 8, 2025

Respectfully submitted,

**KILPATRICK TOWNSEND & STOCKTON**

By: */s/ H. Forrest Flemming, III*

R. Charles Henn Jr. (*pro hac vice*)
H. Forrest Flemming, III (*pro hac vice)*
Erica Chanin (*pro hac vice*)
Kollin Zimmerman (SBN 273092)

*Attorneys for Plaintiff/Counter-Defendant*
IMPOSSIBLE FOODS INC.

**CERTIFICATE OF SERVICE**

I hereby certify that on August 8, 2025, the foregoing document was filed electronically using the Court's CM/ECF system, which will send notification of such filing to counsel for Defendants Impossible LLC and Joel Runyon, and in addition was served by electronic mail addressed as follows:

J. Noah Hagey
Adam S. Cashman
Gregory D. Washington
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
hagey@braunhagey.com
cashman@braunhagey.com
gwashington@keker.com

David E. Weslow
Adrienne J. Kosak
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
dweslow@wiley.law
akosak@wiley.law

Marissa Benavides
BRAUNHAGEY & BORDEN LLP
118 W 22nd Street, 12th Floor
New York, NY 10011
benavides@braunhagey.com

*/s/ H. Forrest Flemming, III*
H. Forrest Flemming, III