G. ROXANNE ELINGS (*pro hac vice*)
roxanneelings@dwt.com
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Telephone: (212) 489-8230
Facsimile: (212) 489-8340

SARAH E. BURNS (CA State Bar No. 324466)
sarahburns@dwt.com
DAVIS WRIGHT TREMAINE LLP
50 California Street, 23rd Floor
San Francisco, CA 94111
Telephone: (415) 276-6500
Facsimile: (415) 276-6599

Attorneys for Plaintiff/ Counter-Defendant
IMPOSSIBLE FOODS INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IMPOSSIBLE FOODS INC.,<br><br>Plaintiff,<br><br>vs.<br><br>IMPOSSIBLE X LLC, et al.,<br><br>Defendants. | Case No. 5:21-cv-02419 BLF<br><br>**IMPOSSIBLE FOODS'PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Judge: Hon. Beth L. Freeman |

Pursuant to the Court's Standing Order Re Civil Bench Trials, Plaintiff and Counterclaim-Defendant Impossible Foods Inc. ("Impossible Foods") provides the following proposed Findings of Fact and Conclusions of law.

THIS MATTER came on for trial to the Court beginning on March 6, 2026. Plaintiff/Counter-Defendant Impossible Foods Inc. ("Impossible Foods") was represented by G. Roxanne Elings, Sarah E. Burns, and Raphael Holoszyc-Pimentel of Davis Wright Tremaine LLP. Defendants/Counter-Plaintiffs Joel Runyon and Impossible X LLC (collectively, "Impossible X") were represented by J. Noah Hagey, Adam S. Cashman, Greg Washington, J. Tobias Rowe, and Oliver McNicholas of BraunHagey & Borden LLP.

After fully considering the evidence offered at trial, the Court now makes and enters the following:

## I. POST-TRIAL FINDINGS OF FACT

1. Plaintiff Impossible Foods is a Delaware corporation with its principal place of business at 400 Saginaw Drive, Redwood City, California. Impossible Foods develops and distributes plant-based substitutes for meat products.

2. Impossible LLC is a Texas limited liability company with a principal place of business at 402 West Johanna St., Austin, Texas 78704. On January 1, 2021, Impossible LLC merged with Impossible X LLC, an Illinois limited liability company with its principal place of business at 1231 Champion Forest Court, Wheaton, Illinois 60187. As a consequence of that merger, Impossible LLC acquired, among other things, any trademark rights owned by Impossible X LLC, as well as any liabilities. ILLC is solely owned and operated by XLLC founder Joel Runyon, and has no other members, employees, or outside investors, and no manufacturing or production facilities. On information and belief, Mr. Runyon resides in Austin, Texas. Joel Runyon, Impossible X LLC, and Impossible LLC are collectively referred to as "Impossible X."

3. Impossible X offers motivational blog and video content and information relating to exercise and fitness through its multiple websites, in addition to a small offering of apparel. Impossible X also claims to offer search engine optimization services and marketing consulting in the field of social media.

4. Impossible Foods owns federally-registered trademark rights in numerous IMPOSSIBLE-formative marks, including:

| MARK | REG. NO. | DATE OF FIRST USE | FILING DATE/ REG. DATE | GOODS AND SERVICES |
|---|---|---|---|---|
| IMPOSSIBLE | 5459255 | Oct 29, 2015 | Oct 25, 2013 / May 1, 2018 | Substitutes for foods made from animals or animal products, namely, vegetable-based burger patties; meat substitutes |
| IMPOSSIBLE™ | 7179385 | Oct 29, 2015 | Apr 19, 2022 / Oct 3, 2023 | Meat substitutes; plant-based meat substitutes; plant-based meat patties; vegan and vegetarian meat substitutes; plant-based chicken substitutes; poultry substitutes; plant-based poultry substitutes |
| IMPOSSIBLE | 98042164 | Oct 29, 2015 | Jun 14, 2023 / May 28, 2024 | Meat substitutes; plant-based meat substitutes; vegan and vegetarian meat substitutes; plant-based meat patties; plant-based ground meat; chicken substitutes; poultry substitutes; pork substitutes; plant-based meatballs; plant-based sausage; prepared meals consisting primarily of plant-based meat; frozen meals consisting primarily of plant-based meat |
| IMPOSSIBLE BURGER | 6211591 | July 2016 | May 16, 2018 / Dec. 1, 2020 | Substitutes for food, namely, plant-based meat substitutes |

| MARK | REG. NO. | DATE OF FIRST USE | FILING DATE/ REG. DATE | GOODS AND SERVICES |
|---|---|---|---|---|
| IMPOSSIBLE | 7249916 | Oct 12, 2016 | May 13, 2021 / Dec. 19, 2023 | Restaurant services; café services, cafeterias, snack bar services, and the provision of food in restaurants and cafes; catering services for meals |
| IMPOSSIBLE | 5370337 | Nov 3, 2016 | May 20, 2014 / Jan 2, 2018 | Providing food and drink via mobile truck; catering services |

The registrations in the foregoing table are collectively referred to as "Impossible Foods' Registrations," and the marks underlying those registrations are collectively referred to as "Impossible Foods' Marks."

5. Over almost a decade, Impossible Foods invested millions of dollars in building and promoting its IMPOSSIBLE trademarks. Impossible Foods's IMPOSSIBLE-branded products are widely available at restaurants and grocery retailers across the United States.

6. Impossible Foods is a pioneer in the field of plant-based substitutes for meat products. The company's aim is to give people the taste and nutritional benefits of meat without the negative health and environmental impacts associated with products from livestock. The company's signature products—the IMPOSSIBLE BURGER and other plant-based IMPOSSIBLE meat substitutes—are widely available in grocery stores across the United States. IMPOSSIBLE-branded products are sold at thousands of restaurants and also are also available at numerous independent, high-end restaurants.

7. Since its inception, Impossible Foods's IMPOSSIBLE mark has received considerable publicity and the mark has been featured in prominent national news coverage.

8. Since at least as early as 2015, Impossible Foods has continuously used the mark IMPOSSIBLE in connection with edible products.

9. Impossible Foods began using the IMPOSSIBLE mark with edible products prior

to any trademark use by Impossible X for edible products.

10. Impossible Foods' IMPOSSIBLE marks are arbitrary and enjoy a high degree of commercial strength because Impossible Foods has used the marks regularly and continuously since October of 2015 for plant-based substitutes for meat products, restaurant services, recipes, ingredients, and cooking information, and other related goods and services.

11. As a result of the commercial success of Impossible Foods' products, the IMPOSSIBLE mark has become well-known, including in California—especially in connection with meat substitutes.

12. Impossible Foods intends to continue using its IMPOSSIBLE marks in connection with its goods and services, including those related to recipes, food ingredients, and cooking information.

13. More than five years after Impossible Foods commenced use of its IMPOSSIBLE marks, Impossible X sent a demand letter to Impossible Foods. Impossible X's letter accused Impossible Foods of "encroachment into spaces either occupied by or closely related to goods and services offered by [Impossible X]," which it said "greatly increases the likelihood of confusion."

14. Impossible X's letter demanded that Impossible Foods "cease all use of its confusingly similar IMPOSSIBLE designs (that is, uses without 'FOODS' in stylizations that mimic [Impossible X's] marks) and limit the use of its IMPOSSIBLE mark to only use in association with plant-based food substitutes."

15. On November 25, 2020, Impossible X filed a Notice of Opposition with the Trademark Trial and Appeal Board opposing Impossible Foods's trademark application for the mark IMPOSSIBLE (Serial No. 88/855875), which covers: "Providing information about recipes, ingredients and cooking information; providing an online computer database to consumers featuring information about recipes, ingredients and cooking information."

16. In its Notice of Opposition, Impossible X alleged it "has used its IMPOSSIBLE Marks in association with nutrition, food, and cooking resources since 2010 including publication of guides to different foods, ingredients, diets, and recipes."

17. In its Notice of Opposition, Impossible X alleged ownership of 10 trademark

registrations and 1 pending application. None of the USPTO filings submitted in connection with those marks shows use in connection with food or cooking.

18. In its Notice of Opposition, Impossible X also alleged:

- That Impossible Foods lacks "any constructive or actual right" in the IMPOSSIBLE trademark;
- That "[t]here is no issue of priority."; and
- That registration of Impossible Foods' IMPOSSIBLE trademark in connection with the applied-for services "would result in irreparable damage to Impossible X as consumers would be likely to consider the services offered under the registered mark as emanating from Impossible X, and purchase such services, resulting in a loss to Impossible X."

19. The three websites at the core of Impossible X's web presence, <impossiblex.com>, <impossiblehq.com>, and <impossible.co>, did not offer any products or services related to recipes, food or cooking until 2017 at the earliest.

20. The goods and services that Impossible Foods has continuously provided under its IMPOSSIBLE marks since 2015 or earlier are not similar to any goods and services Impossible X actually offered under its marks prior to 2016 and are not likely to create confusion among consumers.

21. The consuming public does not associate Impossible X's IMPOSSIBLE- formative marks with recipes, food ingredients, or cooking information because Impossible X has no history of providing such goods and services under IMPOSSIBLE-formative marks.

22. Impossible X is using, at the direction of Mr. Runyon, IMPOSSIBLE-formative marks in connection with edible products such as sleep and energy powders, and intends to offer for sale additional edible products soon (the "Accused Products").

23. Impossible X's use of IMPOSSIBLE-formative marks in connection with the Accused Products are similar to, and compete with, the edible products offered and sold by Impossible Foods.

24. Defendants adopted and used IMPOSSIBLE-formative marks in connection with the Accused Products, at the direction of Mr. Runyon,  knowing Impossible Foods was using IMPOSSIBLE-formative marks in connection with edible products.

25. The Accused Products are marketed through channels that overlap the channels through which Impossible Foods sells its edible products, including social media, and offered through overlapping channels of trade, including online through Amazon.

26. Impossible X's use of IMPOSSIBLE-formative marks in connection with the Accused Products is not authorized by Impossible Foods.

27. On July 26, 2016, Impossible X, at the direction of Mr. Runyon, filed an intent-to-use application (Serial No. 87116501) for the mark IMPOSSIBLE NUTRITION & Design shown below in connection with, *inter alia*, "nutritional supplements" in Class 5

28. On March 7, 2017, the USPTO issued a notice of allowance for Impossible X's application for the above mark.

29. On November 16, 2017, Impossible X, at the direction of Mr. Runyon, filed a Statement of Use ("SOU") for the application for the above mark, claiming a first-use date of August 15, 2017 in connection with "nutritional supplements."

30. On the same day, November 16, 2017, Impossible X, at the direction of Mr. Runyon, filed an amended drawing for the mark, which is shown below and ultimately matured to registration ("IMPOSSIBLE NUTRITION Design Mark"):

31. On January 23, 2018, the IMPOSSIBLE NUTRITION Design Mark matured to registration, Registration No. 5387588.

32. Impossible X began offering nutritional supplements for sale in connection with the IMPOSSIBLE NUTRITION Design Mark on a third-party website on or around December 14, 2017:

33. On September 16, 2022, Impossible X, at the direction of Mr. Runyon, instructed

the third- party website to remove those products:

34. Impossible X's last sale of nutritional supplements in connection with the IMPOSSIBLE NUTRITION Design Mark was on September 21, 2021:

35. By October 17, 2021, Impossible X's nutritional supplements bearing the IMPOSSIBLE NUTRITION Design Mark were no longer available for purchase on Impossible X's website:

36. On January 23, 2023, the USPTO issued a reminder to Impossible X to submit a Section 8 Declaration of Use and/or Excusable Neglect by January 23, 2024, with an option to file a Section 15 Declaration to "claim the benefits of incontestability."

37. Impossible X thereafter resumed using the IMPOSSIBLE NUTRITION Design Mark on its website in connection with nutritional supplements.

38. On July 12, 2024, Impossible X, at the direction of Mr. Runyon, submitted a combined Section 8 and Section 15 declaration for the IMPOSSIBLE NUTRITION Design Mark attesting that "the mark has been continuously used in commerce for five (5) consecutive years after the date of registration."

39. Because Impossible X had not used the IMPOSSIBLE NUTRITION Design Mark in connection with nutritional supplements between October 2021 and December 2023, ILLC's attestation in the Section 8 and Section 15 declaration that "the mark has been continuously used in commerce for five (5) consecutive years" was false.

40. On August 3, 2016, Impossible X at the direction of Mr. Runyon, filed an intent-to-use application (Serial No. 87125862) for IMPOSSIBLE FITNESS & Design ("IMPOSSIBLE FITNESS Design Mark") in connection with "clothing" in Class 25.

IMPOSSIBLE FITNESS

41. On December 14, 2016, the examining attorney filed an Examiner's Amendment amending the identification of the goods and services to: "Clothing and performance apparel, namely, t-shirts, sweatshirts, pants, shorts, tank tops, yoga pants, tights, and underwear."

42. On August 15, 2018, Impossible X, at the direction of Mr. Runyon, filed a SOU in

connection with the application for the IMPOSSIBLE FITNESS Design Mark claiming a first-use date of January 24, 2014.

43. Impossible X at trial produced no evidence or credible testimony that, at the time Impossible X filed the SOU in connection with the IMPOSSIBLE FITNESS Design Mark, it was using or had never used the mark in commerce in connection with “sweatshirts, pants, shorts, tank tops, yoga pants, tights, and underwear.”

44. The August 15, 2018 SOU for the application for the IMPOSSIBLE FITNESS Design Mark was accompanied by a specimen showing purported use on a t-shirt.

45. On October 23, 2018, the IMPOSSIBLE FITNESS Design Mark matured to registration, Registration No. 5590801.

46. Mr. Runyon’s testimony at trial showed that at the time Impossible X filed the SOU in connection with the IMPOSSIBLE FITNESS Design Mark, Impossible X knew that it was not using and had never used the mark in commerce in connection with sweatshirts, pants, shorts, tank tops, yoga pants, tights, and underwear, making its declaration of such use false.

47. On November 16, 2017, Impossible X, at the direction of Mr. Runyon, filed an intent-to-use application (Serial No. 87687403) for IMPOSSIBLE FITNESS (“IMPOSSIBLE FITNESS Word Mark”) in connection with “[c]lothing and performance apparel, namely, t-shirts, sweatshirts, pants, shorts, tank tops, yoga pants, tights, and underwear” in Class 25.

48. On August 15, 2018, Impossible X, at the direction of Mr. Runyon, filed a SOU for the application for the IMPOSSIBLE FITNESS Word Mark claiming a first-use date of January 24, 2014.

49. Impossible X at trial produced no evidence or credible testimony indicating that at the time Impossible X filed the SOU in connection with the IMPOSSIBLE FITNESS Design Mark, it was using or had ever used the mark in commerce in connection with “sweatshirts, pants, shorts, tank tops, yoga pants, tights, and underwear.”

50. The August 15, 2018 SOU was accompanied by the same specimen submitted on August 15, 2018, for the IMPOSSIBLE FITNESS Design Mark at Paragraph 60:

51. On November 6, 2018, the IMPOSSIBLE FITNESS Word Mark matured to

registration, Registration No. 5603025.

52. Mr. Runyon's testimony at trial showed that, at the time Impossible X filed the SOU in connection with the IMPOSSIBLE FITNESS Word Mark, Impossible X knew that it was not using and had never used the mark in commerce in connection with sweatshirts, pants, shorts, tank tops, yoga pants, tights, and underwear, making its declaration of such use false.

53. On January 15, 2018, Impossible X, at the direction of Mr. Runyon, filed a use-based application (Serial No. 87755108) for IMPOSSIBLE ("IMPOSSIBLE Word Mark"), in which Impossible X stated to the USPTO that the IMPOSSIBLE Word Mark was currently in use in commerce in connection with, inter alia, "clothing and performance apparel, namely, t-shirts, sweatshirts, pants, shorts, tank tips [sic], yoga pants, tights and underwear" in Class 25 and claimed that the date of first use was "[a]t least as early as" September 9, 2011.

54. The application for the IMPOSSIBLE Word Mark included a specimen showing the mark used on a tank top.

55. On January 18, 2024, Impossible X, at the direction of Mr. Runyon, submitted a Section 8 Declaration of Use in connection with the application for the IMPOSSIBLE Word Mark asserting, for the Class 25 goods, "[c]lothing and performance apparel, namely, t-shirts, sweatshirts, pants, shorts, tank tops, yoga pants, tights and underwear," that "the mark is in use in commerce on or in connection with **all** goods/services" (emphasis in original).

56. On January 18, 2024, ILLC, at the direction of Mr. Runyon, submitted a specimen for the IMPOSSIBLE Word Mark application showing the mark used on a t-shirt.

57. On February 3, 2024, a trademark examining attorney issued an office action to the application for the IMPOSSIBLE Word Mark "randomly select[ing] [Registration No. 5620625] for audit to determine whether the mark is in use with all of the goods and/or services identified in the affidavit or declaration of use submitted to maintain the registration" requiring ILLC to either (1) submit proof of use for "[c]lothing and performance apparel, namely, tank tops" and "underwear" or (2) delete the audited goods.

58. On December 4, 2024, Impossible X, at the direction of Mr. Runyon, responded to the February 3, 2024 office action for the IMPOSSIBLE Word Mark, deleting "sweatshirts,"

"pants," "shorts," "yoga pants," "tights," and "underwear" from the identification of the goods.

59. On December 4, 2024, Impossible X, at the direction of Mr. Runyon, also submitted specimens showing the IMPOSSIBLE Word Mark in connection with a t-shirt and a tank top.

60. At trial, Impossible X produced no evidence or credible testimony showing that, at the time that Impossible X filed the use-based application in connection with the IMPOSSIBLE Word Mark, Impossible X was using or had ever used the mark in connection with pants, shorts, yoga pants, tights, and underwear.

61. On December 4, 2018, the IMPOSSIBLE Word Mark matured to registration, Registration No. 5620625.

62. Mr. Runyon's testimony at trial showed that, at the time that Impossible X filed the use-based application in connection with the IMPOSSIBLE Word Mark, Impossible X knew that it was not using and had never used the mark in commerce in connection with pants, shorts, yoga pants, tights, and underwear, making its declaration of such use false.

63. On April 19, 2018, Impossible X, at the direction of Mr. Runyon, filed a use-based application (Serial No. 87884481) for IMPOSSIBLE ("IMPOSSIBLE Motion Mark"), in which Impossible X stated to the USPTO that the IMPOSSIBLE Motion Mark was currently in use in commerce in connection with, *inter alia*, "clothing and performance apparel, namely, t-shirts, sweatshirts, pants, shorts, tank tips [sic], yoga pants, tights and underwear" in Class 25 and claimed that the date of first use was "[a]t least as early as" May 29, 2012.

64. The application for the IMPOSSIBLE Motion Mark also included a specimen, which is a video that shows the IMPOSSIBLE Motion Mark at the beginning of the video and then a person appearing to advertise a shirt with the static IMPOSSIBLE mark on it. *See* https://tsdr.uspto.gov/documentviewer?caseId=sn87884481&docId=SPE20180419160610&linkId=22#docIndex=21&page=1.

65. On November 12, 2018, the trademark examiner issued an office action to the application for the IMPOSSIBLE Motion Mark, refusing registration because the specimen submitted in connection with the Class 25 goods was "mere advertising material" and requesting

that Impossible X either submit a new and sufficient specimen evidencing use in commerce or amend the application to an intent-to-use basis.

66. On May 10, 2019, Impossible X, at the direction of Mr. Runyon, responded to the November 12, 2018 office action for the IMPOSSIBLE Motion Mark application and submitted the an alternative specimen of a t-shirt.

67. On January 22, 2020, the trademark examiner issued another office action refusing registration of the IMPOSSIBLE Motion Mark "because the webpage specimen in International Class 25 [was] not an acceptable display associated with the goods and appear[ed] to be mere advertising material."

68. On May 11, 2020, Impossible X, at the direction of Mr. Runyon, submitted another specimen, which is a video recording of a webpage displaying the IMPOSSIBLE Motion Mark next to a t-shirt appearing to be offered for sale. *See* https://tsdr.uspto.gov/documentviewer?caseId=sn87884481&docId=SPE20200511122033&linkId=12#docIndex=11&page=1; Exhibit MM.

69. On September 28, 2020, the trademark examiner issued another office action rejecting the specimen for "appear[ing] to be in the nature of a digital mockup that fail[ed] to show the applied-for mark in actual use in commerce."

70. On October 20, 2020, Impossible X, at the direction of Mr. Runyon, responded to the September 28, 2020 office action for the IMPOSSIBLE Motion Mark and submitted another new specimen in connection with the application: a video recording of a webpage displaying the IMPOSSIBLE Motion Mark next to a t-shirt being offered for sale. *See* https://tsdr.uspto.gov/documentviewer?caseId=sn87884481&docId=SPE20201020190019&linkId=8; Exhibits OO-PP.

71. Evidence at trial showed that, until May 2020, there was no use of the IMPOSSIBLE Motion Mark on any of Impossible X's websites in connection with any of the Class 25 goods, "clothing and performance apparel, namely, t-shirts, sweatshirts, pants, shorts, tank tips, yoga pants, tights and underwear," listed in the identification.

72. After May 2020, the only good that Impossible X offered in connection with the

IMPOSSIBLE Motion Mark was a "Men's IMPOSSIBLE Shirt (Blue)" that was displayed in the October 20, 2020 specimen.

73. At least as of October 2021, archived webpages reveal that the IMPOSSIBLE Motion Mark appears nowhere on ILLC's website in connection with any of the Class 25 goods, "clothing and performance apparel, namely, t-shirts, sweatshirts, pants, shorts, tank tips, yoga pants, tights and underwear."

74. Mr. Runyon's testimony at trial shows that, at the time Impossible X filed the use-based application for the IMPOSSIBLE Motion Mark, Impossible X was not using and had never used the mark in connection "clothing and performance apparel, namely, t-shirts, sweatshirts, pants, shorts, tank tips, yoga pants, tights and underwear."

75. On November 30, 2021, the IMPOSSIBLE Motion Mark matured to registration, Registration No. 6571603.

76. Mr. Runyon's testimony at trial showed that, as of the date Impossible X filed the used-based application in connection with the IMPOSSIBLE Motion Mark, Impossible X knew that it was not using and had never used the mark in commerce in connection with "clothing and performance apparel, namely, t-shirts, sweatshirts, pants, shorts, tank tips, yoga pants, tights and underwear," making its declaration of such use false.

77. Mr. Runyon's testimony at trial indicated that knew the above-described false statements were false when they were submitted and intended for the USPTO to rely on each of his false statements of use.

## II. CONCLUSIONS OF LAW

**Declaratory Judgment**

1. Based on all the evidence at trial, Impossible Foods's use of its IMPOSSIBLE-formative marks in connection with recipes, food ingredients, and cooking information, does not infringe or dilute any of Impossible X's valid trademark rights and does not violate any federal or state trademark, trade name, or related law.

**Lanham Act**

2. Impossible Foods asserts claims for trademark infringement and unfair competition under the Lanham Act. 15 U.S.C. §§ 1114(1); 1125(a)(1). To prevail on a either claim under the Lanham Act, Impossible Foods must prove that (1) it has a protectible ownership interest in the mark and (2) the defendant's use of the mark is likely to confuse consumers. *Network Automation, Inc. v. Adv. Sys. Concepts*, 638 F.3d 1137, 1144 (9th Cir. 2011); *Dep't of Parks & Rec. v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006).

3. Impossible Foods established that its IMPOSSIBLE marks are entitled to protection because the IMPOSSIBLE marks are arbitrary as applied to the Impossible Foods products at issue, i.e., plant-based meat products. The word "impossible" does not describe and does not suggest any specific qualities of those specific products. Accordingly, the IMPOSSIBLE marks are inherently distinctive and entitled to broad protection. *See Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165, 1174 (9th Cir. 2007). Moreover, Impossible Foods' registrations for the IMPOSSIBLE marks are valid and constitute *prima facie* evidence of Impossible Foods' exclusive right to use the marks in connection with the goods and services at issue in United States commerce. *See* 15 U.S.C. § 1057(b). At least one of Impossible Foods' registrations is also incontestable. *See* Registration No. 5459255. *See also* 15 U.S.C. § 1065 (mark in continuous use for five consecutive years subsequent to date of registration is incontestable, subject to qualifications); *Wal-Mart Stores, Inc. v. Samara Bros, Inc.*, 529 U.S. 205, 209 (2000) ("Registration of a mark . . . ordinarily renders the registered mark incontestable after five years of continuous use . . . ."). Incontestable registrations are conclusive evidence of mark validity and the registrant's exclusive right to use the mark registered. 15 U.S.C. § 1115.

4. The likelihood of confusion inquiry turns on whether a "reasonably prudent consumer in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998).

5. Courts in the Ninth Circuit consider the following so-called *Sleekcraft* factors in evaluating likelihood of confusion: 1. strength of the mark; 2. proximity of the goods; 3. similarity

of the marks; 4. evidence of actual confusion; 5. marketing channels used; 6. type of goods and the degree of care likely to be exercised by the purchaser; 7. defendant's intent in selecting the mark; and 8. likelihood of expansion of the product lines. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979). Application of the *Sleekcraft* factors is "fluid," and the plaintiff "need not satisfy every factor, provided that strong showings are made with respect to some of them." *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631 (9th Cir. 2005).

6. As discussed above, Impossible Foods' mark is arbitrary. It therefore must be "afforded the widest ambit of protection from infringing uses." *Interstellar Starship Servs., Ltd. v. Epix Inc.*, 184 F.3d 1107, 1111 (9th Cir. 1999). This factor weighs heavily in Impossible Foods's favor.

7. The second *Sleekcraft* factor, the similarity of the parties' marks, "has always been considered a critical question in the likelihood-of-confusion analysis." *JL Bev. Co.*, 828 F.3d at 1109. Impossible X conceded that the parties' marks—each "IMPOSSIBLE," displayed in all capital letters—are similar. This factor therefore also weighs heavily in Impossible Foods's favor.

8. The parties' goods, i.e., plant-based meat sold by Impossible Foods and sleep and energy powder sold by Impossible X, are related. *See, e.g.*, *Suja, Life, LLC v. Pines Int'l, Inc.*, No. 16-CV-985-GPC(WVG), 2016 WL 6157950, at *7 (S.D. Cal. Oct. 24, 2016) (juice products and "nutritional supplements sold in powder and capsule form" were "somewhat related"); *Hansen Bev. Co. v. Cytosport, Inc.*, No. CV 09-0031-VBF(AGRx), 2009 WL 5104260, at *12 (C.D. Cal. Nov. 4, 2009) (energy drinks and protein shakes were "'related' in the minds of the consumer"). "For related goods, the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." *Sleekcraft*, 599 F.2d at 350. The fact that other well-known companies sell both types of products shows that consumers are likely to believe the parties' products come from the same company. *See Naterra Int'l, Inc. v. Bensalem*, 92 F.4th 1113, 1117 (Fed. Cir. 2024) ("[T]estimony that third-party companies sell both types of goods is pertinent to the relatedness of the goods."). For example, Quest Nutrition sells "meatlovers" pizza and protein powders. Clif Bar sells plant-based protein bars and electrolyte powders. And Hormel sells plant-based meat products and plant-based

protein shakes.

9. The next factor, evidence of actual confusion, favors neither party. Evidence of actual confusion is not required. The absence of such evidence is not dispositive." *Sunsauce Foods Indus. Corp.v. Son Fish Sauce USA Corp.*, No. 22-cv-8973-PCP, 2024 WL 4933346, at *6 (N.D. Cal. Dec. 2, 2024) (quoting *Off. Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1393 (9th Cir. 1993)). *See also Acad. of Mot. Picture Arts & Scis. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991). The paucity of evidence of actual confusion in this case is not surprising, given Impossible X's small number of customers. It is not dispositive in this case and does not weigh in favor of either party. *See Gallo Winery*, 967 F.2d at 1292 (explaining that the absence of evidence of actual confusion "need not create an inference that there is no likelihood of confusion").

10. The fifth factor considers whether the parties' customer bases overlap and how the parties advertise and market their products. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1130 (9th Cir. 2014). This factor looks to whether consumers are likely to be confused by encountering the parties' goods in similar contexts. *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 876–77 (9th Cir. 2014). It weakly weighs in Impossible Foods' favor because the parties market their products using social media, sell their products online, and in particular, sell their products on Amazon. *See Blue Bottle Coffee*, 2024 WL 2061259, at *14.

11. The sixth factor considers the type of goods and the degree of care likely to be exercised by the purchaser. "In analyzing the degree of care that a consumer might exercise in purchasing the parties' goods, the question is whether a 'reasonably prudent consumer' would take the time to distinguish between the two product lines." *Surfvivor Media*, 406 F.3d at 634 "Obviously, the price level of the goods . . . is an important factor in determining the amount of care the reasonably prudent buyer will use." 3 McCarthy, supra, § 23:95. Further,"[p]urchasers of relatively inexpensive goods such as ordinary grocery store foods are held to a lesser standard of purchasing care." *Id.* Here, Impossible X's product retails for between $39 and $49, and Impossible Foods's products retail for between $7 and $11 per pound. Impossible X offered no evidence to show consumers exercised particular care in selecting its products or grocery

products. Given the relatively low price of both products, this factor weighs weakly in favor of likelihood of confusion.

12. The seventh factor favors the plaintiff "where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark." *JL Beverage Co., LLC v. Jim Beam Brands Co*., 828 F.3d 1098, 1111 (9th Cir. 2016) (citation omitted). This factor favors Impossible Foods because Impossible X was aware of Impossible Foods and its priority in this area prior to offering the powders.

13. "The final factor is whether "either or both parties might expand their offered products . . . to overlap." *Interstellar Starship*, 184 F.3d at 1111. Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354. Impossible X has spent years attempting to offer protein bars and protein powders—foods that are even closer to Impossible Foods's meat (i.e., high protein) products. This also favors Impossible Foods.

14. Because all of the *Sleekcraft* factors either weigh in favor of Impossible Foods or are neutral, the Court finds that Impossible Foods proved, by a preponderance of the evidence, its claims for trademark infringement and unfair competition under the Lanham Act.

**Unfair Competition Under California Law**

15. Impossible Foods also asserts a claim for unfair competition under California common law, also arising from Impossible X's use of the Impossible mark in connection with sleep and energy powders. "This Circuit has consistently held that state common law claims of unfair competition . . . are 'substantially congruent' to claims made under the Lanham Act." *Cleary v. News Corp.*, 30 F.3d 1255, 1263–63 (9th Cir. 1994). This Court has also held that "[t]he elements of California state common law claims of unfair competition . . . are substantially congruent to claims made under the Lanham Act." *Iglesia Ni Cristo v. Cayabyab*, No. 18-cv-00561-BLF, 2019 WL 3997474, at *12 (N.D. Cal. Aug. 23, 2019) (Freeman, J.) (citation omitted). Because the Court finds that Impossible Foods succeeds in its Lanham Act claims, it also finds that Impossible Foods succeeds on its claim for unfair competition under California

law.

**Fraud In The Procurement**

16. Impossible Foods seeks cancellation of four of Impossible X's marks, Reg. Nos. 5590801, 5603025, 5620625, and 6571603, collectively referred to hereinafter as the "Void Marks," on the basis that they were procured by fraud. Pursuant to 15 U.S.C. § 1064(3), a federal trademark registration may be canceled "at any time" upon a showing that a registration was procured or maintained via fraud upon the United States Patent and Trademark Office. It also alleges that Impossible X obtained the incontestable status of 5387588 via fraud.

17. A party seeking trademark cancellation for fraud on the PTO pursuant to 15 U.S.C. §§ 1064(c), 1119 must show "a false representation regarding a material fact, the registrant's knowledge or belief that the representation is false, the intent to induce reliance upon the misrepresentation, and reasonable reliance thereon, and damages." *Hokto Kinoko Co. v. Concord Farms, Inc.*, 810 F. Supp. 2d 1013, 1041 (C.D. Cal. 2011) (citations omitted), *aff'd*, 738 F.3d 1085 (9th Cir. 2013). Cancellation under sections 1064(c) and 1119 may be "sought if there is already an ongoing action that involves a registered mark." *Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt.*, 744 F.3d 595, 599 (9th Cir. 2014).

18. A party has standing to pursue cancellation so long as the party believes that it "is or will be damaged by the registration of the mark." *Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 735 F.2d 346, 348 (9th Cir. 1984) (emphasis omitted) (quoting 15 U.S.C. § 1064). *See also Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 1305 (Fed. Cir. 2020). This is a low bar and "requires only" that the party show a "real interest" in the proceeding. *Star-Kist Foods*, 735 F.2d at 349; *see also Blue Bottle Coffee, LLC v. Liao*, No. 21-cv-6083-CRB, 2024 WL 2061259, at *8 (N.D. Cal. May 7, 2024) ("All that is needed is a real interest in the outcome of the proceeding beyond the general public."). The Court finds that Impossible Foods has satisfied its burden by demonstrating a particularized, concrete injury by Impossible X's wielding of the Void Marks. *See Hokto Kinoko*, 738 F.3d at 1097.

19. The Court further finds that Impossible Foods showed, by clear and convincing evidence, and with respect to each of the Void Marks, "a false representation regarding a material

fact, the registrant's knowledge or belief that the representation is false, the intent to induce reliance upon the misrepresentation, and reasonable reliance thereon, and damages." *Id.* at 1041. Over many years, Mr. Runyon submitted sworn Statements of Use, each time attesting that various marks were "currently" or "continuously" being used in connection with a broad array of products. In fact, his company had never even made most of those products.

20. Impossible Foods also showed that Mr. Runyon knew his representations to the USPTO that the Void Marks had been used in connection with products for which they had never been used were false, and he intended induce the USPTO's reliance upon the misrepresentation, and the USPTO did so rely.

21. Impossible Foods' showing as to 5387588 was similar and for the same reasons, Impossible Foods has shown by clear and convincing evidence that Impossible X obtained the incontestable status of that mark by fraud.

**Abandonment**

22. Impossible Foods also asks the Court to find that three of Impossible X's registered marks, 590801, 5603025, and 6571603, be cancelled for abandonment pursuant to 15 U.S.C. § 1064. The Lanham Act sets forth the conditions under which a trademark is subject to cancellation for abandonment: "When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. 'Use' of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. A party makes out a prima facie case of non-use by demonstrating that a mark has not been used for three consecutive years. *On-Line Careline, Inc. v. Am. Online, Inc.*, 229 F.3d 1080, 1087 (Fed. Cir. 2000).

23. At trial, Mr. Runyon conceded that Impossible X never offered many of the goods covered by the relevant marks. Impossible X produced no evidence of use of the marks in connection with any of the other goods and services listed in the registrations for at least three years, triggering the presumption of non-use. No evidence at trial overcame that presumption, and the Court therefore finds that Impossible X abandoned 590801, 5603025, and 6571603.

**Declaratory Judgment**

24. At the jury trial of Impossible X's affirmative claims, the jury found in favor of Impossible Foods. Based on the jury's rejection of Impossible X's infringement and unfair competition claims, as well as the Court's finding that Impossible X's IMPOSSIBLE mark was obtained by fraud, the Court enters declaratory relief finding that Impossible Foods's use of its IMPOSSIBLE-formative marks in connection with recipes, food ingredients, and cooking information, does not infringe or dilute any of Impossible LLC's valid trademark rights and does not violate any federal or state trademark, trade name, or related law.

**Relief**

25. Based on the above findings and conclusions, the Court awards the following relief:

a. The Court grants Impossible Foods' request for declaratory relief in its entirety. Impossible Foods's use and registration of its IMPOSSIBLE-formative marks with services relating to recipes, food ingredients, and cooking information do not infringe upon, dilute, or otherwise violate any valid right of Impossible X under applicable federal or state law.

b. The Court grants Impossible Foods' request for an injunction in its entirety. Impossible X, its agents, employees, licensees, affiliates, any parent and subsidiary corporations, attorneys and representatives and all those in privity with, or acting under its direction and/or pursuant to its control, are hereby RESTRAINED and ENJOINED from directly or indirectly from using any mark that is confusingly similar to any of Impossible Foods' marks in connection with edible products and other related goods and services, including sleep and energy powder.

c. Impossible Foods seeks recovery of revenue Impossible LLC earned from sales of infringing sleep and energy powders. Impossible Foods is awarded $___.

d. The Court directs the Commissioner of Trademarks that the following trademark registrations are to be canceled by the United States Patent and

Trademark Office: U.S. Reg. 5387588, U.S. Reg. 5590801, U.S. Reg. 5603025, U.S. Reg. 5620625, U.S. Reg. 6571603.

______________________________________
HONORABLE BETH LABSON FREEMAN