J. Noah Hagey, Esq. (SBN: 262331)
hagey@braunhagey.com
Adam S. Cashman, Esq. (SBN: 255063)
cashman@braunhagey.com
Greg Washington, Esq. (SBN: 318796)
gwashington@braunhagey.com
J. Tobias Rowe, Esq. (SBN: 305596)
rowe@braunhagey.com
Oliver McNicholas, Esq. (SBN: 363554)
omcnicholas@braunhagey.com
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210

Marissa R. Benavides (*pro hac vice* admission)
benavides@braunhagey.com
BRAUNHAGEY & BORDEN LLP
200 Madison Avenue, 23rd Floor
New York, NY 10016
Telephone: (646) 829-9403

[Other counsel of record indicated on docket.]

*Attorneys for Impossible LLC and Joel Runyon*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| IMPOSSIBLE FOODS INC.,<br><br>Plaintiff / Counter-Defendant,<br><br>v.<br><br>IMPOSSIBLE LLC and JOEL RUNYON,<br><br>Defendants / Counter-Plaintiffs. | Case No. 5:21-cv-02419-BLF (SVK)<br><br>**IMPOSSIBLE LLC AND JOEL RUNYON'S OPPOSITION TO IMPOSSIBLE FOODS'S MOTION IN LIMINE NO. 2 TO EXCLUDE REPORT AND TESTIMONY OF ROBERT PALMATIER, PH.D.**<br><br>**Judge:** Hon. Beth Labson Freeman<br>**Conference Date:** February 12, 2026<br>**Conference Time:** 1:30 p.m. |

Impossible LLC and Joel Runyon (together "Impossible LLC") oppose Impossible Foods's Motion *in Limine* No. 2 ("Mot.") to exclude Robert Palmatier, Ph.D.'s report and testimony.

**INTRODUCTION**

Dr. Palmatier is a distinguished marketing professor with extensive experience evaluating marketing strategy, customer decision making, and the scientific principles underlying the ways in which brands are built or damaged. In his expert opinion, Dr. Palmatier analyzed the evidence of injury to Impossible LLC's brand and business from Impossible Foods's trademark infringement and applied generally accepted principles of marketing science set forth in peer-reviewed research, academic textbooks, studies, and professional materials to conclude that corrective advertising is necessary to repair these injuries. (Dkt. 324-4 ¶¶ 70-78.) Dr. Palmatier explains that "Impossible LLC would need to spend multiple times the amount expended by Impossible Foods in selling, promoting, and marketing their clothing and cookbook products . . . because correcting brand harm typically requires a multiple of the cost of the actions that caused the harm in the first place." (*Id.* ¶ 74.) Thus, "at a conservative estimate," Dr. Palmatier concluded that "Impossible LLC would likely have to spend 3 to 5 times as much to correct false or unwanted brand associations as was originally spent by Impossible Foods to create these associations." (*Id.* ¶ 78.)

Impossible Foods mischaracterizes Dr. Palmatier's opinion as based on a "single study" when, in fact, he engaged in a multi-factored analysis of at least ***fifteen*** sources to conclude that the "3 to 5 times" multiplier is warranted and supported by the science and evidence here. (*See id.* ¶¶ 70-78.) Moreover, Dr. Palmatier's opinion is consistent with precedent holding that corrective advertising awards exceeding the amount originally spent on the infringing advertising is appropriate. This Court should accordingly deny Impossible Foods's Motion.

**BACKGROUND**

Impossible LLC has asserted federal and common law trademark claims against Impossible Foods for its infringing uses of IMPOSSIBLE-formative marks in connection with apparel, cookbooks, and related goods. To help the jury evaluate these claims, Impossible LLC will present testimony from Dr. Palmatier, a tenured marketing professor at the University of Washington, Foster School of Business and the founder and research director of the University of Washington's

Center for Sales and Marketing Strategy and the Global Sales and Marketing Strategy Institute. (Dkt. 324-4 ¶ 7.) Dr. Palmatier has published more than 100 peer-reviewed "articles, books, and book chapters" on issues ranging from "marketing strategy, understanding the roles of brands and relationships in marketing, customer loyalty, consumer decision making, and methodological approaches for the analysis of marketing data." (*Id.* ¶ 11.) He is a highly-regarded marketing scholar who is regularly awarded for his scholarship and contributions to the field. (*Id.* Ex. 1.)

Dr. Palmatier's report analyzes the evidence of Impossible Foods's infringement and the resulting harm to Impossible LLC's goodwill and reputation. (*Id*. ¶¶ 41-78.) He explains how trademarks generate value for their owners, the ways in which infringement degrades a trademark owner's brand equity, and the reasons why corrective advertising is necessary to repair these injuries. (*Id*. ¶¶ 50-61.) As Dr. Palmatier explains, Impossible Foods' infringement harms Impossible LLC's brand equity in numerous ways, which may be addressed through corrective advertising. (*Id*. ¶ 5-6.) However, such "restorative marketing efforts operate at a substantial handicap" because it is difficult to identify affected customers and harder to overcome correcting negative or unwanted associations. (*Id*. ¶ 77.)

Dr. Palmatier thus concluded that Impossible LLC's corrective advertising would need to exceed Impossible Foods's original investment in infringing advertising to dispel confusion. His report supports this opinion with citations to at least ***fifteen*** academic articles, textbooks, consumer surveys, cross-industry studies, and marketing experiments. (*Id.* ¶¶ 70-78.) Indeed, Dr. Palmatier cited a public relations industry article that "it takes ***three to ten*** positive stories to counteract a negative one." (*Id.* ¶ 76 (emphasis added).) Moreover, Dr. Palmatier relied on a marketing report that concluded that "it takes anywhere from ***12 to 40*** positive customer reviews to offset the reputation harm of a single negative review." (*Id*. (same).) And Dr. Palmatier noted that "reacquiring lost or potential customers (*e.g*., in the consideration stage) can be disproportionately expensive, since the marketing efforts to acquire customers cost from ***5 to 25 times more*** than the efforts to retain existing ones." (*Id.* ¶ 77 (same).) Considering the effectiveness of restorative marketing, Dr. Palmatier concluded that "at a conservative estimate, Impossible LLC would likely have to spend 3 to 5 times as much to correct false or unwanted brand associations as was

originally spent by Impossible Foods to create these associations." (*Id.* ¶ 78.)

## ARGUMENT

Expert testimony is admissible under Federal Rule of Evidence 702 if it is relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). Testimony is relevant if it will "assist the trier of fact to understand or determine a fact in issue," *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007), and it is reliable "if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). The Ninth Circuit has emphasized that the inquiry into the admissibility of expert testimony is "a flexible one." *Id.* at 564. So long as the expert's evidence is admissible, it "is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.*

Under this standard, there is no question that Dr. Palmatier's opinion on corrective advertising is admissible. Impossible Foods's Motion does not dispute that Dr. Palmatier is qualified, nor that his corrective advertising opinion is relevant. Indeed, corrective advertising is a typical remedy for trademark infringement. *See Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1113 (9th Cir. 2012) (affirming award of corrective advertising); *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1041 (9th Cir. 1986) (same). Dr. Palmatier's opinion will help the jury evaluate the harm to Impossible LLC's brand and the extent of the corrective advertising necessary to correct such harm. *See Stone Brewing Co., LLC v. Molson Coors Beverage Co. USA LLC*, No. 23-3142, 2024 WL 5244556, at *3 (9th Cir. Dec. 30, 2024) (affirming admission of Dr. Palmatier's testimony on corrective advertising).

Instead, Impossible Foods asserts that Dr. Palmatier's report "relie[d] on a single academic paper for this opinion." (Mot. at 3.) That is untrue. Dr. Palmatier's report methodically analyzed the evidence to explain how Impossible Foods's infringement harmed Impossible LLC's brand. Dr. Palmatier's underlying marketing methodology is well-supported by at least fifteen academic articles, textbooks, consumer surveys, and other sources. *See* Dkt. 324-4 ¶¶ 70-78; *Primiano*, 598 F.3d at 564 (concluding that "publication in peer reviewed literature, and general acceptance" favors admission under Rule 702). Other courts have approved the use of corrective advertising

multipliers for the same reasons. In *Guardant Health, Inc. v. Natera, Inc.*, for example, Judge Chen approved the use of a "3x multiplier" for corrective advertising damages and rejected a *Daubert* challenge where "the 3x multiplier was 'rational and supported'" based on "industry references" and "other cases." No. 21-CV-04062-EMC, 2025 WL 2106522, at *13 (N.D. Cal. July 28, 2025).

Impossible Foods also complains that Dr. Palmatier did not design a hypothetical corrective advertising plan. (Mot. at 3.) But such a plan is not a prerequisite to recovering corrective advertising damages. *See Skydive Arizona*, 673 F.3d at 1113 (affirming award of corrective advertising based solely on evidence of past injury and plaintiff's "need to undertake corrective advertising"); *Guardant Health, Inc.*, Case No. 21-cv-04062-EMC, ECF No. 324-3 at 3 (N.D. Cal. Mar. 1, 2023) (concluding that plaintiff "need not have contemplated future corrective advertising costs" to recover corrective advertising damages). In any event, Dr. Palmatier cited research demonstrating that "correcting brand harm typically requires a multiple of the cost of the actions that caused the harm." (Dkt. 324-4 ¶ 74.) He further explained that a dollar-based multiplier is appropriate based on the assumption that Impossible Foods designed a rational plan to effectively generate impressions through the infringing advertising items and that Impossible LLC would design a similarly rational and effective plan. (Ex. 1 at 92:22-94:16.) That is an appropriate assumption when crafting an opinion. *See, e.g.*, *Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256, 1262 (9th Cir. 1981) ("[E]conomic rationality must be assumed for all competitors, absent the strongest evidence of chronic irrationality.")

Similarly, Dr. Palmatier's report contradicts Impossible Foods's argument that Dr. Palmatier "could not explain why product production costs were an appropriate proxy for advertising impressions." (Mot. at 3.) As Dr. Palmatier explains, Impossible Foods's production and distribution of promotional items including apparel and cookbooks is ***itself*** a form of advertising because it is part of a strategy "to build Impossible Foods' brand equity and help generate sales of its products," which is "a common marketing and awareness-building strategy" that companies use "as an alternative or supplement to conventional paid advertising." (Dkt. 324-4 ¶ 44.) Because the costs associated with these products are advertising, they are correctly included in the base for corrective advertising. *See Marketquest Grp., Inc. v. BIC Corp.*, No. 11-CV-618-

BAS (JLB), 2018 WL 1756117, at *5 (S.D. Cal. Apr. 12, 2018) (holding that where infringing items were "advertising campaign" materials, expert properly calculated corrective advertising "based on [defendant's] advertising expenses devoted to infringing [plaintiff's] marks").

In addition, Impossible Foods is mistaken in emphasizing any distinction between "impressions" and "advertising spend," because impressions are simply how the industry measures and sells marketing impact across media. Indeed, the very purpose of advertising is to create impressions. Thus, there is no inferential leap required when applying the science of corrective impressions to a calculation of corrective advertising dollars. The *PODS Enterprises, LLC v. U-Haul International, Inc.*, 126 F. Supp. 3d 1263 (M.D. Fla. 2015) decision does not, as Impossible Foods contends, imply a rule requiring experts to quantify cost to "create an impression" to use an advertising multiplier. (Mot. at 4.) Instead, the "cost per impression" metric was salient in that case because it involved infringing "search engine marketing" in which advertisements are priced in that manner. *PODS*, 126 F. Supp. 3d at 1283. Outside of that context, a dollar-based multiplier is appropriate. *Guardant*, 2025 WL 2106522, at *13 (upholding corrective advertising award based on "3x multiplier" of infringing advertising spending in dollars).

Finally, Impossible Foods argues that corrective advertising is capped at the "FTC-based approach requiring one-quarter of the infringing advertising budget." (Mot. at 4.) But the Ninth Circuit has "never adopted a 25 percent cap." *Stone*, 2024 WL 5244556, at *3 (rejecting this argument); *Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 989 n.2 (9th Cir. 1995) (acknowledging the 25 percent rule in other circuits but declining to adopt a cap). Rather, the so-called "FTC rule" is a *floor* to ensure adequate compensation, not an upper limit. And, as Impossible Foods concedes, other courts have awarded corrective advertising based on a multiple of the defendant's infringing advertising. *See, e.g., PODS*, 126 F. Supp. 3d at 1283 (3x multiple). Impossible Foods is free to argue that a lower amount is appropriate based on the evidence at trial, but that is no basis to exclude Dr. Palmatier's opinion. *See Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) (such concerns "are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.").

Dated: February 5, 2026

Respectfully submitted,

BRAUNHAGEY & BORDEN LLP

By: */s/ Adam S. Cashman*
Adam S. Cashman

*Attorneys for Impossible LLC and Joel Runyon*