# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

|  |  |
|---|---|
| IMPOSSIBLE FOODS INC., <br><br> Plaintiff, <br><br> v. <br><br> IMPOSSIBLE X LLC, <br><br> Defendant. | Case No.  5:21-cv-02419-BLF <br><br> **ORDER DENYING RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW; GRANTING IN PART AND DENYING IN PART MOTION FOR NEW TRIAL; AND DENYING MOTION FOR ALTERATION OF JUDGMENT** <br><br> [Re:  ECF No. 498] |

Following a trial in March 2026, a jury returned a verdict against Plaintiff/Counter-Defendant Impossible Foods Inc. ("Impossible Foods") on each of its claims against Defendant/Counter-Plaintiff Impossible X LLC ("Impossible LLC") and for Impossible LLC on each of its claims against Impossible Foods.  ECF No. 459.  On May 8, 2026, the Court granted Impossible LLC's post-trial requests for attorneys' fees and injunctive relief, *see* ECF No. 492 ("Fees Order"), and entered judgment and a permanent injunction against Impossible Foods.  *See* ECF No. 493.

Before the Court are Impossible Foods's (1) renewed motion for judgment as a matter of law ("JMOL") pursuant to Federal Rule of Civil Procedure 50(b), (2) motion for a new trial pursuant to Rule 59(a), and (3) motion for alteration of judgment as to attorneys' fees pursuant to Rule 59(e).  ECF No. 498 ("Mot."); ECF No. 501 ("Reply").  Impossible LLC opposes the motions.  ECF No. 499 ("Opp."); ECF No. 504-2 ("Sur-Reply").[1]  The Court heard oral argument on July 23, 2026.  *See* ECF No. 507.

For the reasons stated on the record at the hearing and set forth below, (1) the JMOL

---

[1] The Court granted Impossible LLC's motion for leave to file a sur-reply on July 13, 2026.  *See* ECF No. 506.

motion is DENIED, (2) the new trial motion is GRANTED as to punitive damages and otherwise DENIED, and (3) the alteration of judgment motion is DENIED.

## I.    BACKGROUND

### A.    Factual Background

This case is between two companies that both use marks incorporating the word IMPOSSIBLE in connection with their goods and services.

Impossible LLC was founded by Counter-Plaintiff Joel Runyon in 2010 based on his blog *The Impossible List*, which contained a list of goals that at first seemed impossible but could be achieved (and crossed off the list) with hard work.  Through Impossible LLC, Mr. Runyon began using his IMPOSSIBLE marks in connection with (1) apparel (the "LLC Apparel") starting in 2011, (2) fitness and recipe information starting in 2012, and (3) nutritional supplements (the "LLC Supplements") starting in 2017.  Mr. Runyon also provides other services through Impossible LLC, such as consulting and marketing services.

Impossible Foods—originally called Maraxi, Inc.—was founded by Patrick O. Brown in 2011 as a research and development company for meat analogue products.  In 2015, Impossible Foods adopted the Impossible brand and thereafter began using its IMPOSSIBLE marks in connection with marketing and selling its signature product, the Impossible Burger.  Since then, Impossible Foods has expanded to other food products and services, including the Impossible Sausage, Impossible Pork, and Impossible Taste Place.  Impossible Foods has also used its IMPOSSIBLE marks on (1) promotional apparel that it distributes without charge at events and to employees, which it posts on social media (the "Foods Swag"), and (2) a cookbook released in 2020 called *Impossible: The Cookbook: How to Save Our Planet, One Delicious Meal at a Time* (the "Foods Cookbook").

### B.    Procedural Posture

#### 1.    Pleadings

On April 2, 2021, Impossible Foods initiated this action by filing a single-count complaint for declaratory judgment of noninfringement after Mr. Runyon and Impossible LLC filed a notice of opposition with the United States Patent and Trademark Office ("PTO") in connection with

United States District Court
Northern District of California

Impossible Foods's U.S. Trademark Application No. 88855875, which sought to use the mark IMPOSSIBLE in connection with "[p]roviding information about recipes, ingredients and cooking information; providing an online computer database to consumers featuring information about recipes, ingredients and cooking information."  ECF No. 1.

In the complaint, Impossible Foods requested that the Court declare that (1) Impossible Foods's use of the IMPOSSIBLE mark in connection with recipes, food ingredients, and cooking information did not infringe Impossible LLC's rights, (2) Impossible Foods had superior rights in the IMPOSSIBLE mark in that field, and (3) Impossible LLC's trademark registrations in U.S. Trademark Registration Nos. 5376208, 5387588, and 5620625 were abandoned.

On November 16, 2021, the Court granted Impossible LLC's motion to dismiss for lack of personal jurisdiction.  ECF No. 50.  Impossible Foods appealed to the Court of Appeals for the Ninth Circuit, which reversed.  ECF No. 58; *see also Impossible Foods Inc. v. Impossible X LLC*, 80 F.4th 1079 (9th Cir. 2023).  On February 16, 2024, Impossible Foods filed the first amended complaint.  ECF No. 78.  On March 8, 2024, Impossible LLC filed its answer and counterclaims, asserting that Impossible Foods's use of the IMPOSSIBLE mark in connection with the Foods Swag and Foods Cookbook infringed Impossible LLC's trademarks.  ECF No. 80.

On September 17, 2024, after the Court granted Impossible Foods's motion for leave to amend, Impossible Foods filed the second amended complaint, adding claims that Impossible LLC's use of the IMPOSSIBLE mark in connection with the LLC Supplements infringed Impossible Foods's trademarks.  ECF No. 103.

On March 7, 2025, after the Court granted Impossible Foods's second motion for leave to amend, Impossible Foods filed the third amended complaint, adding affirmative claims for cancellation of Impossible LLC's trademark registrations in U.S. Trademark Registration Nos. 5590801, 5603025, and 6571603 for abandonment, and U.S. Trademark Registration Nos. 5590801, 5603025, 5620625, and 6571603 for fraud on the PTO.  ECF No. 151.  In its answer to the third amended complaint, Impossible LLC retained its counterclaims based on Impossible Foods's use of the IMPOSSIBLE mark in connection with the Foods Swag and Foods Cookbook.  ECF No. 241.

United States District Court
Northern District of California

### 2. Summary Judgment

The Parties filed cross-motions for summary judgment. Impossible Foods requested partial summary judgment that (1) Impossible LLC was not entitled to corrective advertising or reputational damages for any of its counterclaims and (2) Impossible LLC's equitable affirmative defenses failed as a matter of law. ECF No. 259. Impossible LLC requested partial summary judgment that (1) Impossible Foods's trademark infringement and unfair competition claims failed as a matter of law, (2) Impossible LLC's asserted marks were neither abandoned nor procured by fraud, and (3) Impossible LLC was entitled to summary adjudication of priority as to certain IMPOSSIBLE marks. ECF No. 262.

On November 3, 2025, the Court granted Impossible Foods's motion with respect to Impossible LLC's affirmative defenses and request for reputational damages but otherwise denied both motions. ECF No. 311. The Court explained that Impossible Foods was not entitled to judgment as a matter of law as to either corrective advertising damages or punitive damages because, although Impossible LLC "certainly face[d] an uphill battle at trial, . . . a reasonable jury could find that [it] experienced a financial decline following the release of the Impossible Cookbook and Impossible Swag that was attributable to harm to [its] goodwill and reputation," *id.* at 10, and that the availability of punitive damages should be left to the jury following the Parties' evidentiary presentations at trial, *see id.* at 13. The Court similarly found that Impossible LLC was not entitled to judgment as a matter of law as to Impossible Foods's infringement and trademark cancellation claims, concluding that there were genuine issues of material fact as to some of the *Sleekcraft* factors and the continuous use of Impossible LLC's marks. *See id.* at 18–33.

Prior to trial, the Court granted Impossible Foods's motion *in limine* to preclude Impossible LLC's Dr. Jennifer Vanderhart from opining as to corrective advertising damages for Impossible Foods's use of the IMPOSSIBLE marks in connection with the Foods Cookbook. ECF No. 383.

### 3. Trial

Impossible Foods and Impossible LLC proceeded to trial on their trademark infringement

United States District Court
Northern District of California

and unfair competition claims under the Lanham Act, 15 U.S.C. §§ 1114–1129; federal common law; and California common law.  The case went to trial on March 9, 2026.  ECF No. 407; *see also* ECF Nos. 445–55 ("Tr.").  Impossible LLC presented its affirmative case first, followed by Impossible Foods.

Impossible LLC called eight witnesses during its affirmative case.  Mr. Runyon testified as to his business before and after Impossible Foods adopted its current Impossible branding and began using the IMPOSSIBLE marks in connection with the Impossible Swag and Impossible Cookbook.  *See* Tr. at 129–354.  Myra Pasek, former in-house counsel at Impossible Foods, testified as to Impossible Foods's trademark search and related intellectual property work during the rebrand.  *See id.* at 356–81.  Nicholas Halla, former Senior Vice President of Impossible Foods, testified as to Impossible Foods's rapid growth and success in the plant-based foods market.  *See id.* at 382–429.  John Durant, an associate of Mr. Runyon, testified as to his experience with Impossible LLC and the fitness and dieting market, as well as instances in which consumers mistakenly identified his Impossible LLC t-shirt as being associated with Impossible Foods.  *See id.* at 430–37.  Keaton Schwartz, Senior Director of Finance at Impossible Foods, testified as to Impossible Foods's finances.  *See id.* at 474–536.  Caitlyn Hatman, Senior Director of Integrated Marketing at Impossible Foods, testified as to Impossible Foods's branding and marketing of the Impossible Swag and Impossible Cookbook.  *See id.* at 558–674.  Dr. Robert Palmatier, Impossible LLC's branding expert, testified regarding injury to brands under a linkages model.  *See id.* at 679–745.  Dr. Vanderhart testified regarding the calculation of corrective advertising damages.  *See id.* at 746–825.

Impossible Foods called three witnesses during its affirmative case.  John Plumpe, Impossible Foods's rebuttal damages expert, testified regarding Dr. Vanderhart's calculation of corrective advertising damages and opined that Dr. Vanderhart's methodology was not economically reasonable.  *See* Tr. at 826–59, 877–925.  Emma Giffin, a paralegal employed by the law firm representing Impossible Foods, authenticated several exhibits, which were moved into evidence by Impossible Foods.  *See id.* at 927–59.  Finally, Impossible Foods also re-called Dr. Palmatier based on survey evidence regarding likelihood of confusion that he prepared in

advance of trial but did not present during Impossible LLC's case. *See id.* at 968–1019.

At the close of Impossible LLC's case, Impossible Foods moved for JMOL pursuant to Federal Rule of Civil Procedure 50(a). Tr. at 859–77. In its motion, Impossible Foods argued that Impossible LLC failed to adduce legally sufficient evidence for a jury to find that (1) the accused Impossible Swag and Impossible Cookbook infringed Impossible LLC's marks and (2) such infringement caused a quantifiable harm to the value of Impossible LLC's marks. *See id.* at 859–62. The Court denied Impossible Foods's Rule 50(a) JMOL motion as to likelihood of confusion, explaining that Impossible LLC had "sufficient evidence on confusion to go to the jury." Tr. at 867. The Court granted the motion as to damages because Impossible LLC failed to present evidence as to the "amount of diminution of value to the brand caused by the infringing conduct," *id.* at 871:18–22, which under the Parties' agreed upon jury instructions represented the ceiling for corrective advertising damages. *See* ECF No. 457, Jury Instruction No. 63.

After the Court gave Impossible LLC the opportunity to reopen its case, Impossible LLC once again called Mr. Runyon, who provided testimony that the value of his brand had decreased from roughly $25 million at its height to "not . . . all that much" at the time of the trial. *See* Tr. at 1020–1034. Impossible Foods did not cross-examine Mr. Runyon, *see id.* at 1034:6–10, instead renewing its Rule 50(a) JMOL motion. *Id.* at 1045–50. The Court denied the motion, explaining that Mr. Runyon's testimony supplied the missing diminution in value evidence. *See id.* at 1047:2–7, 1050:17–18.

Impossible LLC also moved for JMOL pursuant to Rule 50(a), arguing that (1) Impossible Foods failed to prove abandonment or fraud by clear and convincing evidence and (2) Impossible Foods's affirmative infringement claims failed as a matter of law based on Ms. Hatman and Mr. Halla's testimony that they did not find Impossible LLC's marks to be confusing. Tr. at 1050–56. The Court denied that motion as well. *See id.* at 1056:18–21.

The Parties made closing arguments to the jury on March 18, 2026, after which the case was submitted. Tr. at 1113–1212. The jury was instructed based on the instructions agreed upon by the Parties, the correctness of which they stipulated to apart from Impossible LLC's objections made on the record. *See id.* at 770:8–9 ("[There] will be no more objections because [the Parties]

6

have presented these as stipulated instructions.”).

After two days of deliberation, the jury returned its verdict on March 23, 2026. *See* Tr. at 1242:20–21. On Impossible LLC’s case, the jury found that Impossible Foods willfully infringed Impossible LLC’s trademarks by using its IMPOSSIBLE marks in connection with the Foods Swag and the Foods Cookbook and that Impossible Foods acted with oppression, fraud, or malice; the jury awarded $1,500,000 in corrective advertising damages. *Id.* at 1244:4–1247:5; *see also* ECF No. 459 at 2–5. On Impossible Foods’s case, the jury did not find any of Impossible LLC’s marks to be invalid and did not find that Impossible LLC infringed Impossible Foods’s trademarks by using its IMPOSSIBLE marks in connection with the LLC Supplements. Tr. at 1243:9–24, 1247:6–1248:8; *see also* ECF No. 459 at 1, 6.

Based on the jury’s oppression, fraud, or malice finding, the trial proceeded to a punitive damages phase, at which Mr. Schwartz testified regarding Impossible Foods’s financial condition. *See* Tr. at 1273–89. After the Parties presented additional closing arguments to the jury regarding punitive damages, the case was resubmitted. *Id.* at 1292–1303. On March 24, 2026, the jury awarded Impossible LLC $1,750,000 in punitive damages. *Id.* at 1306:25–1307:3; *see also* ECF No. 460.

### 4. Post-Trial Motions

Both Parties moved for post-trial relief prior to the entry of judgment. Impossible Foods sought a declaration from the Court that Impossible LLC’s trademark infringement and unfair competition claims were barred by the doctrine of laches. ECF No. 440. Impossible LLC sought an award of attorneys’ fees and costs, enhanced damages, injunctive relief, and an order directing the PTO to reject Impossible Foods’s U.S. Trademark Application No. 88855875 based on the jury’s verdict. ECF No. 476. The Court issued its order on the post-trial motions on May 8, 2026. ECF No. 492.

The Court denied Impossible Foods’s motion, agreeing with Impossible LLC that the jury’s willfulness finding precluded Impossible Foods’s laches defense and that, in any event, Impossible Foods failed to show prejudice.

The Court granted in part and denied in part Impossible LLC’s motion. As to attorneys’

United States District Court
Northern District of California

fees and costs, the Court agreed with Impossible LLC that the totality of the circumstances—including the jury's willfulness finding, Impossible Foods's exceptionally poor presentation at trial, and considerations of fairness and compensation—rendered this case exceptional within the meaning of 15 U.S.C. § 1117(a) such that attorneys' fees for warranted. As to enhanced damages, the Court found that additional damages above and beyond the jury's award would be punitive rather than compensatory and declined to increase damages. Finally, the Court granted Impossible LLC's request for a narrowly tailored permanent injunction but declined to issue an order directing the PTO to deny Impossible Foods's trademark application.

The Court entered judgment for Impossible LLC on May 8, 2026. ECF No. 493. Impossible Foods's timely motion followed. ECF No. 498.

## II.    LEGAL STANDARDS

### A.  Rule 50(b)

Federal Rule of Civil Procedure 50(b) allows a party to renew a motion for judgment as a matter of law made under Rule 50(a) that was not granted by the Court. Fed. R. Civ. P. 50(b). "Because it is a renewed motion, a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion. Thus, a party cannot properly 'raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion.'" *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (quoting *Freund v. Nycomed Amersham,* 347 F.3d 752, 761 (9th Cir. 2003)). "However, Rule 50(b) 'may be satisfied by an ambiguous or inartfully made motion' under Rule 50(a)." *Id.* (quoting *Reeves v. Teuscher,* 881 F.2d 1495, 1498 (9th Cir. 1989)).

Under Ninth Circuit law, a renewed motion for judgment as a matter of law should be granted "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). "Conversely, '[i]f reasonable minds could differ as to the import of the evidence, . . . a verdict should not be directed.'" *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1018 (9th Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)). "A jury's verdict must be upheld if it is supported by substantial evidence, which

United States District Court
Northern District of California

8

is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008) (quoting *Pavao*, 307 F.3d at 918).

In reviewing a motion for a judgment as a matter of law, the Court must draw all reasonable inferences in favor of the nonmoving party. *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242–4 (9th Cir. 2014); *Sanghvi v. City of Claremont*, 328 F.3d 532, 536 (9th Cir. 2003). "'[A]lthough the court should review the record as a whole, it must disregard [all] evidence favorable to the moving party that the jury is not required to believe,' and may not substitute its view of the evidence for that of the jury." *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)). "[T]he court must not weigh the evidence, but should simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion." *Harper*, 533 F.3d at 1021.

**B. Rule 59(a)**

Under Federal Rule of Civil Procedure 59(a), the Court "may, on motion, grant a new trial on all or some" of the issues. Fed. R. Civ. P. 59(a)(1). The Court may grant a new trial "if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 510 n. 15 (9th Cir. 20000)). The Court should not grant a new trial unless she "is left with the definite and firm conviction that a mistake has been committed." *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371–72 (9th Cir. 1987) (quoting 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2806, at 48–49 (1973)). Ultimately, the Court can grant a new trial under Rule 59 on any ground necessary to prevent a miscarriage of justice. *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990).

In considering a Rule 59(a) motion for a new trial, the Court "is not required to view the trial evidence in the light most favorable to the verdict. Instead, the district court can weigh the evidence and assess the credibility of the witnesses." *Experience Hendrix L.L.C.*

United States District Court
Northern District of California

9

*v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir. 2014).  A new trial may be ordered even in cases where the jury's verdict is supported by substantial evidence if "the clear weight of the evidence does not compel it." *Dees v. Cnty. of San Diego*, 960 F.3d 1145, 1156 (9th Cir. 2020).  That said, "a district court may not grant or deny a new trial merely because it would have arrived at a different verdict." *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999).

### C.  Rule 59(e)

Under Federal Rule of Civil Procedure 59(e), a party may move to have the court amend its judgment within twenty-eight days after entry.  "Since specific grounds for a motion to amend or alter are not listed in the rule, the district court enjoys considerable discretion in granting or denying the motion.  However, reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly." *McDowell v. Calderon*, 197 F.3d 1253, 1255 n.1 (9th Cir. 1999) (en banc) (per curiam) (quoting 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2810.1 (1995)).  "In general, there are four basic grounds upon which a Rule 59(e) motion may be granted: (1) if such motion is necessary to correct manifest errors of law or fact upon which the judgment rests; (2) if such motion is necessary to present newly discovered or previously unavailable evidence; (3) if such motion is necessary to prevent manifest injustice; or (4) if the amendment is justified by an intervening change in controlling law." *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011).  "Rule 59(e) permits, if not encourages, a district court to correct its own clear errors." *Kaufmann v. Kijakazi*, 32 F.4th 843, 851 (9th Cir. 2022).

### III.    DISCUSSION

#### A.  Likelihood of Confusion

Impossible Foods first challenges the verdict by asserting that Impossible LLC's evidence failed to support a likelihood of confusion in the marketplace for the goods at issue (i.e., the Impossible Swag and the Impossible Cookbook).

The Lanham Act creates a cause of action against "[a]ny person who . . . without the consent of the registrant[,] use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause

10

confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). The hallmark of federal trademark injury is likelihood of confusion, which turns on whether a "reasonably prudent consumer in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998); *see also Network Automation, Inc. v. Adv. Sys. Concepts*, 638 F.3d 1137, 1144 (9th Cir. 2011); *Dep't of Parks & Rec. v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006).

In assessing likelihood of confusion, courts in the Ninth Circuit consider the *Sleekcraft* factors:

> (1) strength of the mark;
> (2) proximity of the goods;
> (3) similarity of the marks;
> (4) evidence of actual confusion;
> (5) marketing channels used;
> (6) type of goods and purchasers' degree of care;
> (7) defendant's intent in selecting the mark; and
> (8) likelihood of expansion of the product lines.

*See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979). Application of the *Sleekcraft* factors is "fluid," and the plaintiff "need not satisfy every factor, provided that strong showings are made with respect to some of them." *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631 (9th Cir. 2005). Although the *Sleekcraft* factors "'channel the analytical process,' they do not necessarily dictate a result." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1125 (9th Cir. 2014) (quoting *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1141 (9th Cir. 2002)). Accordingly, "it is 'the totality of facts in a given case that is dispositive.'" *Id.* (quoting *Entrepreneur Media*, 279 F.3d at 1140).

Impossible Foods argues that it is entitled to JMOL of noninfringement because Impossible LLC "did not present evidence that consumers purchased, attempted to purchase, or declined to purchase apparel or cookbooks . . . because of confusion concerning source" and that Impossible LLC's evidence presented at trial accordingly "does not support the jury's finding of likely confusion as to the goods actually at issue in this case." Mot. at 6. Impossible Foods dedicates the majority of its briefing on infringement to its argument that Impossible LLC failed to provide examples of actual confusion. As to the remaining *Sleekcraft* factors, Impossible Foods cursorily argues that the evidence also "demonstrated neither meaningful product proximity nor

United States District Court
Northern District of California

overlapping marketplace channels" and could not sustain the jury's verdict because "the *Sleekcraft* factors are 'an adaptable proxy for consumer confusion, not a rote checklist.'" *Id.* at 11–12 (quoting *Network Automation*, 638 F.3d at 1149).

As a preliminary matter, the Court agrees with Impossible LLC that Impossible Foods's argument rests on a misapplication of the *Sleekcraft* factors, of which evidence of actual confusion is just one piece. The Ninth Circuit has repeatedly instructed that, although "[e]vidence of actual confusion is strong evidence that future confusion is likely, . . . the absence of such evidence is not dispositive." *Off. Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1393 (9th Cir. 1993) (citations omitted); *see also Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 433 (9th Cir. 2017) (explaining that "actual confusion . . . evidence is not necessary for a finding of likelihood of confusion"); *Eclipse Assocs. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1118–19 (9th Cir. 1990) (affirming district court's finding of likelihood of confusion despite absence of actual confusion evidence). While Impossible Foods is correct that "[t]rademark infringement protects against confusion in the marketplace—not confusion generally," Mot. at 7, that truism is merely the starting point for the likelihood of confusion analysis. And that starting point is the same for claims of forward confusion and reverse confusion, as here, where "[t]he question . . . is whether consumers doing business with the senior user *might* mistakenly believe that they are dealing with the junior user." *Dreamwerks*, 142 F.3d at 1130 (emphasis added).

Impossible Foods accordingly frames the issue incorrectly by urging that shoring up examples in which "a consumer mistakenly purchased—or attempted or declined to purchase—the wrong apparel or cookbook . . . [was] required to show actionable confusion." Mot. at 7. To the contrary, it is precisely the evidentiary difficulty that is inherent in acquiring direct evidence of actual mistaken purchases or other actual confusion evidence that makes the flexible *Sleekcraft* inquiry necessary. *See, e.g.*, *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1050 (9th Cir. 1999) ("The failure to *prove* instances of actual confusion is *not* dispositive against a trademark plaintiff, because actual confusion is hard to prove; difficulties in gathering evidence of actual confusion make its absence generally unnoteworthy."); *Marketquest Grp., Inc. v. BIC Corp.*, No. 11-cv-00618-BAS-JLB, 2018 WL 1756116, at *4 (S.D. Cal. Apr. 12, 2018) ("Actual

United States District Court
Northern District of California

confusion is not essential to a finding of trademark infringement because it is almost impossible to obtain evidence of actual confusion.”); *JOL Mgmt. Co. v. Polycell Nutraceuticals, Inc.*, No. 08-cv-00198-ABC-FFMx, 2008 WL 11334472, at *3 (C.D. Cal. Aug. 18, 2008) (“Evidence of actual confusion is difficult to obtain, and as a result, evidence of actual confusion is not required . . . .”).

The Court accordingly begins its analysis as to whether the jury's infringement finding was supported by substantial evidence under the *Sleekcraft* factors, which—per the Parties' agreed upon instruction—the jury was instructed to consider in determining likelihood of confusion. *See* Jury Instruction No. 56. A straightforward application of the *Sleekcraft* test readily disposes with Impossible Foods's challenge to the sufficiency of the evidence presented at trial:

1. Similarity of Marks: Impossible Foods does not (and cannot) dispute that the evidence before the jury showed that the Parties' marks were virtually identical. *See* TX 712, TX 750. The jury was entitled to infer that a reasonably prudent consumer would be confused as to source upon encountering Impossible LLC's apparel and the accused Impossible Swag.

2. Proximity of Goods: Mr. Runyon testified that the accused Impossible Swag used “the word ‘IMPOSSIBLE’ in a similar styling” to Impossible LLC's asserted marks, and Impossible LLC introduced evidence of social media posts promoting that same Impossible Swag, viewable by Impossible Foods's hundreds of thousands of followers online. Tr. at 209:6; *see also* TX 298, TX 423, TX 759. Impossible Foods identifies no authority for its contention that the jury was required to discount this evidence because “[t]he apparel generated no revenue and was incidental to [Impossible Foods]'s core food business.” Mot. at 11. A reasonable jury could infer that the similarity between the Impossible Swag and Impossible LLC apparel supported a likelihood of confusion.

3. Intent: Mr. Halla testified that, during Impossible Foods's rebranding, its employees viewed and internally circulated an article by Impossible LLC bearing the asserted marks with a list of quotations incorporating the word “impossible,” afterwards discussing “making some t-shirts with Impossible quotes” while Impossible Foods

United States District Court
Northern District of California

"launch[ed] [its] PR." *See* Tr. at 386:7–389:22; *see also* TX 33, TX 34.  The jury was entitled to credit that evidence both under the *Sleekcraft* analysis and in rendering its willfulness determination, notwithstanding Impossible Foods's argument that the jury should have instead drawn on Impossible Foods's evidence purportedly showing that it "adopted and developed the IMPOSSIBLE mark in connection with its plant-based meat business and used apparel and cookbooks only incidentally to support that lawful business."  Mot. at 12.

4. Strength of Mark: Dr. Palmatier testified that "Impossible Foods's marketing, as kind of a magnitude, they [sic] spent over $250 million on marketing between 2016 and 2024, which is about 600 times larger" than Impossible LLC's marketing.  Tr. at 687:6–8.  The jury could reasonably infer that Impossible Foods's brand strength dwarfed Impossible LLC's brand strength.  *See Network Automation*, 638 F.3d at 1149.

5. Marketing Channels: The jury heard testimony from both Mr. Runyon and Ms. Hatman that the Parties used their respective marks in overlapping ways and marketing channels, namely, on social media and in public to generate awareness.  *See* Tr. at 199:22–200:8, 566:5–567:22, 608:19–22, 619:4–16, 1023:11–14.  The jury could reasonably infer that this evidence supported some degree of market channel convergence, regardless of Impossible Foods's peremptory argument that Impossible LLC failed to show "consumers encountering two competing apparel brands or two competing cookbook brands in the marketplace."  Mot. at 12.

While Impossible Foods urges that the "evidence showed recognition of [Impossible Foods]'s food business and association with [Impossible Foods]'s products, not likely confusion . . . of the goods submitted to the jury," Mot. at 12, a reasonable jury could (and did) disagree.  Construing the foregoing evidence in the light most favorable to the verdict, there was substantial evidence upon which a jury could have found for Impossible LLC on its trademark infringement claims.  *See, e.g.*, *Nat'l Prods., Inc. v. Arkon Res., Inc.*, 294 F. Supp. 3d 1042, 1060 (W.D. Wash. 2018), *aff'd*, 773 F. App'x 377 (9th Cir. 2019) ("Although there is no single factor which is dominant in this case, the majority of the *Sleekcraft* factors weigh in favor of [plaintiff].

14

In light of the evidence presented, the court cannot conclude that the jury's finding of likelihood of confusion was not supported by substantial evidence."); *Interactive Health LLC v. King Kong USA, Inc.*, No. 06-cv-01902-VBF-PLAx, 2008 WL 11339609, at *6 (C.D. Cal. Dec. 5, 2008) (denying Defendants' renewed JMOL motion in part because "focus[ing] on the question of evidence regarding actual customer confusion . . . is not the test").

For the sake of completeness, the Court also notes that Impossible Foods's attacks on the evidence of actual confusion fall short. The jury could have inferred that the evidence introduced at trial showed actionable confusion with respect to the accused Impossible Swag and Impossible Cookbook that—together with evidence pertaining to other *Sleekcraft* factors—supported an infringement verdict. As set forth in its opposition, Impossible LLC argues that a reasonable jury could infer from Mr. Runyon and Mr. Durant's testimony that the accused Impossible Swag and Impossible Cookbook caused consumers to mistakenly believe that Impossible LLC's apparel originated from Impossible Foods. *See* Opp. at 5–9. Mr. Runyon testified that, following Impossible Foods's launch of the Impossible Swag, he began experiencing hostile reactions to his own IMPOSSIBLE-branded apparel while promoting Impossible LLC:

> Q. And remind us again, the time frame when you believe you first saw this?
> A. I think this was in 2015, 2016, right around then.
> Q. Okay. At some point, do you ever remember seeing any Impossible Foods-branded apparel?
> A. Yes.
> Q. Okay. And do you remember what time frame that was when you first started seeing that apparel?
> A. I'm not quite sure when I first saw the apparel.
> Q. Was it close in time, in your mind, to when you first learned of their company?
> A. I think it was soon thereafter.
>  . . . .
> Q. Did those Impossible Foods-branded apparel items use the company's full name, Impossible Foods, or did they say something else, to your recollection?
> A. They just said the word "IMPOSSIBLE" in a similar styling.
>  . . . .
> Q. Do you recall what you thought when you saw this [social media post of the Impossible Swag]?
> A. I thought it looked like our logo.
>  . . . .
> Q. Do people are [sic] confuse your company with Impossible Foods?
> A. It happens all the time.
> Q. What do you mean by that?
> A. Every time I wear an Impossible shirt, people think I'm

15

representing something that I'm not. They think I'm promoting something that I'm not. It happened to me the day before I flew out here at the local coffee shop. Someone asked me if I'm with Impossible Foods, and I had to explain that, no. This is my company. This is what we stand for. And I have to spend a lot of time, a lot of time correcting the confusion.

Q. Are these isolated incidents?

A. No. It happens all the time.

Q. What do you mean by that?

A. Everywhere I go, I can't – it's – when I first started Impossible, I would wear the shirt out, and I would talk, you know, on stage, do a talk, go to a conference, do whatever, people would see the shirt. They would understand the brand. Even if they didn't know it they would get the message right away. Go do something Impossible. And since Impossible Foods has launched, every single time I wear the shirt – its nearly constant – I get a question, "Hey, is that that plant-based meat? Is that Impossible Foods?" And I have to describe, "No, we are actually an apparel and health and fitness company."

Q. How do people react to you when you have your shirt on, your Impossible shirt, and they see it?

A. Yeah. I mean, it used to be universally positive, and now it's – I get a lot of hesitation. People ask questions. Sometimes – you know, sometimes they don't even say anything. They just get a face, and they turn away.

. . . .

I went to a [chili] cookoff fundraiser in west Texas. It was fundraising for ALS. And I was wearing my Impossible shirt and hanging out. And it was like a honky tonk and general good times fundraiser. And one of the guys, big burly west Texas guy comes up to me and is like, "You are not with that plant meat, fake meat thing, are you, because if you are, you're in the wrong spot. We don't eat that stuff."

. . . .

Q. Mr. Runyon, do you use brand ambassadors to help market your company and your brand?

A. Yes.

Q. And have you noticed any difference in their enthusiasm about wearing your Impossible gear before and after Impossible Foods rebranded?

A. Yeah. Brand ambassadors are one of the thing that is [sic] got us started and got the momentum. And when I'm experiencing the confusion we talked about, I'm able to have that conversation with the people and try to clear up that confusion. But with brand ambassadors, a lot of times people just assume that they are automatically representing another company, and they don't necessarily want to deal with that either. So I would say there's been a big drop in enthusiasm on just, like, representing a brand when, you know, it kind of becomes a hassle for them.

Q. Has that impacted your ability to market your brand?

A. Yeah. I think it slows down – every time you get momentum, it just kind of pulls the rug out from under you.

Q. How has this confusion, if you know, impacted your ability to continue selling apparel and cookbooks under your company name?

A. It's made it really tough. We can't get away from it. It's constantly happening. People are confused; algorithms are confused; Google is confused.

United States District Court
Northern District of California

Tr. at 208:10–217:16.

> Q. Do you ever receive outreach from people in written form where people are asking you questions that are obviously, at least to your mind, directed to Impossible Foods?
> A. Yeah.  We get e-mail or help desk inquiries from people who have issues with their burgers or they – customer service requests, or we will get expo-related news or people soliciting us to, like, pay to be in a vegan award list.

Tr. at 263:8–15.  Mr. Durant testified that he stopped wearing Impossible LLC's IMPOSSIBLE-branded apparel because he got fed up with people mistaking it for Impossible Foods:

> Q. Do people ever mistake your Impossible shirt for another company?
> A. Yeah. . . .
> Q. How often?
> A. Roughly, I [sic] seems like every other time I'd wear it where there was a crowd of people somebody would mistake it for Impossible Foods.  It became a running joke.
> Q. How would you know that they were mistaking your shirt for another company?
> A. They would bring up the company.  They would say, "Oh, Impossible Foods," or something to that effect.
> Q. As a result of those experiences, did you change your behavior?
> A. Impossible Foods is not in line with my health views, and that's a subjective thing.  And like the paleo [diet] world prefers grass fed meat and real meat.  And Impossible Foods, many of their products are imitation meat.  Fake meat.
> Q. Did you stop wearing your Impossible shirt?
> A. Mostly.
> Q. Why?
> A. Because I didn't want to be associated with something that was sort of antithetical to my health views.

Tr. at 434:19–435:18.

The jury could have inferred based on Mr. Runyon and Mr. Durant's testimony that consumers experienced reverse confusion and mistakenly believed Impossible LLC's apparel originated with Impossible Foods or that Impossible LLC and its apparel were otherwise affiliated, connected, or associated with Impossible Foods.  *See, e.g.*, *Americana Trading v. Russ Berrie & Co.*, 966 F.2d 1284, 1289 (9th Cir. 1992) ("[A] letter from a customer indicating that the customer believed [defendant's] products to have been manufactured by [plaintiff,] . . . . if believed by the trier of fact, would aid [plaintiff's] infringement claim."); *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 845 (9th Cir. 1987) (explaining that "whether to discount[] the evidence of actual confusion" is a question for the jury).  The jury could have reasonably concluded that this confusion was caused by consumers viewing the Impossible Swag during Impossible Foods's

multimillion-dollar campaign designed to generate brand awareness, which prominently displayed the Impossible Swag. *See* Tr. at 567:18–22 (explaining that the Impossible Swag is distributed to "celebrity influencers or other high-profile people as a way of helping to promote the brand"), 619:4–16 (confirming that "fairly viral" social media campaign was posted to "roughly – 340,000 followers" on social media); *see also* TX 421, TX 423, TX 298, TX 759, TX 760.  The jury could have supported this inference based on Mr. Runyon and Mr. Durant's testimony that the confusion did not occur prior to the launch of the accused products.  *See* Tr. at 213:4–219:20, 434:19–435:7.

The fact that Impossible LLC did not introduce evidence suggesting that consumers mistakenly *purchased* one of the Parties' products based on confusion between the marks does not, as Impossible Foods now suggests, mean that the jury could not consider the testimony as modest evidence of actual confusion.  *See Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1165–66 (9th Cir. 2021) (explaining that a "reasonable jury could rely on" testimony that "various unnamed third parties or individuals had mixed up, or were concerned that others would mix up, [the Parties]" to "support a finding of actual confusion"); *cf. Karl Storz Endoscopy Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 854 (9th Cir. 2002) (noting that "the 1962 amendments to . . . the Lanham Act specifically struck language limiting the scope of the Act to confusion by 'purchasers'" (citation omitted)).

Impossible Foods's remaining attacks on the sufficiency of Impossible LLC's evidence of actual confusion fall short.  Impossible Foods argues that Mr. Durant's testimony fails to prove that negative reactions to his Impossible LLC shirt were caused by the accused Impossible Swag and Impossible Cookbook (rather than Impossible Foods's non-accused plant-based food business) because he responded "I don't know exactly why" when "asked whether he knew the source of the alleged confusion."  Mot. at 8 (quoting Tr. at 437:8).  Impossible Foods also argues that "[w]hile survey evidence is not required, the absence of any consumer testing on the central confusion theory presented to the jury is telling."  *Id.* at 9 (citing *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1041–42 (C.D. Cal. 1998)).  The Court cannot grant JMOL on these bases, which necessarily go to the weight and credibility to be accorded to testimony at trial rather than the sufficiency of the evidence.  *See Experience Hendrix*, 762 F.3d at 842.

18

Impossible Foods's reliance on *Cairns* is particularly misplaced; in addition to not being binding on the Court, that case involved a district court's conclusion that the plaintiff had not shown a likelihood of success on the merits at the preliminary injunction stage because "a plaintiff's failure to conduct a consumer survey, assuming it has the financial resources to do so, may lead to an inference that the results of such a survey would be unfavorable." *Cairns*, 24 F. Supp. 2d at 1041–42. While a reasonable jury *could* discount Mr. Durant's testimony based on his cross-examination responses or infer that the lack of survey evidence meant that no such evidence existed, it was not *required* to do so. *See San Diego Comic Convention v. Dan Farr Prods.*, 336 F. Supp. 3d 1172, 1185 (S.D. Cal. 2018) (denying renewed JMOL motion because plaintiff "was under no obligation to provide [a survey] and [defendant] is incorrect in asserting that a lack of a confusion survey demonstrates that confusion is not likely").

Finally, Impossible Foods also appears to argue that counsel for Impossible LLC tricked the jury during closing argument, specifically, that Impossible LLC inappropriately suggested that the jury could find for Impossible LLC based on confusion attributable to Impossible Foods's non-accused plant-based food offerings rather than the accused Impossible Swag and Impossible Cookbook.[2] *See* Mot. at 9 ("Mr. Cashman's closing argument confirms that [Impossible LLC]'s theory was not that consumers were purchasing apparel or cookbooks under a mistaken belief about source. Rather, counsel argued that the injury was that consumers associated the IMPOSSIBLE name with [Impossible Foods], that some consumers did not wish to be associated with [Impossible Foods]'s products, and that [Impossible Foods]'s prominence had diminished Mr. Runyon's ability to use IMPOSSIBLE as a source identifier."). The Court disagrees with Impossible Foods's characterization of closing arguments but, in any case, the jury was specifically instructed *not* to draw this improper inference:

> Impossible LLC does not allege infringement by Impossible Foods' use of the Impossible trademark in connection with plant-based products. In considering Impossible LLC's claims, you must consider only whether Impossible Foods' apparel and cookbooks infringe Impossible LLC's trademark rights.

---

[2] Impossible Foods was apparently tricked as well, as counsel did not object to the cited portions of Impossible LLC's closing argument at trial.

Jury Instruction No. 47-a.

"A jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *accord Richardson v. Marsh*, 481 U.S. 200, 211 (1987). There was sufficient evidence in the record for the jury to find a likelihood of confusion as instructed, and the Court does not adopt Impossible Foods's *reverse* presumption that the jury disregarded that evidence, disregarded the Court's instructions, and illicitly found a likelihood of confusion based on Impossible Foods's legitimate plant-based business instead. Put simply, Impossible Foods's speculations as to the propriety of the jury's decisionmaking process is simply not a basis to grant its Rule 50(b) motion.

The Court agrees with Impossible LLC that substantial evidence supports the jury's infringement finding and that Impossible Foods is accordingly not entitled to JMOL. Impossible Foods also moves for a new trial under Rule 59(a) for the same reasons, namely, that the jury's infringement determination is against the weight of the evidence. For the foregoing reasons, the Court finds that the jury's verdict was not against the clear weight of the evidence. "That the Rule 59 standard does not require a court to accept the jury's credibility findings does not change the Court's conclusion." *Nunez v. Santos*, 427 F. Supp. 3d 1165, 1190 (N.D. Cal. 2019) (denying new trial motion raising the same grounds as denied JMOL motion). "While the evidence presented by [Impossible LLC] was not overwhelming and the jury could have found otherwise, the record does not compel a new trial because the verdict was not against the clear weight of the evidence; there was no 'absolute absence of evidence to support the jury's verdict.'" *Siqueiros v. Gen. Motors LLC*, 676 F. Supp. 3d 776, 815 (N.D. Cal. 2023) (quoting *Hung Lam v. City of San Jose*, 869 F.3d 1077, 1084 (9th Cir. 2017)). And one could hardly say that Impossible Foods's modest evidentiary submissions demonstrate that the verdict was against the clear weight of the evidence.

Because the jury's verdict is supported by substantial evidence and is not against the clear weight of the evidence, Impossible Foods's JMOL motion and new trial motion as to infringement are DENIED.

### B. Corrective Advertising

Next, Impossible Foods argues that the corrective advertising award fails as a matter of

law.

"An award of the cost of corrective advertising, like compensatory damage awards in general, is intended to make the plaintiff whole.  It does so by allowing the plaintiff to recover the cost of advertising undertaken to restore the value plaintiff's trademark has lost due to defendant's infringement."  *Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 988 (9th Cir. 1995).  "Such an award, however, is 'appropriate only where a plaintiff has shown that in fact it has been injured,' or, put another way, 'that the mark lost value.'"  *Fortinet, Inc. v. Fortanix, Inc.*, No. 20-cv-06900-MMC, 2022 WL 1128723, at *11 (N.D. Cal. Apr. 15, 2022) (quoting *Marketquest Grp., Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1301 (S.D. Cal. 2018)).  A plaintiff seeking corrective advertising damages must demonstrate that (1) it enjoys an established goodwill and reputation, (2) it has suffered harm to that goodwill and reputation because of the defendant's infringing activities, and (3) corrective advertising is appropriate to restore that harm.  *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1112–13 (9th Cir. 2012).  While the plaintiff "need not show a specific measure of harm," it "must present non-speculative evidence that goodwill and reputation . . . was damaged in some way."  *Quia Corp. v. Mattel, Inc.*, No. 10-cv-01902-JF-HRL, 2011 WL 2749576, at *5 (N.D. Cal. July 14, 2011); *see also Int'l Oddities v. Record*, No. 12-cv-03934-CAS, 2013 WL 3864050, at *14 (C.D. Cal. July 22, 2013).

Impossible Foods argues that it is entitled to JMOL on corrective advertising damages for three reasons.  First, Impossible Foods argues that "[a]s explained *supra*, [Impossible LLC] failed to show any actionable actual confusion" or "any other injury requiring corrective advertising."  Mot. at 13 (citation omitted).  Second, Impossible Foods argues that Impossible LLC failed to quantify the diminution of value to its marks on a nonspeculative basis.  *See id.* at 14.  Third, Impossible Foods argues that "[a]s explained *supra*, [Impossible LLC] failed to show any causal link between [Impossible Foods]'s apparel and cookbook and any confusion or other harm."  *Id.* at 16 (citation omitted).

With respect to actionable injury, Impossible Foods acknowledges that "Mr. Runyon testified that customers were concerned about being associated with [Impossible Foods]'s brand, that business momentum had been diminished, and that additional efforts would be required to

21

explain and promote the brand" but nonetheless argues that the jury's corrective advertising damages award is not supported because Impossible LLC "failed to show any actionable actual confusion" and "did not quantify any of the purported injuries." Mot. at 13–14 (citations omitted) (citing Tr. at 1032–33). To the extent that Impossible Foods renews its argument that Impossible LLC was required to supply evidence of actual confusion to be entitled to corrective advertising damages, that argument fails for the reasons set forth above. As with proof of infringement, proof of injury to goodwill can take many forms, including evidence of "confusion," *Skydive*, 673 F.3d at 1113, a decline in "sales and profits," *Marketquest*, 316 F. Supp. 3d at 1301, or other evidence that, in the "totality of the circumstances" supports an inference that the plaintiff was harmed. *Hansen Beverage Co. v. CytoSport, Inc.*, No. 09-cv-00031-VBF-AGRx, 2010 WL 11914746, at *2 (C.D. Cal. Apr. 9, 2010); *see also Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1410 (9th Cir. 1993) (explaining that "evidence of actual consumer confusion" is not required to establish the "fact of damages").

As noted *supra* § I.B.3, the Court granted Impossible Foods's Rule 50(a) JMOL motion at trial, agreeing with Impossible Foods that Impossible LLC failed to present evidence of the diminution in value of its brand caused by the accused goods. Tr. at 871:18–22, 872:10–13. Such evidence is required because the Parties' agreed upon jury instruction states that corrective advertising damages costs cannot "exceed the actual damage to the value of Impossible LLC's mark at the time of the infringement by Impossible Foods." Jury Instruction No. 63. Upon reopening its affirmative case, Impossible Foods re-called Mr. Runyon, who testified that his Impossible apparel was fundamental to the value of his IMPOSSIBLE brand and that, based on his experience in evaluating businesses, he estimated that the value of his brand had decreased from $25 million at its height to significantly less following Impossible Foods's adoption of the IMPOSSIBLE marks on the accused products:

> Q. Now, in general, how have your consulting clients found you?
> A. Every single one has found me through Impossible.
> Q. Can you explain a little bit more what you mean by that?
> A. Sure. When I started my blog, it was a way to shape my story, but people also got really connected to the brand. And so pretty early on, people started recognizing what I was doing at Impossible from a marketing and branding perspective and also wanting help with that for their own businesses and their own brands. . . . [M]y shirt is my

United States District Court
Northern District of California

business card.

. . . .

Q. Based on your experience, did the company and the brand grow in value over time?

A. Yes.

Q. And what would you say the height was, if you could fix it for us in time?

A. Yeah. I mean, I would say after the 777 project in 2017, we were generating a lot of excitement. . . . And I was connected to a lot of different brands were doing different fundraisers, you know, 10 to 20, 25 [million dollars], some were way more, million dollar range. And that was an option for Impossible if I wanted to raise that. . . . I think in 2019 and the 2020 range when I moved to Austin, I think I could have easily raised something that would have valued it at 15 to 20, $25 million.

. . . .

Q. Have you performed a formal valuation of your brand at any point in time?

A. I have not performed a formal brand valuation, no.

Q. Nonetheless, sitting here today, do you have a sense of what your brand is worth today?

A. Not as much. . . . It's not much.

Tr. at 1022:22–1031:25.

A reasonable jury could have credited Mr. Runyon's testimony that, based on his experience as the sole owner of Impossible LLC—including his consulting experience assisting other companies with business valuation, *see* Tr. at 1026:18–25, 1027:1–8—the value of his IMPOSSIBLE brand decreased from $25 million at its peak to practically nothing. The jury in this case was entitled to assess Mr. Runyon's credibility and determine for itself whether it agreed that the diminution in value of Impossible LLC's brand was comparable to $25 million in assessing corrective advertising damages and indeed, the jury awarded a corrective advertising award far below that mark at $1.5 million. *See DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1223 (9th Cir. 2010) ("The law does not require expert testimony to establish damages, though that would have made the jury's task easier." (internal footnote omitted)).

Impossible LLC was not—as Impossible Foods now urges in challenging the jury's damages award—required to present expert testimony precisely "calculat[ing] the value of the IMPOSSIBLE mark before or after the alleged infringement," nor is Mr. Runyon's testimony insufficient simply because he "admitted that he had never performed a valuation of the brand or trademark[] [and] [i]nstead[] . . . offered his personal belief that the company might once have supported a valuation of $15–25 million and that the brand is now worth 'not much.'" Mot. at 14

United States District Court
Northern District of California

(quoting Tr. at 808:16–809:7, 1027:15–1031:25). To the contrary, the Lanham Act "demands neither empirical quantification nor expert testimony to support a monetary award of actual damages; many sources can provide the requisite information upon which a reasonable jury may calculate damages." *Skydive*, 673 F.3d at 1113; *see also id.* at 1112 ("In reviewing a jury's award of actual damages for intentional infringement, we accept 'crude' measures of damages based upon reasonable inferences so long as those inferences are neither 'inexorable . . . [nor] fanciful.'" (alterations in original) (quoting *Intel Corp. v. Terabyte Int'l, Inc.,* 6 F.3d 614, 621 (9th Cir. 1993))).

In arguing that "even after reopening its case, [Impossible LLC] failed to provide valuation evidence necessary to support a corrective advertising award," Impossible Foods is essentially inviting the Court to (1) establish for itself that Mr. Runyon's testimony was not credible, (2) determine that Dr. Palmatier and Dr. Vanderhart's failure to quantify Impossible LLC's injuries shows that such injuries were *de minimis*, and (3) reweigh the evidence in favor of Impossible Foods. Mot. at 15. The Court declines that invitation. *See Johnson*, 251 F.3d at 1227 (instructing that a court adjudicating a Rule 50(b) motion "must disregard all evidence favorable to the moving party that the jury is not required to believe"). The fact that the Court would take a different view of Impossible LLC's theory of damages or discount Mr. Runyon's testimony based on his less than rigorous analysis does not mean that the jury's award was not supported by substantial evidence.

Finally, with respect to causation, Impossible Foods argues that Impossible LLC failed to establish a causal nexus between the accused Impossible Swag and Impossible Cookbook and the harm to Impossible LLC's marks. Impossible Foods's causation argument is merely a reprisal of its already rejected arguments that Impossible LLC failed to provide evidence of actual confusion. *See* Mot. at 16 ("[Impossible LLC] could not identify a single customer who even saw [Impossible Foods]'s accused apparel or cookbook let alone were confused by those goods."). While Impossible Foods is correct that Impossible LLC's injury must be caused by Impossible Foods's infringement rather than its lawful plant-based foods business to be compensable, it does not follow that Impossible LLC was required to supply evidence of actual confusion to that effect.

24

The fact that Impossible Foods deploys its goods using accused and non-accused IMPOSSIBLE marks does not transform Impossible LLC's evidentiary burden into one requiring it to affirmatively disprove what amounts to a superseding-cause argument, especially given that Impossible Foods did not present that evidence at trial.

In any case, Impossible LLC presented evidence that Impossible Foods deployed the Impossible Swag as part of a multimillion-dollar campaign designed to generate brand awareness and extensively promoted the Impossible Swag online through social media. *See* Tr. at 566:5–567:22, 619:4–16; TX 421, TX 423, TX 298, TX 759, TX 760. The jury could have reasonably concluded that this campaign played a substantial role in consumers subsequently expressing confusion regarding the source of Impossible LLC's apparel or whether Mr. Runyon was affiliated with Impossible Foods, which both he and Mr. Durant testified had not occurred prior to the launch of the accused products. *See* Tr. at 213:4–219:20, 434:19–435:7, 437:4–5. The jury could have also credited Dr. Palmatier's opinion that harm suffered by Impossible LLC was the type of harm one would reasonably expect as a consequence of brand deterioration under principles of marketing science. *See id.* at 702:16–706:25; 707:18–709:16.

Ultimately, the question of causation is "quintessentially one for the jury." *Gross v. CitiMortgage, Inc.*, 33 F.4th 1246, 1253 (9th Cir. 2022); *see also Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1168 (9th Cir. 2013). There was sufficient evidence for the jury to conclude that Impossible LLC's damages flowed from the alleged infringement.

The Court agrees with Impossible LLC that substantial evidence supports the jury's corrective advertising damages award and that Impossible Foods is accordingly not entitled to JMOL on actual damages. Impossible Foods's new trial motion fares no better; based on the foregoing, the Court cannot say that the jury's verdict was against the clear weight of the evidence. This is particularly the case where, as here, Impossible Foods itself neglected to proffer any causation or valuation evidence at trial and inexplicably allowed Mr. Runyon's $25 million valuation to go uncontroverted by failing to cross-examine him. *See* Tr. at 1034:5–8.

Because the jury's verdict is supported by substantial evidence and is not against the clear weight of the evidence, Impossible Foods's JMOL motion and new trial motion as to corrective

25

advertising damages are DENIED.

### C.  Oppression, Fraud, or Malice

Impossible Foods claims that the punitive damages award fails as a matter of law because there was no oppression, fraud, or malice.

Under California law, a party may be awarded punitive damages only if "there is some evidence of fraud, malice, express or implied, or oppression." *Spinks v. Equity Residential Briarwood Apartments*, 171 Cal. App. 4th 1004, 1052 (2009) (citation omitted).  Punitive damages must be proven by "clear and convincing" evidence.  *Am. Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton*, 96 Cal. App. 4th 1017, 1049 (2002) (quoting Cal. Civ. Code § 3294).  "In the usual case, the question of whether the defendant's conduct will support an award of punitive damages is for the trier of fact, 'since the degree of punishment depends on the peculiar circumstances of each case.'"  *Spinks*, 171 Cal. App. 4th at 1053 (quoting *Hannon Eng'g, Inc. v. Reim*, 126 Cal. App. 3d 415, 431 (1981)).

Impossible Foods argues that it is entitled to JMOL or a new trial as to punitive damages on three grounds.  First, Impossible Foods argues that "because the corrective advertising award cannot be sustained, the punitive award necessarily falls with it."  Mot. at 16.  Second, Impossible Foods argues that "[p]unitive damages additionally fail because [Impossible LLC] did not present clear and convincing evidence of oppression, fraud, or malice."  *Id.* at 17.  Third, Impossible Foods argues that the amount of punitive damages was constitutionally excessive, *see id.* at 18, and that the jury's award was improperly based on Impossible Foods's protected litigation conduct.  *See* Reply at 11.

### 1.  JMOL as to Punitive Damages

First, Impossible Foods's argument that it is entitled to JMOL on punitive damages because Impossible LLC failed to adduce evidence of compensable trademark injury entitling it to actual damages is wrong for the same reasons stated above.  As set forth *supra* § III.B, the Court concludes that the jury's corrective advertising damages award was supported by substantial evidence.  Because there was sufficient evidence presented at trial for a reasonable jury to conclude that corrective advertising damages were warranted, Impossible Foods is not entitled to

JMOL on punitive damages for failure to establish actual injury.

Second, Impossible Foods's argument that it is entitled to JMOL on punitive damages because Impossible LLC failed to prove oppression, fraud, or malice by clear and convincing evidence was forfeited because Impossible Foods did not raise this argument during its Rule 50(a) JMOL motion at trial. *See, e.g.*, *Cisco Sys. Inc. v. Arista Networks, Inc.*, No. 14-cv-05344-BLF, 2017 WL 4771009, at *10 (N.D. Cal. May 10, 2017).  At trial, Impossible Foods only moved for JMOL on infringement and corrective advertising damages:

> After the close of Plaintiff's case, there is legally insufficient evidentiary basis for a reasonable jury to find on essential elements of his claims, including confusion and damages.
>
> So Plaintiff bears the burden of proving the likelihood of confusion caused by the accused conduct.  The record contains no legally sufficient evidence.  It shows that the Parties operate in fundamentally different markets.  Impossible Foods produces and sells plant-based meat products in the food manufacturing and grocery market.  Impossible LLC operates first and foremost a consulting and SEO service.  It is where his company derives most of its income.  Impossible is also a fitness, lifestyle, and personal development brand offering training programs, content, and community services.  These markets serve different consumer purposes and needs.
>
> Impossible LLC's claims are only as to apparel and cookbooks; however, the evidence shows that the apparel is not a significant product line for either party.  And there is one cookbook made back in 2012 that was not successful and did not last long on Impossible LLC's side.  On Impossible Foods's side, its cookbook was also not successful.  Impossible LLC's apparel is ancillary to its lifestyle brand and something he has derived about 50,000 [sic] over sixteen years.  He presented no evidence that consumers feel either party is an apparel brand or that apparel sales meaningfully overlap.  There is no evidence of confusion among Impossible LLC's consumers, which is a relevant space here.  The anecdotal examples referenced at trial concerned consumers associating the word "IMPOSSIBLE" with plant-based meat products.  Those products are not accused in this case, and it does not show confusion.  The relevant question is whether confusion is caused by the accused apparel.  Plaintiff presented no evidence answering that question.  Without evidence tying confusion to the accused goods, no reasonable jury could find likelihood of confusion.
>
> Second, Plaintiff failed to prove damages.  Even if Impossible LLC could establish liability, it has failed to present the least sufficient evidence of damages.  Its damages theory rests entirely on a corrective advertising model, however, that model lacks the evidentiary foundation required under the Lanham Act.
>
> They presented no evidence of brand valuation or a lost brand valuation.  No evidence that it suffered lost sales, lost customers, lost profits or again reduced the brand value.  And any purported valuation based on marketing spend is highly inflated, including non-IMPOSSIBLE branded services.  The complained goods here is [sic]

apparel. The revenue is a fraction of his own revenue. The damages expert did not calculate lost sales or lost profits and did not identify any specific customers who stopped doing business with Plaintiff and did not [value] the brand.

Palmatier testified, no lost customers. He did not provide a valuation. Instead, the damages theory that he puts forth assumes that brand harm has occurred. The same thing with Dr. Vanderhart, Plaintiff also failed to show that the accused products caused any alleged harm. The anecdotal testimony, again, did not go to the goods here. They went to the plant-based meat products. And they just never isolated the effect of apparel from Impossible Foods's broader marketing or business. As a result, the damage as figured is produced by multiplying assumptions rather than measuring harm, and this speculation cannot support a jury award.

In short, Impossible LLC's corrective advertising damages claim is not viable because there was nothing for corrective advertising to correct. Because Plaintiff failed to present legally sufficient evidence of likelihood of confusion caused by the accused products and failed to present reliable evidence of damages, Defendant or Impossible Foods respectfully moves for judgment as a matter of law.

Tr. at 859:17–862:12 (formatting altered). Because a post-verdict Rule 50(b) challenge is a renewed motion, it "is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion." *E.E.O.C.*, 581 F.3d at 961. "Thus, a party cannot properly 'raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion.'" *Id.* (quoting *Freund*, 347 F.3d at 761). Nowhere in Impossible Foods's Rule 50(a) motion is there any argument as to punitive damages or even a mention of "oppression," "fraud," or "malice," so the argument is waived.

Impossible Foods attempts to explain away its waiver by urging that "the punitive award necessarily depended on the same evidence at issue in [Impossible Foods]'s preserved challenges to liability and damages," such that "[Impossible LLC] still had an opportunity to cure them, thereby satisfying Rule 50(a)'s notice function." Reply at 3. Not so. While Impossible Foods preserved its argument that punitive damages cannot stand in the absence of actual damages, its oppression, fraud, or malice argument in its Rule 50(b) JMOL motion relies on entirely different evidence than its Rule 50(a) JMOL motion. While "Rule 50(b) 'may be satisfied by an ambiguous or inartfully made motion,'" the argument in some form still needs to be made. *Antonick v. Elec. Arts, Inc.*, 841 F.3d 1062, 1068 (9th Cir. 2016) (quoting *E.E.O.C.*, 581 F.3d at 961). Here, that argument was not made in any form. Impossible Foods's citation to *Embotelladora Electropura*

*S.A. de C.V. v. Accutek Packaging Equipment Company, Inc.*, No. 16-cv-00724-GPC-MSB, 2020 WL 1952820 (S.D. Cal. Apr. 23, 2020), is not to the contrary. There, the district court determined that the defendant had preserved its "factual and legal position that [its] financial condition was an essential element for a punitive damage award and that Plaintiff did not have evidence to offer on financial condition" during a colloquy before the punitive damages phase. *See id.* at \*5. That was because "the parties addressed the factual predicate for a punitive damage award before [plaintiff] presented its evidence." *Id.* No such exchange occurred here.

Impossible Foods's failure to raise this argument during its Rule 50(a) motion precludes it from raising it here. That is because—unlike with Impossible Foods's challenge to Impossible LLC's valuation evidence—Impossible LLC did not have the opportunity to cure any evidentiary defect on which Impossible Foods now seeks to set aside the verdict. *Cf. Freund*, 347 F.3d at 761 ("The purpose of [limiting Rule 50(b) motions to the grounds set forth in Rule 50(a)] is twofold. First it preserves the sufficiency of the evidence as a question of law, allowing the district court to review its initial denial of judgment as a matter of law instead of forcing it to 'engage in an impermissible reexamination of facts found by the jury.' Second, it calls to the court's and the parties' attention any alleged deficiencies in the evidence at a time when the opposing party still has an opportunity to correct them." (citation omitted) (quoting *Lifshitz v. Walter Drake & Sons,* 806 F.2d 1426, 1428–29 (9th Cir. 1986))).

Third, Impossible Foods's argument that the punitive damages award is constitutionally excessive also does not entitle it to JMOL. While Impossible Foods styles its constitutional argument as a single due process challenge, in reality it makes two loosely related arguments (one of which it raises for the first time on reply). First, Impossible Foods argues that the punitive damages award is "constitutionally suspect" based on the "large punitive-to-compensatory ratio[]" and the fact that "Impossible LLC's punitive case focused overwhelmingly on [Impossible Foods]'s lawful and non-infringing plant-based meat business, rather than the accused apparel and cookbook goods submitted to the jury." Mot. at 18. Second, Impossible Foods argues that Impossible LLC's "attacks on [Impossible Foods]'s declaratory action and affirmative claims were a basis for the jury's verdict, which only confirms its constitutional defect." Reply at 11 (citation

omitted).  The Court addresses each sub-argument in turn.

The amount of punitive damages the jury awarded in this case—$1.75 million in punitive damages in comparison to $1.5 million in actual damages—was not constitutionally excessive.[3] The Supreme Court has "instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).  The jury's punitive damages award, which represents a 1.167x multiplier over its corrective advertising damages award, does not come close to approaching the Constitutional limit recognized by the Ninth Circuit:  "We have limited punitive damages to a 4 to 1 ratio 'where there are significant economic damages . . . but behavior is not particularly egregious.'  However, we will consider a single digit multiplier above 4 to 1 '[i]n cases with *significant economic damages* and more egregious behavior.'  We have upheld punitive damages ranging from six to nine times compensatory damages in such cases." *Riley v. Volkswagen Grp. of Am., Inc.*, 51 F.4th 896, 902 (9th Cir. 2022) (alterations in original) (internal citations and footnote omitted) (quoting *Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists*, 422 F.3d 949, 962 (9th Cir. 2005)).

Impossible Foods cites the California Supreme Court's decision in *Roby v. McKesson Corporation*, 47 Cal. 4th 686 (2009), for the proposition that "'a one-to-one ratio between compensatory and punitive damages is the federal constitutional limit' in cases with a 'relatively

---

[3] While Impossible LLC argues that Impossible Foods also forfeited its argument that the punitive damages award was constitutionally excessive, the Court disagrees.  Although Impossible Foods did not use the word "punitive" in its Rule 50(a) motion, it still moved for JMOL on the basis that Impossible LLC's case punished it for its lawful plant-based food business rather than the accused Impossible Swag and Impossible Cookbook.  *See* Tr. at 861:23–862:2 ("The anecdotal testimony, again, did not go to the goods here.  They went to the plant-based meat products.  And they just never isolated the effect of apparel from Impossible Foods's broader marketing or business.").  This statement provided adequate notice to Impossible LLC of the evidentiary basis for Impossible Foods's objection, which Impossible LLC could have cured upon the reopening of its case.

low degree of reprehensibility' and a 'substantial compensatory damages verdict." Mot. at 18 (quoting *Roby*, 47 Cal. 4th at 719). That case is not to the contrary—in *Roby*, a wrongful discharge case, the jury awarded $3,511,000 in compensatory damages and $15 million in punitive damages. *Roby*, 47 Cal. 4th at 692. The California Supreme Court held that the constitutional limit for punitive damages was the compensatory damages figure under the circumstances of that case because the jury had already awarded a "substantial compensatory damages verdict, which included a substantial award of noneconomic damages." *Id.* at 719. Those circumstances are not present here.

As to the second portion of this argument, Impossible Foods forfeited its claim that awarding punitive damages would improperly punish it for its litigation conduct by failing to raise the argument during its Rule 50(a) motion. *See Kaiser Steel Corp. v. Frank Coluccio Constr. Co.*, 785 F.2d 656, 658 (9th Cir. 1986). Unlike its constitutional excessiveness argument, which cannot arise until after the verdict is rendered, Impossible Foods raised no objection as to invocations of its litigation conduct during trial. Only after this motion was fully briefed and argued to the Court[4] did Impossible Foods file a "notice" advising the Court that it had preserved this issue by objecting to Impossible LLC's closing argument during the punitive damages phase of the trial. *See* ECF No. 510. Impossible Foods mischaracterizes the record, which reflects that Impossible Foods only raised—and the Court sustained—a single objection to Impossible LLC's closing argument's reference to Impossible Foods retaining "four different law firms." Tr. at 1294:18–21. In any case, because the objection was sustained, the jury is presumed to have disregarded the improper reference to four law firms. *See Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1270 (9th Cir. 2000). Moreoover, this argument fails because it was Impossible Foods's obligation to object to the evidence and argument as it was presented at trial. Had that happened, the Court would have sustained proper objections, stricken improper testimony, and admonished

---

[4] In its notice, Impossible Foods avers that it noted this objection "in its brief in opposition to [Impossible LLC]'s administrative motion to strike an allegedly new argument in [Impossible Foods]'s reply brief or alternatively for leave to file a sur-reply. ECF No. 510. Impossible Foods does not dispute that it failed to raise this point in its merits briefing and or raise it orally at the motion hearing afterward.

United States District Court
Northern District of California

the jury not to consider the stricken testimony by way of a curative instruction.  Having sat on its hands at trial, Impossible Foods cannot now be heard on this issue.

The motion for JMOL is accordingly DENIED as to punitive damages.

### 2.  New Trial as to Punitive Damages

While Impossible Foods did not preserve its Rule 50(b) arguments that Impossible LLC failed to prove oppression, fraud, or malice by clear and convincing evidence and that Impossible LLC improperly influenced the jury by repeatedly referencing Impossible Foods's litigation conduct as a basis for punitive damages, those arguments may still form the basis for relief under Rule 59.  The Court agrees with Impossible Foods that a new trial on punitive damages is warranted because the jury's finding of oppression, fraud, or malice is against the clear weight of the evidence.  Coupled with Impossible LLC's repeated invitations for the jury to fill that evidentiary gap by considering Impossible Foods's lawful litigation activities—including by initiating this declaratory judgment action and asserting invalidity defenses to Impossible LLC's counterclaims for trademark infringement—the Court further concludes that a new trial is required to prevent a miscarriage of justice.  *See Moist Cold Refrigerator Co. v. Lou Johnson Co.*, 249 F.2d 246, 256 (9th Cir. 1957), *cert. denied*, 356 U.S. 968 (1958) ("[T]he trial judge then had the right, and indeed the duty, to weigh the evidence as [she] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [her] conscientious opinion, the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial judge, a miscarriage of justice.").

"Unlike with a Rule 50 determination, the district court, in considering a Rule 59 motion for new trial, is not required to view the trial evidence in the light most favorable to the verdict.  Instead, the district court can weigh the evidence and assess the credibility of the witnesses.  The district court also is not limited to the grounds a party asserts to justify a new trial, but may sua sponte raise its own concerns about the damages verdict.  Ultimately, the district court can grant a new trial under Rule 59 on any ground necessary to prevent a miscarriage of justice." *Experience Hendrix*, 762 F.3d at 842 (citations omitted) (first citing *Kode v. Carlson,* 596 F.3d 608, 612 (9th Cir. 2010) (per curiam), then citing Fed. R. Civ. P. 59(d), then citing *Murphy,* 914 F.2d

32

at 187).

Although the Court is mindful that a "stringent standard" applies when a party moves for a new trial on the ground that the jury's verdict was against the clear weight of the evidence, *Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1347 (9th Cir. 1984), the Court finds that this stringent standard has been met.  The evidence adduced at trial quite simply did not even approximate oppression, fraud, or malice, as defined by the Parties' agreed upon punitive damages instruction:

> "Malice" means that Impossible Foods acted with intent to cause injury or that Impossible Foods' conduct was despicable and was done with a willful and knowing disregard of the rights or safety of another.  A party acts with knowing disregard when it is aware of the probable dangerous consequences of its conduct and deliberately fails to avoid those consequences.
> "Oppression" means that Impossible Foods conduct was despicable and subjected Impossible LLC to cruel and unjust hardship in knowing disregard of its rights.
> "Despicable conduct" is conduct that is so vile, base, or contemptible that it would be looked down on and despised by reasonable people.
> "Fraud" means that Impossible Foods intentionally misrepresented or concealed a material fact and did so intending to harm Impossible LLC.

Jury Instruction No. 65-a.

The evidence presented at trial did not at any point suggest that Impossible Foods or its agents possessed a state of mind even approaching oppression, fraud, or malice, with Impossible LLC's theory of the case (to wit, knowing disregard of the probable dangerous consequences of its conduct) never turning up evidence establishing more than mere negligence or (at most) recklessness.  There is no evidence in the record at all that Impossible Foods at any time singled out Mr. Runyon for mistreatment or abuse.  On the contrary, the evidence affirmatively shows that Impossible Foods did not think about him (or other potential senior trademark registrants) at all after its initial rebranding, for example, by failing "to take any steps to avoid harming existing trademark rights for apparel when it started distributing [the Impossible Swag]" or "run a new trademark search" when it "began making cookbooks with the Impossible name affixed to the cover."  Tr. at 426:5–25.

On the other side of the ledger, Impossible Foods presented state of mind evidence in the

form of Ms. Pasek's testimony that Impossible Foods conducted a thorough trademark search during the rebranding process and believed that it could coexist with other IMPOSSIBLE marks because it "only wanted [its] IMPOSSIBLE mark to cover the classes of goods related to food." Tr. at 371:8–14; *see also* TX 2181; Tr. at 373:17–19 (stating that, based on trademark search, Impossible Foods concluded that "the word 'IMPOSSIBLE' is being used a lot in commerce, and there is a lot of coexistence of this mark between a lot of different business and individuals"). Mr. Halla testified that he had discussions regarding licensing.  *See* Tr. at 416:8–417:9.

While evidence of Impossible Foods's awareness of Impossible LLC's marks during the period it began marketing and promoting the Impossible Swag and Impossible Cookbook may support a finding of willfulness, it does not reflect "conduct that is 'so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people.'"  *McNeal v. Whittaker, Clark & Daniels, Inc.*, 80 Cal. App. 5th 853, 872 (2022) (quoting *In re Johnson & Johnson Talcum Powder Cases*, 37 Cal. App. 5th 292, 332–33 (2019)); *see also Coll. Hosp. Inc. v. Superior Ct.*, 8 Cal. 4th 704, 725 (1994) ("[A]bsent an intent to injure the plaintiff, 'malice' requires more than a 'willful and conscious' disregard of the plaintiffs' interests.  The additional component of 'despicable conduct' must be found.").

In opposing Impossible Foods's new trial motion, Impossible LLC urges that:

> The evidence showed that Impossible Foods: (1) admittedly knew of the IMPOSSIBLE® Marks and adopted an identical mark in a near-identical stylized design (2) discussed Impossible LLC's marketing as inspiration as it rolled out its own branding; (3) proceeded to launch infringing products in the same categories where Impossible LLC had priority; (4) never adopted any plan to mitigate confusion that would inevitably occur; (5) filed a preemptive declaratory judgment action when Impossible LLC asked it to stop infringing; (6) brought baseless infringement, fraud, and abandonment claims against Impossible LLC and Mr. Runyon in an attempt to bury a smaller competitor; (7) never tempered or ceased its infringing conduct pending the outcome of the trial; and (8) continued expanding its infringement into new areas in which Impossible LLC has priority without regard for Impossible LLC's trademark rights.

Opp. at 19 (citations omitted) (citing TX 33; TX 34; TX 312, TX 421, TX 423, TX 712; TX 750; TX 759; TX 2181; TX 2208; Tr. at 224:11–16; 267:12–268:1, 362:12–23, 385:14–389:5, 598:15–599:1, 599:8–600:12).  The problem for Impossible LLC is that none of these eight grounds alone or in combination with one another supports punitive damages.  Although the first, second, third,

and fourth points as presented to the jury at trial and reflected in the evidence certainly support willfulness, they fall far short of malice.

The fifth, sixth, seventh, and eighth points confirm that Impossible LLC's theory of punitive damages was based at least in part on inviting the jury to punish Impossible Foods for its legitimate litigation conduct. *De Anza Santa Cruz Mobile Ests. Homeowners Assn. v. De Anza Santa Cruz Mobile Ests.*, 94 Cal. App. 4th 890, 921 (2001) (explaining that it is a "generally accepted rule of law that the manner in which a defendant conducts its defense cannot be the basis for tort liability"); *see also Bosack v. Soward*, 586 F.3d 1096, 1105 (9th Cir. 2009) (same). During Impossible LLC's closing arguments during the punitive phase, Impossible LLC argued that:

> [W]hen he just reached out and said hey, can we have a conversation so that we can figure who is going to do what and we can avoid confusion [i.e., sending a cease-and-desist to Impossible Foods and filing a notice of opposition with the PTO], they didn't take him up on that [and] instead just put the lawyers on him. They sued him. And then they did more, they sued him personally, right, they said I'm going to name you individually and then they gave that up, I guess, during the trial.
> They didn't stop there, they accused him of infringing their trademarks but they didn't even bother to bring anybody here to try to prove that up to you. They just used their lawyers and used the courts as a tool to punch down on a much, much smaller party.
> They didn't stop there. They accused him of fraud, they said he gave up his trademarks. These are just things that lawyers do to flex their muscles.

Tr. at 1294:3–17. Mr. Runyon also testified as to Impossible Foods's litigation conduct during his first direct examination:

> Q. How did Impossible Foods respond to this letter?
> A. They sued me.
> Q. When was that?
> A. That was in April.
> Q. Of what year?
> A. It was April 2, 2021.
> Q. What did they sue you for?
> A. I think they asked for superior rights in – to the word "IMPOSSIBLE" on recipes and cookbooks and that they are not infringing on us.
> Q. And that's the lawsuit we are here on today?
> A. That's the start of the lawsuit, yes.
> Q. Over the last five years, has the case changed in any way that you are aware of?
> A. Yes, it's expanded.
> Q. Does it involve your [LLC Supplements]?
> A. Yes.

United States District Court
Northern District of California

Q. In what other ways has it changed or expanded.
A. I think a couple years into the lawsuit, they alleged infringement of the nutritional products, they filed to cancel a whole bunch of trademarks, and they filed to sue me personally as well.
Q. They sued you personally
A. That's – yes.
Q. Is that still going on?
A. As far as I know, yes.
Q. And when you say they "filed to cancel trademarks," whose trademarks are you talking about?
A. They filed to cancel the trademarks that Impossible LLC owns, so mine – my trademarks.

Tr. at 223:3–224:8.  Impossible LLC also cross-examined Ms. Hatman, who is not a lawyer, about the propriety of Impossible Foods's cease-and-desist letters to third parties and admitted those exhibits into evidence.  *See id.* at 660–668; TX 203, TX 204, TX 210, TX 214, TX 2090, TX 2091.  Given the lack of evidence showing oppression, fraud, or malice, it is likely that Impossible LLC's repetitive invocations of Impossible Foods's litigation conduct inflamed the jury's passions, thus exerting a prejudicial effect on the jury that very well could have played a significant role in the punitive damages award.  That Impossible Foods failed to object to much of these examples (and the Court was accordingly not asked to issue a curative instruction) does not change the inexorable conclusion that the punitive damages award constitutes a manifest injustice under the facts of this case.

While the Court accords significant deference to the jury's role as factfinder, the Court is left with a firm conviction that the jury's punitive damages award is against the clear weight of the evidence and effected a manifest injustice in this case.  That conclusion is only reinforced by the district court decisions that Impossible LLC cites in its opposition brief, which involved conduct much more egregious than anything presented to the jury here.  In *QS Wholesale, Inc. v. World Marketing, Inc.*, the district court denied the defendant's motion for a new trial on punitive damages (while nonetheless reducing the jury's $3.5 million punitive damages award to $375,000) because the evidence at trial showed that the defendant began infringing the asserted mark after three unsuccessful attempts to purchase it, actively "cover[ed] its tracks by telling employees to stop pronouncing" the mark as used by the plaintiff, and continued selling the accused products "even as it represented to [plaintiff] that it had stopped selling products."  No. 12-cv-00451-DOC-RNBx, 2014 WL 12586120, at *8 (C.D. Cal. Jan. 7, 2014).  In *City of Carlsbad v. Shah*, the

36

district court awarded punitive damages following a bench trial where the defendant bought up web domains mimicking the name of the plaintiff city's newly named golf course in a deliberate cybersquatting scheme.  850 F. Supp. 2d 1087, 1106–12 (S.D. Cal. 2012).  Neither of those cases resembles the evidence before the jury here.

Because Impossible Foods waived its Rule 50(b) motion as to punitive damages, its JMOL motion is DENIED.  But because the Court agrees with Impossible Foods that the jury's punitive damages award is against the clear weight of the evidence presented at trial, Impossible Foods's new trial motion is GRANTED.  The Court anticipates that a new trial on punitive damages should take less than three days and will set the new trial schedule in a separate order to follow.

### D.  Exceptional Case

Finally, Impossible Foods takes another run at the Court's award of attorneys' fees.

"The court in exceptional cases may award reasonable attorney fees to the prevailing party."  15 U.S.C. § 1117(a).  "An 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."  *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179, 1180 (9th Cir. 2016) (en banc) (per curiam) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)).  The Ninth Circuit has instructed district courts to consider the "totality of the circumstances" in determining whether an award of attorneys' is appropriate, including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."  *Id.* at 1181 (quoting *Octane Fitness*, 572 U.S. at 554 n.6).  A court's determination whether a case is exceptional is based on a preponderance of the evidence.  *Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1223 (9th Cir. 2023).

The Court previously granted Impossible LLC's request for attorneys' fees pursuant to 15 U.S.C. § 1117(a), agreeing with Impossible LLC that the totality of the circumstances in this case made it exceptional.  The Court based its exceptionality determination in part on the "seriousness of Impossible Foods's conduct and its willful infringement" and the Court's

United States District Court
Northern District of California

37

assessment that Impossible Foods's "abandonment defense and affirmative infringement claims were exceptionally weak, particularly as presented to the jury at trial." Fees Order at 14. The Court also accorded "some weight" to Impossible LLC's argument that considerations of fairness and compensation favor attorneys' fees, based on the disparity between the jury's award and Impossible LLC's expenses and Mr. Runyon's declaration that he partially funded the litigation by liquidating his retirement accounts. *Id.* (citing ECF No. 476-1 ¶ 7). Impossible Foods submits that "the Court clearly erred in concluding that [Impossible Foods] presented 'no evidence' supporting core elements of its claims and defenses" and that "[Impossible LLC] was fully compensated by the $3.25 million verdict." Mot. at 19–23 (capitalization omitted).

Impossible Foods's first argument rests on a bald mischaracterization of the Fees Order, contending that the Court mistakenly "conclu[ded] that [Impossible Foods] presented 'no evidence supporting its affirmative infringement claim and abandonment defense." Mot. at 19. The Court did no such thing. Despite accusing the Court on five separate occasions of this "erroneous 'no evidence' premise"—internal quotation marks included—Impossible Foods tellingly neglects to *cite* where the Fees Order used those words. Mot. at 24; *see also id.* at 1, 19, 20. The Court did not conclude that Impossible Foods presented "no evidence" at all of abandonment, fraud, or infringement but instead pointed out that Impossible Foods neglected to "introduc[e] evidence as to each of those claims and defenses' *substantive elements*," explaining that, "[f]or example, Impossible Foods adduced *no evidence* in support of its abandonment defense that Mr. Runyon intended to permanently cease marketing nutrition and recipe products and services under the IMPOSSIBLE marks." Fees Order at 13 (emphasis added).[5]

If anything, Impossible Foods's briefing on this issue only confirms the exceptional manner in which it has litigated this case. Impossible Foods has submitted an eleven-page "appendix" cataloguing evidence "identified by the Court as purportedly unsupported." ECF

---

[5] Impossible Foods does not dispute that it failed to adduce evidence of intent to abandon, instead pointing out the "statutory presumption [of abandonment] arising from three years of non-use." Mot. at 21. That of course does not explain why Impossible Foods neglected to provide such evidence after Mr. Runyon testified that he did not intend to abandon the marks and, on the contrary, only paused such offerings due to the onset of the COVID pandemic. *See* Tr. at 157:8–11. In any case, the Court's finding did not depend on this illustrative example.

No. 498-1. Impossible Foods did not make these arguments in opposing Impossible LLC's request for attorneys' fees for the first time, instead timidly arguing as follows:

> [Impossible Foods]'s affirmative infringement claim was not frivolous. [Impossible LLC]'s own survey found a statistically significant likelihood of confusion between [Impossible Foods]'s plant-based meat and ILLC's nutritional supplements. Trial Exs. 1401–1406; Tr. at 991:1–992:2; 995:15–25; 996:7–16. The evidence also showed overlapping marketing channels, including Amazon and social media, (Tr. at 294:19–24; 618:19–24), and a plausible likelihood of expansion, as companies in the plant-based space have entered supplements and [Impossible Foods] itself had considered doing so. Tr. Ex. 1161; Tr. at 929:25–930:7; Tr. at 420:2–17. At a minimum, these facts made the claim debatable, not frivolous. *See Applied Info. Scis. Corp. v. eBAY, Inc.*, 511 F.3d 966, 973 (9th Cir. 2007) (case not frivolous where issues are "debatable").

ECF No. 480 at 10–11. In any case, Impossible Foods's argument that it presented evidence as to the some of the *Sleekcraft* factors and Impossible LLC's non-use of its marks in no way alters the Court's conclusion that Impossible Foods made an exceptionally poor showing at trial. To the extent that Impossible Foods suggests that its evidentiary presentation was not exceptionally weak because it stumbled into favorable survey evidence from Dr. Palmatier at trial, *see* Mot. at 21, the Court disagrees. That survey evidence was limited to supplements and did not include apparel or cookbooks. Tr. at 999:11–1000:12.

Impossible Foods's second argument is similarly unavailing. Impossible Foods argues that the Court mistakenly determined that "Mr. Runyon '*spent* more than $6 million during the prosecution of this case'" when he instead "stated that he 'incurred more than six million dollars in attorney's fees and expenses.'" Mot. at 22 (alterations in original) (first quoting Fees Order at 14, then quoting ECF No. 476-1 ¶ 7); *see also id.* at 22–23 ("After [Impossible Foods] highlighted the ambiguity, Mr. Runyon clarified only that he had paid 'multiple millions of dollars in legal fees and expenses'—but he did not claim to have paid $6 million." (citing ECF No. 481-1 ¶ 4)). Even with that correction, the Court accords some weight to the need for compensation in this case, especially considering the portion of this order vacating the punitive damages award. That Mr. Runyon apparently did not impoverish himself to Impossible Foods's satisfaction does not change the Court's conclusion that considerations of fairness and compensation modestly favor attorneys' fees in this case.

Neither of the grounds presented in Impossible Foods's motion changes the Court's conclusion that this case was exceptional, a finding that the Court made after carefully considering the totality of circumstances in this case.  Impossible Foods's motion for alteration of the judgment as to attorneys' fees is accordingly DENIED.  Impossible LLC may file a declaration regarding the amount of attorneys' fees within fourteen days.

## IV.  ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

(1) Impossible Foods's motion for judgment as a matter of law is DENIED.

(2) Impossible Foods's motion for a new trial is GRANTED as to punitive damages and DENIED as to infringement and corrective advertising damages.

(3) Impossible Foods's motion for alteration of the Court's exceptional case determination is DENIED.

(4) The jury's punitive damages award is VACATED.

(5) Within fourteen days of the date of this order, Impossible LLC SHALL file a motion for fees and accompanying declaration in accordance with the Court's Standing Order.

(6) This order terminates ECF No. 498.

Dated:  July 29, 2026

_____
BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California

40